**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division (Greenbelt)**

BETHESDA SOFTWORKS LLC,

               Plaintiff/Counter-Defendant,

v.                                      Civil No. 09 CV 2357 (DKC)

INTERPLAY ENTERTAINMENT CORP.,

               Defendant/Counter-Plaintiff.

## <u>BETHESDA SOFTWORKS LLC'S</u>
## <u>PRETRIAL MEMORANDUM</u>

Howard H. Stahl, Bar # 24741
Joseph J. LoBue, Bar # 17393
**FRIED, FRANK, HARRIS, SHRIVER &**
**JACOBSON LLP**
801 17th Street, NW
Washington, DC 20006
Telephone:    202-639-7000
Facsimile:    202-639-7003
howard.stahl@friedfrank.com
joseph.lobue@friedfrank.com

*Counsel for Plaintiff/Counter-Defendant, Bethesda*
*Softworks LLC*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................ ii

**INDEX OF EXHIBITS** ....................................................................................................iii

**I.    BETHESDA'S CLAIMS FOR DIRECT AND CONTRIBUTORY COPYRIGHT INFRINGEMENT (COUNT II OF THE FIRST AMENDED COMPLAINT)** .............1

    **A.    Evidence Establishing Bethesda's Ownership of the Copyrights** ....................2

    **B.    Evidence Establishing Validity of the Copyrights** .............................................3

    **C.    Evidence Establishing Interplay's Copyright Infringement** .............................3

**II.   BETHESDA'S CLAIM FOR TRADEMARK INFRINGMENT (COUNT V OF THE FIRST AMENDED COMPLAINT)** ..........................................................5

    **A.    Evidence Establishing Bethesda's Ownership of the Trademarks** .................5

    **B.    Evidence Establishing That the Trademarks Are Valid** ...................................6

    **C.    Evidence Establishing Interplay's Trademark Infringement**...........................6

**III.  BETHESDA'S CLAIM FOR BREACH OF THE APA (COUNT X OF THE FIRST AMENDED COMPLAINT)** .......................................................................7

**IV.   INTERPLAY HAS NO LICENSE TO USE THE FALLOUT TRADEMARKS OR COPYRIGHTS (COUNT I OF THE FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT)**.........................................................................7

    **A.    License Is an Affirmative Defense Upon Which Interplay Bears the Burden of Proof Including the Burden of Persuasion** ......................................7

    **B.    Evidence Establishing That Interplay Failed to Satisfy the "Minimum Financing" Requirement of Section 2.3 of the TLA** .........................................8

    **C.    Evidence Establishing That Interplay Failed to Satisfy the "Full-Scale Development" Requirement of Section 2.3 of the TLA** ...................................16

    **D.    Interplay Has No License to Use the Fallout Copyrights** .................................19

    **E.    Interplay Has No Defense to Bethesda's Contributory Infringement Claim** ...............................................................................................................22

**V.    INTERPLAY'S "MEETING OF THE MINDS" DEFENSE LACKS MERIT** ...........23

**VI.   BETHESDA'S REQUESTED RELIEF** .......................................................................25

i

# TABLE OF AUTHORITIES

## Cases

*Advance Magazine Publishers Inc. v. Leach*, 466 F. Supp.2d 628 (D. Md. 2006) ........................1

*All Pro Maids, Inc. v. Layton*, Civ. A. 058-N, 2004 WL 1878784 (Del. Ch. Aug. 10, 2004) ......24

*American Homepatient, Inc. v. Collier*, No. Civ. A. 274-N, 2006 WL 1134170
    (Del. Ch. Apr. 19, 2006) ...................................................................................................24

*Compliance Source, Inc. v. Greenpoint Mortgage Funding, Inc.*,
    624 F.3d 252 (5th Cir. 2010) ...........................................................................................22

*Costar Group, Inc. v. Loopnet, Inc.*, 373 F.3d 544 (4th Cir. 2004) ............................................1, 2

*Indus. Am., Inc. v. Fulton Indus., Inc.*, 285 A.2d 412 (Del. 1971) ..............................................23

*John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26 (1st Cir. 2003) .............8

*Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922 (4th Cir. 1995) ..............5

*Nelson-Salabas, Inc. v. Morningside Development, LLC*, 284 F.3d 505 (4th Cir. 2002) ..............8

*Osborn v. Kemp*, 991 A.2d 1153 (Del. 2010) ...............................................................................24

*People for the Ethical Treatment of Animals (PETA) v. Doughney*,
    263 F.3d 359 (4th Cir. 2001) .............................................................................................5

*Ramone v. Lang*, No. 1592-N, 2006 WL 4762877 (Del. Ch. Apr. 3, 2006) ................................23

*Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192 (Del. 1992) .....23

*S.E.C. v. Pirate Investor LLC*, 580 F.3d 233 (4th Cir. 2009) .......................................................11

*Service & Training, Inc. v. Data General Corp.*, 963 F.2d 680 (4th Cir. 1992) ............................1

*Softech Worldwide, LLC v. Internet Technology Broadcasting Corp.*,
    761 F. Supp.2d 367 (E.D. Va. 2011) .................................................................................8

*Standard Distrib. Co. v. NKS Distribs., Inc.*, No. 92C-05-036-WTQ, 1996 WL 944898
    (Del. Super. Ct. Jan. 3, 1996)...........................................................................................24

## Miscellaneous

1 WILLISTON ON CONTRACTS § 3:2 n.1 (4th ed. 2007) ............................................................. 23

## INDEX OF EXHIBITS

Asset Purchase Agreement between Bethesda Softworks LLC and
Interplay Entertainment Corp. dated April 4, 2007 ......................................................... Exhibit 1

Trademark License Agreement between Bethesda Softworks LLC and
Interplay Entertainment Corp. dated April 4, 2007 ......................................................... Exhibit 2

Copyright Assignment between Bethesda Softworks LLC and
Interplay Entertainment Corp. dated April 9, 2007 ......................................................... Exhibit 3

Trademark Assignment between Bethesda Softworks LLC and
Interplay Entertainment Corp. dated April 9, 2007 ......................................................... Exhibit 4

United States Copyright Office Certificate of Registration,
Registration Number VA 1-624-742 .................................................................................. Exhibit 5

United States Copyright Office Certificate of Registration,
Registration Number TX 6-812-430 .................................................................................. Exhibit 6

United States Copyright Office Certificate of Registration,
Registration Number VA 1-621-865 .................................................................................. Exhibit 7

United States Copyright Office Certificate of Registration,
Registration Number VA 1-621-867 .................................................................................. Exhibit 8

United States Copyright Office Certificate of Registration,
Registration Number VA 1-621-874 .................................................................................. Exhibit 9

United States Copyright Office Certificate of Registration,
Registration Number VA 1-621-850 ................................................................................ Exhibit 10

United States Copyright Office Certificate of Registration,
Registration Number VA 1-621-849 ................................................................................ Exhibit 11

United States Copyright Office Certificate of Registration,
Registration Number PA 886-144 .................................................................................... Exhibit 12

United States Copyright Office Certificate of Registration,
Registration Number PA 931-744 .................................................................................... Exhibit 13

United States Copyright Office Certificate of Registration,
Registration Number PA 1-617-151 ................................................................................ Exhibit 14

United States Copyright Office Certificate of Registration,
Registration Number PA 1-617-142 ................................................................................ Exhibit 15

United States Copyright Office Certificate of Registration,
Registration Number PA 1-617-156 ................................................................. Exhibit 16

United States Copyright Office Certificate of Registration,
Registration Number VA 1-419-472 ................................................................. Exhibit 17

United States Patent and Trademark Office, Trademark
Registration No. 2,181,084 ............................................................................ Exhibit 18

United States Patent and Trademark Office, Trademark
Registration No. 3,583,756 ............................................................................ Exhibit 19

United States Patent and Trademark Office, Trademark
Registration No. 3,628,689 ............................................................................ Exhibit 20

United States Patent and Trademark Office, Trademark
Registration No. 3,617,444 ............................................................................ Exhibit 21

United States Patent and Trademark Office, Notice of Recordation
of Assignment No. 90074035A ....................................................................... Exhibit 22

Excerpts from the Form 10-K Annual Report of Interplay
Entertainment Corp. for the Fiscal Year Ended December 31, 2007 ............................ Exhibit 23

Excerpts from the Form 10-Q Quarterly Report of Interplay
Entertainment Corp. for the Quarterly Period Ended March 31, 2008 ........................... Exhibit 24

Excerpts from the Form 10-K Annual Report of Interplay
Entertainment Corp. for the Fiscal Year Ended December 31, 2008 ............................ Exhibit 25

Excerpts from the Form 10-Q Quarterly Report of Interplay
Entertainment Corp. for the Quarterly Period Ended March 31, 2009 ........................... Exhibit 26

Excerpts from the Form 10-Q Quarterly Report of Interplay
Entertainment Corp. for the Quarterly Period Ended June 30, 2009 ............................ Exhibit 27

Excerpts from the Form 10-Q Quarterly Report of Interplay
Entertainment Corp. for the Quarterly Period Ended September 30, 2009 .................... Exhibit 28

Excerpts from the Form 10-K Annual Report of Interplay
Entertainment Corp. for the Fiscal Year Ended December 31, 2009 ............................ Exhibit 29

Excerpts from the Form 10-K Annual Report of Interplay
Entertainment Corp. for the Fiscal Year Ended December 31, 2010 ............................ Exhibit 30

Excerpts from the Form 10-Q Quarterly Report of Interplay Entertainment
Corp. for the Quarterly Period Ended March 31, 2011.................................................... Exhibit 31

Supplemental Responses of Interplay Entertainment Corp. to Bethesda
Softworks First Set of Interrogatories dated February 8, 2011...................................... Exhibit 32

Excerpts from the Transcript of Telephonic Hearing on September 23, 2009,
*Bethesda Softworks LLC v. Interplay Entertainment Corp.*, No. 09-CV-2357-DKC...... Exhibit 33

Excerpts from the Transcript of Motions Hearing on December 10, 2009,
*Bethesda Softworks LLC v. Interplay Entertainment Corp.*, No. 09-CV-2357-DKC...... Exhibit 34

Excerpts from the Transcript of August 4, 2011 Preliminary Injunction Hearing,
*Bethesda Softworks LLC v. Interplay Entertainment Corp.*, No. 09-CV-2357-DKC...... Exhibit 35

Game Production Agreement between Interactive Game Group and
Interplay Entertainment Corp. ........................................................................................ Exhibit 36

Excerpts from the Transcript of the Deposition of Frederic Chesnais
dated June 11, 2010......................................................................................................... Exhibit 37

Document identified as Letter of Intent between Interplay
Entertainment Corp. and Masthead Studios dated March 20, 2009 ............................... Exhibit 38

Excerpts from the Transcript of the Deposition of Herve Caen dated
October 8, 2010............................................................................................................... Exhibit 39

Pursuant to Rule 105.7 of the Local Rules of the United States District Court for the District of Maryland, Plaintiff/Counter-Defendant Bethesda Softworks LLC ("Bethesda") respectfully submits this Pretrial Memorandum.[1]

## I.     BETHESDA'S CLAIMS FOR DIRECT AND CONTRIBUTORY COPYRIGHT INFRINGEMENT (COUNT II OF THE FIRST AMENDED COMPLAINT)

Bethesda will pursue at trial its claims for direct and contributory copyright infringement against Interplay in Count II of the First Amended Complaint for Declaratory Judgment and Other Relief (the "First Amended Complaint") for the period subsequent to April 4, 2009.

The Copyright Act grants the copyright owner the exclusive right to reproduce his copyrighted works, to prepare derivatives of those works, and to display those works publicly. *Advance Magazine Publishers Inc. v. Leach*, 466 F. Supp.2d 628, 634 (D. Md. 2006). "[A]nyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright."   *Id.* (internal quotations omitted).   To establish a claim of direct copyright infringement, the plaintiff must prove two elements: (1) ownership of a valid copyright; and (2) copying of protected elements of the copyrighted work by the defendant.   *Costar Group, Inc. v. Loopnet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004).   An admission by a party of copying the works establishes a violation of the copyright owner's exclusive right to reproduce the works.   *See Service & Training, Inc. v. Data General Corp.*, 963 F.2d 680, 689 (4th Cir. 1992) ("Appellants admit that they copied MV/ADEX extensively. . . .   They thereby violated Data General's exclusive right as copyright owner 'to reproduce the copyrighted work'").

---

[1]      Bethesda may present additional evidence at trial not specifically referred to in this Pretrial Memorandum as the need arises during the course of trial.

To establish a claim of contributory infringement, a plaintiff must show that the defendant "with knowledge of the infringing activity, induce[d], cause[d] or materially contribute[d] to the infringing conduct of another."  *Costar Group, Inc.*, 373 F.3d at 550.

A.    **Evidence Establishing Bethesda's Ownership of the Copyrights**

Bethesda's ownership of the Fallout copyrights has not been contested in this case. Evidence establishing Bethesda's ownership of the copyrights includes, but is not limited to:

(1)    On April 4, 2007, Bethesda and Defendant/Counter-Plaintiff Interplay Entertainment Corporation ("Interplay") entered into the Asset Purchase Agreement (the "APA") (Ex. 1).  Sections 2.1, 3.9 and Exhibit A of the APA provide that Bethesda acquired "all of [Interplay's] right, title and interest" in and to "any and all Intellectual Property in or relating or connected in any way with (and to all future uses of every kind) the brand and interactive entertainment software game property known as 'Fallout,'" including specifically "all copyrights, copyright registrations and copyright applications, copyrightable works, and all other corresponding rights".  (Ex. 1, APA, §§ 2.1, 3.9, Exhibit A.)

(2)    In connection with and as part of the APA, Interplay also executed a separate Copyright Assignment in favor of Bethesda.  (Ex. 3.)   In the Copyright Assignment, Interplay "irrevocably assign[ed], transfer[red] and convey[ed]" to Bethesda "all of its rights, titles and interests in and to the Works" related to Fallout "including, without limitation, all copyrights in and to the Works whether registered or unregistered, together with all now or hereafter existing rights of every kind and character whatsoever throughout the world pertaining to the Works, in all media now in existence or to be developed hereafter, in perpetuity." (Ex. 3, Copyright Assignment § 1.)

(3)    Section 5.9 of the APA provides that Interplay retained no ownership rights whatsoever in the transferred intellectual property, including the copyrighted works: "Nothing contained in this Agreement shall be construed as providing the [Interplay] with any retained right, title or other interest of any kind in or to any of the Acquired Assets. [Interplay] recognizes and acknowledges that the Purchased Intellectual Property and all rights therein and all goodwill pertaining thereto solely and exclusively belong to [Bethesda] effective automatically upon the Closing and that all uses of the Purchased Intellectual Property shall inure to the benefit of [Bethesda]." (Ex. 1, APA § 5.9.)

B.     **Evidence Establishing Validity of the Copyrights**

The validity of the copyrights has not been contested in this case.  Evidence establishing

the validity of the copyrights includes, but is not limited to:

(1)     Interplay expressly represented and warranted in Section 3.12 of the APA that "[a]ll registered copyrights, trademarks, and service marks (and all applications relating to any of the foregoing) included in the Fallout Intellectual Property are subsisting and valid under applicable law for those respective categories of Intellectual Property.  There are no facts or circumstances that would render any of the Purchased Intellectual Property invalid or unenforceable . . . ."  (Ex. 1, APA § 3.12.)

(2)     The following United States Copyright Office Certificates of Registration: United States Copyright Office Certificate of Registration, Registration Number VA 1-624-742 (Ex. 5); United States Copyright Office Certificate of Registration, Registration Number TX 6-812-430 (Ex. 6); United States Copyright Office Certificate of Registration, Registration Number VA 1-621-865  (Ex. 7); United States Copyright Office Certificate of Registration, Registration Number VA 1-621-867 (Ex. 8);  United States Copyright Office Certificate of Registration, Registration Number VA 1-621-874 (Ex. 9); United States Copyright Office Certificate of Registration, Registration Number VA 1-621-850 (Ex. 10); United States Copyright Office Certificate of Registration, Registration Number VA 1-621-849 (Ex. 11); United States Copyright Office Certificate of Registration, Registration Number PA 886-144 (Ex. 12); United States Copyright Office Certificate of Registration, Registration Number PA 931-744 (Ex. 13); United States Copyright Office Certificate of Registration, Registration Number PA 1-617-151 (Ex. 14); United States Copyright Office Certificate of Registration, Registration Number PA 1-617-142 (Ex. 15); United States Copyright Office Certificate of Registration, Registration Number PA 1-617-156 (Ex. 16); United States Copyright Office Certificate of Registration, Registration Number VA 1-419-472 (Ex. 17).

C.     **Evidence Establishing Interplay's Copyright Infringement**

Interplay's use of, and intent to continue to use, Bethesda's copyrighted Fallout works in

its MMOG has not been contested in this case.  Evidence establishing Interplay's direct

infringement of Bethesda's copyrights includes, but is not limited to:

(1)     Interplay has admitted in its sworn responses to interrogatories that it is using Bethesda's copyrighted works in developing its MMOG: "By and through its employees, officers and managing agents Plaintiff possessed both actual and constructive knowledge of Interplay's development efforts with respect to the

Fallout-branded MMOG, including knowledge that the content thereof was derived from and contained elements of the Fallout universe, (originally created by Interplay) including copyrighted or copyrightable content related to characters, backstory, etc." (Ex. 32 at 7); *see also* (Transcript of August 4, 2011 Preliminary Injunction Hearing at 76) (THE COURT: "there is no doubt that [Bethesda] owns the copyrights, and I believe there is no doubt that, well, that Interplay concedes that in some fashion it's using them in the development of the Fallout MMOG . . .") (Ex. 35).

(2)     Interplay has admitted in its SEC filings its intent to continue to use the copyrighted elements of the Fallout series in its Fallout MMOG.  (Form 10-K Annual Report of Interplay Entertainment Corp. for the Fiscal Year Ended December 31, 2010 filed with the United States Securities and Exchange Commission on May 24, 2011, at 4) (Ex. 30 at p. F-21.)

(3)     As will be established at trial, documents produced by Interplay reproduce numerous elements of Bethesda's copyrighted works including, but not limited to, Bethesda's copyrighted Vault Boy character.

(4)     As will be established at trial, the content of Interplay's "Fallout Online" website reproduces and publicly displays numerous elements of Bethesda's copyrighted works including, but not limited to, Bethesda's copyrighted "Vault Boy" character and weapons art such as "Brother of Steel Power Armor."  The flash animation opening sequence with the "Please Stand By" test pattern is copied from the opening scene of Bethesda's Fallout 3 game.  The carvings on the desk of "The Master Lives" and "♥Harold" depicted in the animation are references to "The Master" and "Harold," characters from the backstory of the previous Fallout games.

Interplay also has induced, caused or materially contributed to the infringing conduct of a third party, Masthead Studios.   Evidence establishing Interplay's contributory infringement includes, but is not limited to:

(1)     As will be established at trial, and as admitted by Interplay in its responses to interrogatories, Interplay caused and induced Masthead Studio's to make reproductions and derivative works based on Interplay's infringing design.  (Ex. 32 at 5) ("Interplay also had (i) created substantial concept art related to the Fallout Online project; (ii) entered into a binding LOI with Masthead Studios in Bulgaria that provided development services . . . and (iii) Masthead Studios use Interplay's design documents, including the Fallout Wiki and concept art, in conjunction with its game engine and tool set to create a proof of concept demo").

(2)     Interplay's CEO, Herve Caen, has testified in this case that Masthead Studios purportedly has performed work using the design provided by Interplay.

(Transcript of Motions Hearing on December 10, 2009, *Bethesda Softworks LLC v. Interplay Entertainment Corp.*, No. 09-CV-2357-DKC, at 159:13-14) ("Caen Hearing Testimony") (Ex. 34).

## II.   BETHESDA'S CLAIM FOR TRADEMARK INFRINGMENT (COUNT V OF THE FIRST AMENDED COMPLAINT)

Bethesda will pursue at trial its claim for trademark infringement against Interplay in Count V of the First Amended Complaint for the period subsequent to April 4, 2009.

To establish trademark infringement, a plaintiff must prove: (1) that it owns a valid trademark; (2) that the defendant used the mark or a colorable imitation thereof; (3) that the use occurred in commerce in connection with the sale, offering for sale, distribution or advertising of goods or services; and (4) that the defendant used the mark in a manner likely to cause confusion. *People for the Ethical Treatment of Animals (PETA) v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001); *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 930 (4th Cir. 1995).   In applying this test, the trademark owner need not demonstrate actual confusion.  *Id*. at 933.  Unauthorized use of a trademark infringes the trademark owner's rights if it is likely to confuse an ordinary consumer.  *Id*.  Unauthorized use of another's trademark on a website may constitute trademark infringement even if no goods or services are sold or advertised on the website.  *PETA*, 263 F.3d at 365.  This is because the unauthorized use of the trademark on the offending website can hinder consumers from accessing the trademark owner's goods and services.  *Id.* at 365-66.

### A.   Evidence Establishing Bethesda's Ownership of the Trademarks

Bethesda's ownership of the Fallout trademarks has not been contested in this case. Evidence establishing Bethesda's ownership of the trademarks includes, but is not limited to:

(1)   Sections 2.1, 3.9, 5.9 and Exhibit A of the APA, which provide that Bethesda acquired "all of [Interplay's] "right, title and interest" in and to "any and all Intellectual Property in or relating or connected in any way with (and to all future

uses of every kind) the brand and interactive entertainment software game property known as 'Fallout,'" including specifically trademarks, and that Interplay retained no ownership rights whatsoever in such trademarks. (Ex. 1, APA, §§ 2.1, 3.9, 5.9, Exhibit A.)

(2)     In connection with and as part of the APA, Interplay also executed a separate Trademark Assignment in favor of Bethesda in which Interplay "assign[ed], transfer[red] and convey[ed]" to Bethesda "all right, title and interest of [Interplay] in and to the Marks together with the goodwill of the business symbolized by the Marks . . . ." (Ex. 4, Trademark Assignment § 1.)

**B.     Evidence Establishing That the Trademarks Are Valid**

The validity of the trademarks has not been contested in this case. Evidence establishing

validity of the trademarks includes, but is not limited to:

(1)     Interplay expressly represented and warranted in Section 3.12 of the APA that "[a]ll registered copyrights, trademarks, and service marks (and all applications relating to any of the foregoing) included in the Fallout Intellectual Property are subsisting and valid under applicable law for those respective categories of Intellectual Property. There are no facts or circumstances that would render any of the Purchased Intellectual Property invalid or unenforceable . . . ." (Ex. 1, APA § 3.12.)

(2)     The following United States Patent and Trademark Office registrations and notices: United States Patent and Trademark Office, Trademark Registration No. 2,181,084 (Ex. 18); United States Patent and Trademark Office, Trademark Registration No. 3,583,756 (Ex. 19); United States Patent and Trademark Office, Trademark Registration No. 3,628,689 (Ex. 20); United States Patent and Trademark Office, Trademark Registration No. 3,617,444 (Ex. 21); United States Patent and Trademark Office, Notice of Recordation of Assignment No. 90074035A (Ex. 22).

**C.     Evidence Establishing Interplay's Trademark Infringement**

Evidence establishing Interplay's infringement of Bethesda's trademarks includes, but is

not limited to:

(1)     As will be established at trial, the content of Interplay's Fallout Online website at www.fallout-on-line.com uses and displays Bethesda's "Fallout" trademark both in its domain name and in its website content. Interplay's Fallout Online website also uses and displays Interplay's Vault Boy design mark. The use of "Fallout" and the Vault Boy character by Interplay on the website are more than colorable imitations of Bethesda's trademarks, they are substantially identical.

(2)     The purpose of Interplay's Fallout Online website is to promote and advertise Interplay's purported Fallout Online game and to register consumers to participate in purported beta testing of the game and to receive directly via e-mail additional advertising materials about the game.  The website also falsely states that it is using the Fallout trademark under license from Bethesda.  Interplay's use of Fallout and the Vault Boy trademarks in these circumstances is likely to cause confusion among consumers about the source of the Fallout Online game and infringes Bethesda's trademarks.

## III.   BETHESDA'S CLAIM FOR BREACH OF THE APA (COUNT X OF THE FIRST AMENDED COMPLAINT)

Section 2.5 of the APA provides that: "At the Closing [Interplay] will deliver to [Bethesda] (in addition to a duly executed copy of this Agreement, together with all final exhibits, annexes, and schedules hereto) the following . . . (g) *all tangible embodiments* of the Purchased Intellectual Property, including without limitation, the Software and Documentation included in the Purchased Intellectual Property . . ."  (Ex. 1, APA § 2.5) (emphasis added). Interplay breached Section 2.5 by failing to deliver to Bethesda all tangible embodiments of the Fallout copyrighted works.  As will be shown at trial, evidence establishing Interplay's breach of contract includes, but is not limited to, purported design documents produced by Interplay in this case.

## IV.   INTERPLAY HAS NO LICENSE TO USE THE FALLOUT TRADEMARKS OR COPYRIGHTS (COUNT I OF THE FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT)

### A.   License Is an Affirmative Defense Upon Which Interplay Bears the Burden of Proof Including the Burden of Persuasion

Interplay contends that it possesses a license to use Bethesda's Fallout trademark and copyrights under the Trademark License Agreement ("TLA") entered into by the parties on April 4, 2009 in connection with, and as part of, the APA.  License is an affirmative defense and the burden of proving the existence of a license is on the party invoking the purported license.

*Nelson-Salabas, Inc. v. Morningside Development, LLC*, 284 F.3d 505, 514 (4th Cir. 2002); *Softech Worldwide, LLC v. Internet Technology Broadcasting Corp.*, 761 F. Supp.2d 367, 375 (E.D. Va. 2011); *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 40 (1st Cir. 2003). On this issue, Bethesda incorporates by reference the points and authorities set forth in the Memorandum in Support of Bethesda Softworks LLC's Motion in Limine filed on November 4, 201, the Reply Memorandum in Support of Bethesda Softworks LLC's Motion in Limine filed on November 28, 2011 and the Court's December 5, 2011 order regarding the allocation of the burden of proof in this case.

The license granted to Interplay under the Trademark License Agreement existed only through April 4, 2009. At that point, "[t]o retain its license rights under th[e] Agreement," Interplay had to have commenced "full-scale development" and secured "Minimum Financing" as set forth in Section 2.3 of the TLA as follows:

> MMOG Development. *To retain its license rights under this Agreement*, Interplay agrees that (i) full-scale development of its FALLOUT MMOG will commence within twenty four (24) months of the Effective Date of this Agreement (such commencement date defined herein as the "MMOG Development Commencement Date") and (ii) by the MMOG Development Commencement Date, Interplay will have secured financing for the FALLOUT MMOG in an amount no less than US$30,000,000.00 ("Minimum Financing").

(Ex. 2, TLA § 2.3) (emphasis added). Interplay failed to satisfy each of these requirements. Interplay's license rights under the TLA expired on April 4, 2009.

**B.    Evidence Establishing That Interplay Failed to Satisfy the "Minimum Financing" Requirement of Section 2.3 of the TLA**

Interplay failed to establish the "Minimum Financing" requirement of Section 2.3 by April 4, 2009 as required by the TLA. The phrase to "secure financing" is not ambiguous. It means to obtain financing or a binding commitment for financing. Evidence establishing that

Interplay failed to "secure[] financing for the FALLOUT MMOG in an amount no less than US$30,000,000.00" by April 4, 2009 includes, but is not limited to:

(1)    As of December 31, 2007, Interplay's cash balance was approximately $1.1 million and its working capital deficit was approximately $2.3 million. (Form 10-K Annual Report of Interplay Entertainment Corp. for the Fiscal Year Ended December 31, 2007 filed with the United States Securities and Exchange Commission on April 3, 2008, at 8) ("Interplay's 2007 10-K") (Ex. 23).

(2)    As of March 2008, Interplay's cash balance was approximately $320,000 and its working capital deficit was approximately $2.7 million. (Form 10-Q Quarterly Report of Interplay Entertainment Corp. for the Quarterly Period Ended March 31, 2008 filed with the United States Securities and Exchange Commission on May 15, 2008, at 12) ("Interplay's 1st Qtr. 2008 10-Q") (Ex. 24).

(3)    As of December 31, 2008, Interplay's cash balance was approximately $0 and its working capital deficit was approximately $2.4 million.  (Joint Pretrial Order  at 11)  (Stipulated Fact No. 11).

(4)    As of March 2009, Interplay's cash balance was approximately $124,000 and its working capital deficit was approximately $2.2 million. (Form 10-Q Quarterly Report of Interplay Entertainment Corp. for the Quarterly Period Ended March 31, 2009 filed with the United States Securities and Exchange Commission on May 20, 2009, at 12) ("Interplay's 1st Qtr. 2009 10-Q") (Ex. 26).

(5)    As of June 2009, Interplay's cash balance was approximately $16,000 and its working capital deficit was approximately $2.5 million. (Form 10-Q Quarterly Report of Interplay Entertainment Corp. for the Quarterly Period Ended June 30, 2009 filed with the United States Securities and Exchange Commission on August 18, 2009, at 14) ("Interplay's 2nd Qtr. 2009 10-Q") (Ex. 27).

(6)    As of September 2009, Interplay's cash balance was approximately $49,000 and its working capital deficit was approximately $2.5 million. (Form 10-Q Quarterly Report of Interplay Entertainment Corp. for the Quarterly Period Ended September 30, 2009 filed with the United States Securities and Exchange Commission on November 20, 2009, at 17) ("Interplay's 3rd Qtr. 2009 10-Q") (Ex. 28).

(7)    As of December 31, 2009, Interplay's cash balance was approximately $1,000 and its working capital deficit was approximately $2.8 million.  (Joint Pretrial Order at 11)  (Stipulated Fact No. 12).

(8)    As of December 31, 2010, Interplay's cash balance was approximately $3,000 million and its working capital deficit was approximately $2.9 million.  (Ex. 30, Interplay's 2010 10-K at 4.)

(9)     As of March 31, 2011, Interplay's cash balance was approximately $4,000 and its working capital deficit was approximately $3.2 million. (Form 10-Q Quarterly Report of Interplay Entertainment Corp. for the Quarterly Period Ended March 31, 2011 filed with the United States Securities and Exchange Commission on June 17, 2011 at 13) ("Interplay's 1st Qtr. 2011 10-Q") (Ex. 31).

(10)    Interplay did not state at any time in any filing with the United States Securities and Exchange Commission that it had obtained $30 million in financing for the Fallout MMOG.  (Joint Pretrial Order  at 11) (Stipulated Fact No. 13).

(11)    Interplay did not state at any time in any filing with the United States Securities and Exchange Commission that it had obtained $30 million in financing for any game development.  (Joint Pretrial Order  at 11) (Stipulated Fact No. 14).

(12)    As of December 31, 2007, Interplay had no credit agreement, credit facility or line of credit.  (Interplay's 2007 10-K at 9) (Ex. 23).

(13)    As of April 2008, Interplay had no credit agreement, credit facility or line of credit.   (Joint Pretrial Order  at 11) (Stipulated Fact No. 10).

(14)    As of April 2009, Interplay had no credit agreement, credit facility or line of credit and included the following warning in its filings with the SEC: "WE CURRENTLY HAVE SOME OBLIGATIONS THAT WE ARE UNABLE TO MEET WITHOUT GENERATING ADDITIONAL INCOME OR RAISING ADDITIONAL CAPITAL.   IF WE CANNOT GENERATE ADDITIONAL INCOME OR RAISE ADDITIONAL CAPITAL IN THE NEAR FUTURE, WE MAY BECOME INSOLVENT AND/OR BE MADE BANKRUPT AND/OR MAY BECOME ILLIQUID OR WORTHLESS." (Form 10-K Annual Report of Interplay Entertainment Corp. for the Fiscal Year Ended December 31, 2008 filed with the United States Securities and Exchange Commission on April 15, 2009, at 7, ) (Ex. 25); (*see also* Ex. 26, Interplay's 1st Qtr. 2009 10-Q at 14).

(15)    As of April 2010, Interplay had no credit agreement, credit facility or line of credit.  (Form 10-K Annual Report of Interplay Entertainment Corp. for the Fiscal Year Ended December 31, 2009 filed with the United States Securities and Exchange Commission on April 15, 2010, at 7) (Ex. 29).

(16)    As of March/April 2011, Interplay had no credit agreement, credit facility or line of credit.  (Ex. 30, Interplay's 2010 10-K at 5); (Ex. 31, Interplay's 1st Qtr. 2011 10-Q at 15).

The evidence identified above establishes that Interplay failed to "secure[] financing for

the FALLOUT MMOG in an amount no less than US$30,000,000.00" as required by Section 2.3

of the TLA.  For a company with virtually no cash balance and with a working capital deficit consistently around $2-3 million, having secured $30 million in financing would be a material fact that would have been disclosed in its SEC filings.  *S.E.C. v. Pirate Investor LLC*, 580 F.3d 233, 240 (4th Cir. 2009) (holding that a fact is material for SEC disclosure purposes if the fact would significantly alter the total mix of information available about the company).

Interplay contends in its responses to interrogatories that it satisfied the "Minimum Financing" requirements of Section 2.3 of the TLA through a purported development agreement with Masthead Studios and a purported game production agreement ("Game Production Agreement") with an entity called Interactive Game Group ("I2G"):

> Interplay satisfied its obligations under Section 2.3 of the TLA through a funding agreement with Interactive Game Group that provided up to $15 million and through a binding letter of intent for development services and subsequent agreement with Masthead Studios that provided approximately $20 million in development services and technology licenses.

(Ex. 32 at 4.)

Evidence rebutting Interplay's contention that it had secured $15 million in financing by April 4, 2009 through the purported Game Production Agreement with I2G, includes, but is not limited to:

(1)    The owner, founder and sole employee of I2G, Frederic Chesnais, has testified that the Game Production Agreement between Interplay Entertainment Corp. and I2G is not a binding agreement to provide financing to Interplay for the Fallout MMOG.  (Transcript of Deposition of Frederic Chesnais dated June 11, 2010, at 105:22-106:13) ("Chesnais Depo.") (Ex. 37.)

(2)    Mr. Chesnais has testified that there is no binding agreement between Interplay and I2G to provide financing to Interplay for the Fallout MMOG.  (Ex. 37, Chesnais Depo. at 105:22-106:13.)

(3)    Mr. Chesnais has testified that, as of April 4, 2009, the deadline for securing "Minimum Financing" pursuant to Section 2.3 of the TLA, there was no financing available from I2G for the Fallout MMOG. (Ex. 37, Chesnais Depo. at 116:9-15.)

11

(4)     Mr. Chesnais has testified that as of June 11, 2010 I2G had financed only one game for Interplay called "Rat Race."  (Ex. 37, Chesnais Depo. at 64:17-65:8.)

(5)     Mr. Chesnais has testified that I2G did not guarantee that it would provide funding to Interplay under the Game Production Agreement for any particular game.  (Ex. 37, Chesnais Depo. at 67:19-68:1.)

(6)     The purported Game Production Agreement is set forth in Exhibit 36.  All of the conditions contained in paragraph 1.3 of the Game Production Agreement had to be satisfied or waived for Interplay to qualify for any financing from I2G for the Fallout MMOG.  (Joint Pretrial Order at 11) (Stipulated Fact No. 15).

(7)     As of June 11, 2010, after the deadline for securing "Minimum Financing" pursuant to Section 2.3 of the TLA, the condition specified in paragraph 1.3 (ii) of the Game Production Agreement had not been satisfied or waived for the Fallout MMOG.  (Joint Pretrial Order at 11) (Stipulated Fact No. 16).

(8)     As of June 11, 2010, after the deadline for securing "Minimum Financing" pursuant to Section 2.3 of the TLA, the condition specified in paragraph 1.3 (iv) of the Game Production Agreement had not been satisfied or waived for the Fallout MMOG.  (Joint Pretrial Order at 11) (Stipulated Fact No. 17).

(9)     As of October 2009, after the deadline for securing "Minimum Financing" pursuant to Section 2.3 of the TLA, the condition specified in paragraph 1.3 (v) of the Game Production Agreement had not been satisfied or waived for the Fallout MMOG.  (Joint Pretrial Order at 11) (Stipulated Fact No. 18).

(10)    As of April 4, 2009, the deadline for securing "Minimum Financing" pursuant to Section 2.3 of the TLA, the condition specified in paragraph 1.3 (vii) of the Game Production Agreement had not been satisfied or waived for the Fallout MMOG. (Joint Pretrial Order at 11) (Stipulated Fact No. 20).

(11)    As of April 4, 2009, the deadline for securing "Minimum Financing" pursuant to Section 2.3 of the TLA, the condition specified in paragraph 1.3 (ix) of the Game Production Agreement had not been satisfied or waived for the Fallout MMOG. (Joint Pretrial Order at 12) (Stipulated Fact No. 21).

(12)    As of April 4, 2009, the deadline for securing "Minimum Financing" pursuant to Section 2.3 of the TLA, the condition specified in paragraph 1.3 (x) of the Game Production Agreement had not been satisfied or waived for the Fallout MMOG. (Joint Pretrial Order at 12) (Stipulated Fact No. 22).

(13)    The condition specified in paragraph 1.3 (x) of the Game Production Agreement cannot be waived.  (Joint Pretrial Order at 12) (Stipulated Fact No. 23).

(14)     As of April 4, 2009, the deadline for securing "Minimum Financing" pursuant to Section 2.3 of the TLA, the condition specified in paragraph 1.3 (xi) of the Game Production Agreement had not been satisfied or waived for the Fallout MMOG. (Joint Pretrial Order at 12) (Stipulated Fact No. 24).

(15)     As of June 11, 2010, after the deadline for securing "Minimum Financing" pursuant to Section 2.3 of the TLA, the condition specified in paragraph 1.3 (xii) of the Game Production Agreement had not been satisfied or waived for the Fallout MMOG.  (Joint Pretrial Order at 12) (Stipulated Fact No. 25).

(16)     The condition specified in paragraph 1.3 (xii) of the Game Production Agreement cannot be waived.  (Joint Pretrial Order at 12) (Stipulated Fact No. 26).

(17)     As of June 11, 2010, after the deadline for securing "Minimum Financing" pursuant to Section 2.3 of the TLA, Interactive Game Group had only approved and provided financing for one game under the Game Production Agreement called "Rat Race".  (Joint Pretrial Order at 12) (Stipulated Fact No. 27).

(18)     Mr. Chesnais has testified that I2G considered providing no more than five or six million dollars of financing to Interplay for the Fallout MMOG.  (Ex. 37, Chesnais Depo. at 112:21-113:14; 185:12-17).

Furthermore, no evidence relating to Masthead Studios' purported development services and technology (or ability to provide such services and technology) may be introduced at trial. On September 23, 2011, the Court ruled that Interplay was precluded from offering any Masthead employees as witnesses at trial:

THE COURT:  . . . you [Interplay] are not calling any Masthead folks because you have not given the names in discovery, you did not do it timely in response to interrogatories that were sufficiently br[oad] to have required the identity of anybody at Masthead who has knowledge of or participated in the full scale development.

(Transcript of Telephonic Hearing on September 23, 2009, *Bethesda Softworks LLC v. Interplay Entertainment Corp.*, No. 09-CV-2357-DKC, at 62:25-63:5) (Ex. 33); (*see also id*. at 63:19-20) ("Interplay will not be calling any Masthead Studio employees, period"); (*id.* at 71:14-16) ("I have ruled that given the status of the discovery that Interplay will not be permitted to call anybody from Masthead to testify").

The Court also ruled that Interplay could not call any Interplay witnesses to testify about any of the work purportedly done by Masthead.

> MR. GERSH:  . . . we have identified the Interplay employees that have been working on the game, I don't understand how they cannot testify as to what occurred to the game as of April 4th, 2009.
>
> THE COURT:  Because you have not even given that information yet. . . .
>
> MR. GERSH:  Your Honor, that is the Masthead.  I am talking about the Interplay people prior to April of 2009.
>
> THE COURT:  You can talk about what they did themselves not what anybody at Masthead did.

(Ex. 33 at 64:5-65:1.)

All such evidence would be, in any event, hearsay and barred by Rule 802 of the Federal Rules of Evidence.  (Ex. 33 at 67:7-10) ("THE COURT:  Well, it would be total hearsay for them to tell a jury about what they think Masthead was doing in Bulgaria, if it is based simply on what one of them might have told them from Bulgaria.")

Any testimony by Interplay witnesses about Masthead Studios' documents also is precluded.  Interplay witnesses cannot testify to the authenticity of any Masthead documents, all of which are challenged by Bethesda.  Testimony by Interplay witnesses about Masthead documents also would be impermissible hearsay barred by Fed.R.Evid. 802, pure speculation barred by Fed.R.Evid. 602 and/or oral testimony regarding the content of a writing barred by Fed.R.Evid. 1002.  Rule 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Fed.R.Evid. 602.  At the September 23, 2011 hearing, Interplay repeatedly represented that Interplay has no knowledge of what anyone at Masthead was purportedly doing or when they purportedly were doing it:

14

MR. GERSH:  We do not know, Interplay does not know who the specific person at Masthead did what on what game, what part of the game.

* * *

MR. GERSH:  As a matter of fact, Your Honor, the response to the question that we get 35 people with names does not segregate who worked on the game before or after April 4, 2009.  The documents that we have do not show who worked on the game prior to April 4, I believe it is 2009.

* * *

MR. GERSH:  What I am telling you is that the entire list of people [from Masthead] that we were able to put together that worked on the game but don't know at what point in time anybody particularly worked on the game.

* * *

MR. GERSH:  . . . I do not believe that we can break out who worked on the game from Masthead at a particular point in time or what they did.

* * *

MR. GERSH:  What we have is at a point in time this part of the game was being worked on and who did what at a particular moment in time for a particular period in time is unknown and you are asking me that I have to provide something that we just don't have knowledge of or the ability to get.

(Ex. 33 at 42:17-19; 45:5-9; 46:11-14; 51:2-5; 65:8-12.)

Rule 1002 requires that a party introduce into evidence the document itself to prove the content thereof.  Fed.R.Evid. 1002.  Oral testimony to prove the content of a writing is not permitted.  *Id*.[2]

---

[2]     Other Evidence rebutting Interplay's contention that it had secured $20 million in funding by April 4, 2009 through Masthead's development services and technology would include, but is not limited to: (1)  The letter of intent purportedly entered into by Interplay and Masthead Studios on March 20, 2009 (the "LOI") provides no funding to Interplay (Ex. 38); (2) By its plain terms, the LOI is not a binding agreement but rather subject to execution of a definitive agreement  (Ex. 38 at 3) ("This letter constitutes a binding agreement between the parties, provided that the parties will negotiate and enter into a definitive agreement on the principle terms contained in this letter."); (3) Interplay's CEO, Herve Caen, has testified in this case that the LOI is not a final document (Ex. 34, Caen Hearing Testimony at 157:12-15); (4)  There is no agreement between Interplay and Masthead Studios.  The purported development agreement is between Masthead Studios and another entity called PV13 Online, Inc.  (Joint Pretrial Order at 10) (Stipulated Fact No. 9) and (5)  PV13 Online Inc. was not incorporated until December 15, 2009, eight months after the April 4, 2009 "Minimum Financing" deadline set forth in Section 2.3 of the TLA had expired.  (Joint Pretrial Order at 10) (Stipulated Fact No. 8).

C.      **Evidence Establishing That Interplay Failed to Satisfy the "Full-Scale Development" Requirement of Section 2.3 of the TLA**

Interplay failed to establish the "full-scale development" requirement of Section 2.3 by April 4, 2009.  Bethesda will present lay and expert testimony at trial that development of an MMOG costs tens of millions of dollars and requires a team of 40-80 individuals consisting of multiple members of at least twenty-two different professional disciplines: 3D engine programmers; network programmers; back end programmers; content tools programmers; service tools programmers; database programmers / database specialists; audio programmers; 3D model artists; 3D texture artists; technical artists; 3D animators; concept artists; system game designers; world designers; quests designers; writers; music composers; voice actors; producer (project manager); website designers; account system programmers; quality assurance manager; localization manager.  Development of an MMOG also involves production of final game content and final game infrastructure which is comprised of computer source code.

Interplay does not dispute these facts.  Interplay stipulated in the Joint Pretrial Order that, in 2008, it estimated that the cost for developing the Fallout MMOG and all software programming related to it would total at least $26.8 million.  (Joint Pretrial Order at 10) (Stipulated Fact No. 6).  Interplay also stipulated that, in 2008, it estimated that it would need 53 employees to begin full production of the Fallout MMOG.  (Joint Pretrial Order at 10) (Stipulated Fact No. 7).  Evidence establishing that Interplay had failed to commence any development of the Fallout MMOG by April 4, 2009, let alone had commenced "full-scale development" by that date includes, but is not limited to:

    (1)    As of December 31, 2007, Interplay had four employees and no more than one employee working in game development.  (Joint Pretrial Order at 10) (Stipulated Fact No. 3).

16

(2)     As of December 31, 2008, Interplay had seven employees and no more than four employees working in game development.  (Joint Pretrial Order at 10) (Stipulated Fact No. 4).

(3)     As of December 31, 2009, Interplay had nine employees and no more than five employees working in game development.  (Joint Pretrial Order at 10) (Stipulated Fact No. 5).

(4)     For the year ended December 31, 2007, Interplay's total product development costs for all of its products combined were no more than $18,000.  (Ex. 23, Interplay's 2007 10-K at 24.)

(5)     For the year ended December 31, 2008, Interplay's total product development costs for all of its products combined were no more than $328,000.  (Ex. 25, Interplay's 2008 10-K at 23.)

(6)     For the year ended December 31, 2009, Interplay's total product development costs for all of its products combined were no more than $279,000.  (Ex. 29, Interplay's 2009 10-K at 22.)

(7)     For the year ended December 31, 2010, Interplay's total product development costs for all of its products combined were no more than $514,000.  (Ex. 30, Interplay's 2010 10-K at 20.)

(8)     As will be shown at trial, Interplay did not produce a single line of computer source code relating to the Fallout MMOG or any other game during discovery, even though it is now more than two and one-half years beyond the April 4, 2009 deadline for having commenced "full-scale development" of the MMOG.

(9)     As will be shown at trial, Interplay has not identified any exhibit for use at trial that contains a single line of computer source code relating to the Fallout MMOG or any other game.  (Joint Pretrial Order, Appendix B.)  There is no evidence in this case of any MMOG development by Interplay whatsoever, because there is no evidence that a single line of source code has ever been written for the purported Fallout MMOG.

(10)    Interplay's CEO, Herve Caen, has testified in these proceedings that Interplay was not in full-scale development of the Fallout MMOG as of March 19, 2009.  (Ex. 34, Caen Hearing Testimony at 166:18-22.)  Interplay thereby admits that it was not in "full-scale development" of the Fallout MMOG in 2008.  Yet, in each quarterly period in 2009, Interplay's product development costs went down compared to the same quarter in 2008.  These data show that Interplay's development efforts were reduced, not increased, in 2009, when the April 4, 2009 deadline for commencing full-scale development had expired.

- For the quarterly period ended March 31, 2009, Interplay's total product development expenses were no more than $65,000, 3% lower compared to the same period in 2008. (Ex. 26, Interplay's 1st Quarter 10-Q at 12.)

- For the three months ended June 30, 2009, Interplay's total product development expenses were no more than $52,000, 40% lower compared to the same period in 2008. (Ex. 27, Interplay's 2nd Quarter 10-Q at 13.)

- For the three months ended September 30, 2009, Interplay's total product development expenses were no more than $78,000, 13% lower compared to the same period in 2008. (Ex. 28, Interplay's 3rd Quarter 10-Q at 16.)

- For the year ended December 31, 2009, Interplay's total product development expenses were no more than $279,000, 14.94% lower compared to the same period in 2008. (Ex. 29, Interplay's 2009 10-K at 22.)

- The decrease in product development costs from 2008 to 2009 resulted from a decrease in staffing at Interplay from 2008 to 2009. (Ex. 29, Interplay's 2009 10-K at 22.)

Interplay contends in its responses to interrogatories that it satisfied the "full-scale development" requirement of Section 2.3 through the purported work of Masthead Studios. (*See, e.g*, Ex. 32 at 5) ("The combination of Interplay's substantial game design with Masthead's development team and technology, and resultant production of a playable game space satisfied the condition for 'full scale development,' which is not defined in the TLA."). However, for the reasons set forth above, no evidence of Masthead's purported "development team" or purported work on the MMOG may be introduced at trial.[3]

---

[3]     Evidence rebutting Interplay's contention that it satisfied the "full-scale development" requirements by April 4, 2009 through the purported work of Masthead Studios would include, but is not limited to: (1)  In its SEC filings dated April 15, 2009, Interplay admitted that, as of that date, it had no product in development with external developers (Ex. 25, Interplay's 2008 10-K at 16) ("We currently have no product in development with external developers."); (2) By its plain terms, the LOI entered into by Interplay and Masthead Studios is not a binding agreement but rather subject to execution of a definitive agreement (Ex. 38 at 3) ("This letter constitutes a binding agreement between the parties, provided that the parties will negotiate and enter into a definitive agreement on the principle terms contained in this letter."); (3) Interplay's CEO, Herve Caen, has testified in this case that the LOI is not a final document (Ex. 34, Caen Hearing Testimony at 157:12-15); (4)  No definitive development agreement was ever entered into between Interplay and Masthead Studios.  The purported development

**D.**     **Interplay Has No License to Use the Fallout Copyrights**

Even if Interplay established that it satisfied the "full-scale development" and "Minimum Financing" requirements of Section 2.3 so that it retained a license under the TLA beyond April 4, 2009, Interplay has no license to use Bethesda's copyrighted works.   The Court need not address this issue if it finds that Interplay failed to satisfy the "full-scale development" and "Minimum Financing" requirements of Section 2.3.   On this issue, Bethesda incorporates by reference the points and authorities set forth in the Memorandum in Support of Bethesda Softworks LLC's Motion in Limine filed on November 4, 2011 and Reply Memorandum in Support of Bethesda Softworks LLC's Motion in Limine filed on November 28, 2011.

The TLA granted Interplay a conditional and temporally limited right to use the single trademark "FALLOUT" and nothing more, in the creation of an MMOG.  The TLA did not grant Interplay a copyright license.  Evidence establishing that the license granted under the TLA does not encompass copyrights includes, but is not limited to:

(1)     The very title of the agreement, "Trademark License Agreement," clearly denotes what it is.  (Ex. 2, TLA at 1.)

(2)     The first sentence of the agreement reads: "THIS TRADEMARK LICENSE AGREEMENT (this 'Agreement') is made and entered into as of April 4, 2007." (Ex. 2, TLA at 1.)

(3)     Section 2.1, which is the "Grant of License," provides: "Bethesda grants to Interplay an exclusive, non-transferable license and right to use the Licensed Marks on and in connection with Interplay's Fallout-branded MMOG . . . ." (Ex. 2, TLA § 2.1.)

(4)     The term "Licensed Marks" is a capitalized term.  It is specifically defined in the TLA as "the FALLOUT trademarks specified in Schedule 1." (Ex. 2, Recital A.)

(5)     Schedule 1 lists only the single trademark "FALLOUT." (Ex. 2, Recital A.)

---

agreement is between Masthead Studios and another entity called PV13 Online, Inc. (Joint Pretrial Order at 10) (Stipulated Fact No. 9); and (5) Bethesda requested a copy of the MMOG as it existed on April 4, 2009 but it was never produced by Interplay.  (Transcript of the Deposition of Herve Caen dated October 8, 2010 at 107:25-108:4) (Ex. 39).

(6)     Schedule 1 of the TLA stands in contrast to the Copyright Assignment, pursuant to which Interplay "irrevocably assign[ed], transfer[red] and convey[ed]" to Bethesda thirteen different copyrights and categories of copyrighted works.  (Ex. 3, Exhibit A.)

(7)     The Copyright Assignment and TLA were executed by the parties at the same time and as part of the same agreement.

(8)     Section 2.6 of the TLA provides that "[a]ny and all rights not explicitly granted to Interplay hereunder are reserved by Bethesda."  (Ex. 2, TLA § 2.6.)  No provision of the TLA "explicitly granted" Interplay a copyright license.

(9)     Additional intrinsic evidence demonstrating that the TLA license is limited solely to the FALLOUT trademark and does not encompass copyrights include the following clauses, each of which refers only to trademarks or the Licensed Marks (expressly defined as the trademark "FALLOUT") and makes no mention of copyrights.  These provisions establish that the subject of the TLA was limited to the Fallout trademark:

   ●     (Ex. 2, TLA § 2.2) ("Territory.  Worldwide.  Interplay agrees to comply with all applicable laws and regulations pertaining to the use and designation of trademarks in the territory, and to refrain from any action that may or would adversely affect the right of Bethesda to the FALLOUT trademarks.")

   ●     (Ex. 2, TLA § 3.1) ("Sole Owner.  Interplay acknowledges and agrees that, as between the parties, Bethesda is the sole and exclusive owner of the Licensed Marks.  Bethesda may, in its sole discretion, maintain or discontinue the maintenance of any applications and registrations for the Marks or seek registration for any Licensed Mark at any time.")

   ●     (Ex. 2, TLA § 3.2) ("No Assignment.  Nothing contained in this Agreement shall be construed as an assignment to Interplay of any right, title, or interest in or to the Licensed Marks.  Interplay recognizes and acknowledges that the Licensed Marks and all rights therein and goodwill pertaining thereto solely and exclusively belong to Bethesda and that all uses of the Licensed Marks by Interplay shall inure to the benefit of Bethesda.  Interplay shall not directly attack or impair the title of Bethesda to the Licensed Marks, the validity of this Agreement, or any of Bethesda's registrations or applications relating to any Licensed Mark in any jurisdiction.  Interplay agrees its shall not file any state, federal, or foreign applications to register any of the Licensed Marks, in whole or in part, or any name or mark confusingly similar thereto in any jurisdiction.")

- (Ex. 2, TLA § 3.3) ("Further Assistance.  Interplay shall, upon request of Bethesda, execute any documents that may be deemed necessary or desirable by Bethesda to use the Licensed Marks in conformity with any nation's laws, including whatever documents that may be necessary to record Interplay as a user or licensee of the Licensed Marks anywhere in the world.")

- (Ex. 2, TLA § 5.2) ("Interplay shall affix or otherwise display the Licensed Marks in conformance with Bethesda's standards and guidelines, as such may be further developed or amended from time to time, including any manuals that are established or approved by Bethesda, and any other specifications as may be prescribed by Bethesda to promote and foster the goodwill represented by the Licensed Marks.  Interplay shall use the Licensed Marks with appropriate legends as prescribed by Bethesda and shall not use any other trademark or service mark (other than Interplay's INTERPLAY marks) in combination with any of the Licensed Marks without prior written approval of Bethesda.")

- (Ex. 2, TLA § 5.3.3) ("Interplay shall adhere to the standards and guidelines referenced in Section 5.2 with respect to all signage, packaging, advertising and promotional materials bearing the Licensed Marks. Interplay shall submit to Bethesda for its prior written approval, specimens or facsimiles of all signage, packaging, advertising and promotional materials bearing the Licensed Marks.")

- (Ex. 2, TLA § 6.1) ("Interplay shall provide cooperation and assistance to Bethesda in its efforts to register the Licensed Marks in the United States and other territories.")

- (Ex. 2, TLA § 6.2) ("Enforcement.  Interplay shall regularly monitor the marketplace to detect potentially infringing or non-conforming uses of the Licensed Marks.  Interplay shall promptly notify Bethesda of any apparent infringement of or challenge to Interplay's use of any of the Licensed Marks, or claim by any person of any rights in any of the Licensed Marks. Bethesda shall have discretion to take such action as it deems appropriate and the right to exclusively control any litigation, Patent or Trademark Office Proceeding or other proceeding arising out of any such infringement, challenge or claim.  Interplay agrees to execute any and all instruments and documents and to do such acts and things as, in the opinion of Bethesda's counsel, may be reasonably necessary or advisable to protect and maintain the interests of Bethesda in the Licensed Marks.")

- (Ex. 2, TLA § 9.3.5) ("Interplay hereby acknowledges the irreparable harm that Bethesda will incur from any unauthorized use of the Licensed Marks.  Interplay expressly agrees that, notwithstanding any termination or expiration of this Agreement, Bethesda, in addition to all other

remedies, shall be entitled to seek temporary, preliminary and permanent injunctive relief to prohibit the unlawful or unauthorized use of the Licensed Marks.")

### E.    Interplay Has No Defense to Bethesda's Contributory Infringement Claim

Interplay has no defense — not even a "license" defense — to Bethesda's contributory infringement claim in connection with Interplay's activities with Masthead Studios. Section 2.1 precludes Interplay from transferring or sublicensing any rights under the TLA to any third party: "Bethesda grants to Interplay an exclusive, non-transferable license . . . The conditional license herein does not grant Interplay any right to sublicense any of the licensed rights without Bethesda's prior written approval." (Ex. 2, TLA § 2.1.)  No such approval was ever requested by Interplay or given by Bethesda.  Section 11.0 of the TLA precludes Interplay from assigning or delegating any of its rights or duties under the agreement to any third party. (Ex. 2, TLA § 11.0.) Thus, even if Interplay possesses a license to use the copyrighted Fallout works (which it does not), Masthead plainly does not.

It is undisputed that Masthead Studios is a third party unrelated and unaffiliated with Interplay.  In the Joint Pretrial Order, Interplay stipulated that "Masthead Studios is an independent company not affiliated with Interplay." (Joint Pretrial Order at 10) (Stipulation of Fact No. 1.)  Interplay further stipulated that "Masthead Studios is not Interplay's agent or employee." (Joint Pretrial Order at 10) (Stipulation of Fact No. 2.)  No third party has any right to use Bethesda's intellectual property assets regardless of whether Interplay may be found to have such rights, because Sections 2.1 and 11.0 of the TLA preclude transfer, sublicense, assignment or delegation to any third party. *See Compliance Source, Inc. v. Greenpoint Mortgage Funding, Inc.*, 624 F.3d 252, 259-60 (5th Cir. 2010) (third party's use of licensed

22

materials precluded where contract terms barred transfer of rights to third parties, even though use of the licensed materials by the third party was for the benefit of the licensee).

## V.    INTERPLAY'S "MEETING OF THE MINDS" DEFENSE LACKS MERIT

Interplay asks the Court to declare the APA void *ab initio* purportedly because there was no "meeting of the minds." (Joint Pretrial Order at 25.)  The issue of a "meeting of the minds" (or "mutual assent") is a contract formation question.  Under Delaware law, where there is a formal, written agreement signed by both parties, a court will reject any effort by one of the parties to disavow the formation and existence of the contract absent some allegation of fraud or illegality.  "The formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and consideration." *Ramone v. Lang*, No. 1592-N, 2006 WL 4762877, at *10 (Del. Ch. Apr. 3, 2006) (citing *Wood v. State*, 815 A.2d 350 (Del. 2003)). Under Delaware law, the inquiry into mutual assent is an objective, not subjective, one.  "It is basic that overt manifestation of assent — not subjective intent — controls the formation of a contract."  *See Indus. Am., Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415 (Del. 1971) ("[T]he 'only intent of the parties to a contract which is essential is an intent to say the words or do the acts which constitute their manifestation of assent'; that 'the intention to accept is unimportant except as manifested.'") (citation omitted).  *Accord* 1 WILLISTON ON CONTRACTS § 3:2 n.1 (4th ed. 2007) ("The phrase 'meeting of the minds' is a misnomer, commonly used by the courts to determine whether there has been mutual assent . . . because the minds of the parties to a contract need not, in fact, subjectively meet; rather . . . objective assent is all that is required.").  Because the question of "mutual assent" is an objective rather than subjective one, a signed, written contract is conclusive evidence of mutual assent to the terms contained therein. *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (written

agreement is an objective manifestation of intent that supersedes any subjective intent on the part

of the parties); *American Homepatient, Inc. v. Collier*, No. Civ. A. 274-N, 2006 WL 1134170, at

*2 (Del. Ch. Apr. 19, 2006) (written agreement signed by the parties satisfied the requirement of

"mutual assent"); *All Pro Maids, Inc. v. Layton*, No. Civ. A. 058-N, 2004 WL 1878784, at *3

(Del. Ch. Aug. 10, 2004) (the execution of a written agreement "signif[ies] mutual assent");

*Standard Distrib. Co. v. NKS Distribs., Inc.*, No. 92C-05-036-WTQ, 1996 WL 944898, at *1

(Del. Super. Ct. Jan. 3, 1996) ("The 1988 Agreement was reduced to writing, a clear overt

manifestation which in law would override any unexpressed subjective intent.").

The issue of "mutual assent" or "meeting of the minds" arises where there is no formal,

written, or fully executed agreement.  The reason why is clear:  Signing a contract conclusively

establishes the parties' objective manifestation of assent to the written terms of the contract.  In

*Osborn v. Kemp*, the Delaware Supreme Court dismissed out of hand an argument that there was

no mutual assent to a fully-executed contract:  "The face of this contract manifests the parties'

intent to bind one another contractually.  Both parties signed the contract and . . . also exchanged

consideration . . . ."  *Osborn v. Kemp*, 991 A.2d 1153, 1158-59 (Del. 2010).

The APA is a written agreement executed by Interplay that transferred to Bethesda all of

the ownership rights to any and all trademarks and copyrights related to the video game series

Fallout.  (*See* Exs. 1, 2, 3, 4.)  In the Joint Pretrial Order, the parties stipulated to the existence of

the written agreement.  (Joint Pretrial Order at 23) ("The APA, including its exhibits, annexes

and schedules, are an entire agreement").[4]  Interplay's claim that there is an absence of a

"meeting of the minds" or "mutual assent" fails as a matter of law.

* * *

---

[4]      Interplay requested that Bethesda stipulate to this fact in the Joint Pretrial Order.  (Joint Pretrial
Order at 23.)  Bethesda stipulated to this fact during the Pretrial Conference held on November 14, 2011.

All of Interplay's other claims and defenses lack merit as matter of fact and law for the reasons set forth above and as will be established at trial.

## VI.    BETHESDA'S REQUESTED RELIEF

As of the date of this Pretrial Memorandum, Bethesda seeks the following relief on its claims. For Bethesda's claim of copyright infringement:

(1)    a judgment declaring that Interplay has infringed Bethesda's copyrights;

(2)    statutory damages in an amount determined appropriate by the Court for Interplay's willful past infringement of Bethesda's copyrights;

(3)    an impoundment order directing Interplay to deliver to Bethesda all reproductions and public displays of Bethesda's copyrighted works and derivatives thereof in the possession and control of Interplay;

(4)    an order directing Interplay to remove the copyrighted works from its Fallout Online website and enjoining Interplay, and all those acting in concert with it, from reproducing or publicly displaying any of Bethesda's copyrighted works or derivatives thereof, or otherwise infringing Bethesda's copyrights, on any website created, controlled or maintained by Interplay; and

(5)    an order enjoining Interplay, and all those acting in concert with it, from inducing, causing or materially contributing to Masthead Studios' infringement of Bethesda's copyrighted works.

For Bethesda's claim of trademark infringement:

(1)    a judgment declaring that Interplay has infringed Bethesda's trademarks; and

(2)    an order directing Interplay to remove Bethesda's trademarks from it Fallout Online website and enjoining Interplay from infringing Bethesda's trademarks on any website created, controlled or maintained by Interplay.

For Bethesda's declaratory judgment claim:

(1)    a judgment declaring that Interplay's license under the TLA expired on April 4, 2009.

For Bethesda's claim for breach of Section 2.5 of the APA:

(1)    nominal damages; and

(2)      an order directing Interplay to comply with Section 2.5 and deliver to Bethesda all tangible embodiments of the Fallout intellectual property in Interplay's possession or control.

Except as set forth above, Bethesda does not intend to pursue at trial any of the other affirmative relief in connection with Count I of the First Amended Complaint (for Declaratory Judgment), Count IV of the First Amended Complaint (for Permanent Injunction) or Count X of the First Amended Complaint (for Breach of the Asset Purchase Agreement), although Bethesda my use facts relating to such claims defensively in connection with Interplay's counterclaims.

Bethesda does not intend to pursue any affirmative relief at trial in connection with Count III of the First Amended Complaint (for Preliminary Injunction), Count VI of the First Amended Complaint (for Unfair Competition), Count VII of the First Amended Complaint (for an Accounting), Count VIII of the First Amended Complaint (for Common Law Trademark Infringement), Count IX of the First Amended Complaint (for Unfair Competition), or Count XI of the First Amended Complaint (for Breach of the TLA), although Bethesda my use facts relating to such claims defensively in connection with Interplay's counterclaims.

Date:  December 8, 2011                    Respectfully submitted,

                                           **FRIED, FRANK, HARRIS, SHRIVER &
                                           JACOBSON LLP**

                                           By:      /s/ Howard H. Stahl
                                                    Howard H. Stahl, Bar # 24741
                                                    Joseph J. LoBue, Bar # 17393
                                                    801 17th Street, NW
                                                    Washington, DC 20006
                                                    Telephone:     202-639-7000
                                                    Facsimile:     202-639-7003
                                                    Email: howard.stahl@friedfrank.com
                                                            joseph.lobue@friedfrank.com

                                           *Counsel for Plaintiff/Counter-Defendant, Bethesda
                                           Softworks LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of December, 2011, I electronically filed and

served Bethesda Softworks LLC's Pretrial Memorandum on the following:


**Geoffrey Townsend Hervey**
Bregman Berbert Schwartz and Gilday LLC
7315 Wisconsin Ave Ste 800W
Bethesda, MD 20814
13016562707
Fax: 13019616525
Email: ghervey@bregmanlaw.com

**Jeffrey F. Gersh**
Gersh Derby, Attorneys at Law
15821 Ventura Blvd Ste 515
Encino, CA 91436
18185365700
Fax: 18189814618
Email: Jgersh@gershderbylaw.com


Counsel for Defendant/Counter-Plaintiff Interplay Entertainment Corp.

/s/ Joseph J. LoBue