# Exhibit 34

```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
                          SOUTHERN DIVISION


    BETHESDA SOFTWORKS LLC        .

           vs.                    .    09-CV-2357-DKC

    INTERPLAY ENTERTAINMENT       .    GREENBELT, MARYLAND
    CORP.                         .
                                       DECEMBER 10, 2009

                    TRANSCRIPT OF MOTIONS HEARING
              BEFORE THE HONORABLE DEBORAH K. CHASANOW
                     UNITED STATES DISTRICT JUDGE

    A P P E A R A N C E S:


    FOR THE PLAINTIFF:     HUGH J. MARBURY, ESQ.
                           SONIA CHO, ESQ.
                           BENJAMIN SCHUMAN, ESQ.


    FOR THE DEFENDANT:     JEFFREY GERSH, ESQ.
                           GEOFFREY T. HERVEY, ESQ.



    COURT REPORTER:        Sharon O'Neill, CMR
                           Official Court Reporter
                           U.S. District Court - Rm 200
                           6500 Cherrywood Lane
                           Greenbelt, Maryland
                           (301) 344-3227
```

1  Q.  So, this is a document that you entered into with Masthead
2  on or about March 20, 2009, is that right?
3  A.  Correct.
4  Q.  And this is a document that preceded what we'll call the
5  deadline under the TLA agreement by about two weeks, is that
6  right?
7  A.  That's about right.
8  Q.  Okay. And you're relying upon exhibit 24, which is the
9  Masthead LOI, for a portion of financing the Fallout MMO, is
10 that right?
11 A.  Correct.
12 Q.  What portion?
13 A.  The portion that relates to the task that Masthead is
14 supposed to perform for Interplay under this LOI.
15 Q.  Okay. Well, if we were starting with a $30 million
16 financing requirement, how much of the $30 million do you think
17 is satisfied by the Masthead LOI?
18 A.  About $20 million.
19 Q.  About $20 million. And how do you calculate that
20 $20 million?
21 A.  Well, let's say we took out of the budget every single
22 task that Masthead has agreed to do under this LOI, and that
23 reduced the whole budget by about $20 million.
24 Q.  Where -- Does it say $20 million anywhere in this
25 document?

1   A.   No, it doesn't.

2   Q.   Does it say anywhere in this document that they're going

3   to provide you with $20 million in financing?

4   A.   No, it doesn't.

5   Q.   Isn't this document actually called a Product Development

6   and Licensing Agreement?

7   A.   Yes, it is.

8   Q.   It's not a line of credit, is it?

9   A.   No, it's not.

10  Q.   It's not a financing document, is it?

11  A.   Well, I would argue with that.

12  Q.   Okay.  And it's not a final document, because you've just

13  told me that it's currently being negotiated in final long

14  form, correct?

15  A.   That's correct.

16  Q.   It calls for an engine license agreement, on page two, at

17  the top of page two.  That agreement hasn't been executed, has

18  it?

19  A.   Not yet.

20  Q.   And as of April, 2009, it hadn't executed, of course,

21  right?

22  A.   Right.

23  Q.   All right.  Sub part three, a Tools Licensing Agreement,

24  as of April, 2009, that hadn't been executed, had it?

25  A.   No.

1  Q.  Who is the president of Masthead?

2  A.  Atanas Atanasov.

3  Q.  Okay. Mr. Atanasov. I got it right this time. Did you

4  or anyone at Interplay ask them to participate in this

5  litigation?

6           MR. GERSH:  Objection, Your Honor. It's irrelevant.

7           THE COURT:  Sustained.

8  Q.  How did you first learn of Mr. Atanasov?

9  A.  He contacted me through the Interplay website.

10 Q.  And when did that happen?

11 A.  I believe around February of this year.

12 Q.  And prior to that contact in February of 2009, had you

13 ever heard of Masthead Studios?

14 A.  No.

15 Q.  Where are they located?

16 A.  In Bulgaria.

17 Q.  What games has Masthead Studios published in the past?

18          MR. GERSH:  Objection, Your Honor.

19          THE COURT:  Sustained.

20 Q.  Do you know if Masthead Studios ever developed a game?

21          MR. GERSH:  Objection.

22          THE COURT:  Overruled.

23 A.  I don't know.

24 Q.  Do you know if Masthead Studios has ever developed and

25 launched an MMO?

1   A.   I don't think so.

2   Q.   So, other than the Masthead Letter of Intent, and the IGG,

3   Interactive Game Group game production agreement, there are no

4   other documents that you're relying upon to satisfy the

5   $30 million financing obligation as of April, 2009, correct?

6   A.   Correct.

7   Q.   Now, in support of Interplay's argument that you've

8   complied with the full scale development condition in the TLA

9   that we talked about earlier, and I think you heard about,

10  you're relying upon the work of Masthead Studios, right?

11  A.   In part.

12  Q.   What part?

13  A.   Masthead Studios has performed using the design that

14  Interplay has provided them with.  Development work.  It

15  resulted in a compelling presentation to Interplay and game up

16  and running and that's what I based my decision on.

17  Q.   I asked you at your deposition, well, let me state it

18  another way.  How many people does Masthead have working on the

19  Fallout MMO as of April, 2009?

20  A.   Around 20.

21  Q.   How many people did Interplay have working on the Fallout

22  MMO as of April, 2009?

23  A.   About five.

24  Q.   And you characterize that 25 people working on an MMO was

25  full scale development in your opinion, is that correct?

1  A.  Correct.

2  Q.  Prior to negotiating with Masthead and signing this Letter

3  of Intent, Interplay considered developing the game itself

4  internally, correct?

5  A.  That's correct.

6  Q.  Okay. And Interplay created some budget documents during

7  that process, didn't they?

8  A.  We did.

9  Q.  And you were primarily responsible for some of the initial

10  budget work, correct?

11  A.  Correct.

12  Q.  You consulted some people at Interplay, but it was largely

13  your work, right?

14  A.  Right.

15          MR. MARBURY: Judge, may I?

16          THE COURT: Our local rule says if you are showing a

17  witness an exhibit, you certainly may.

18  Q.  Mr. Caen, in front of you is a document marked exhibit 25.

19  It was used at your deposition. You may remember it as exhibit

20  40, if you paid close attention, but you remember talking about

21  this budget that you created?

22  A.  I do.

23  Q.  Okay. Now, on the third page, because it appears to have

24  been copied on double side to save some trees, on the third

25  page there is a chart. Do you see that chart?

1    Before I get to the third page, let's just start at
2    the first page, right. The budget for your initial release was
3    $26,800,000 for the development costs, correct?
4    A.   Correct.
5    Q.   And that did not include public relations and marketing
6    expenses that you expected to spend too, correct?
7    A.   That's correct.
8    Q.   Okay. And then there were additional post-release costs
9    that you have listed at about half a million dollars, is that
10   right, $433,000?
11   A.   Per month, I believe.
12   Q.   Oh, monthly. Thank you. On the third page you break the
13   budget out into different sections, initial design,
14   pre-production, full production, pre-alpha, pre-bata, and the
15   copy is hard to read, pre-launch. Do you see that?
16   A.   I do.
17   Q.   Okay. When we took your deposition, you and I looked at
18   the full production page, and it's unfortunately not numbered,
19   so it's very challenging to locate in this document. But if
20   you would try, it was under the term full production one(d).
21   Can you find that page? It's actually on the back side of a
22   page.
23   A.   Yes. I see that.
24   Q.   You see that. And this lists a number of people that you
25   were budgeting in -- Isn't it true that you created this

1    document in 2007?

2    A.   It's true.

3    Q.   Okay.  So, in 2007, when you were planning full

4    production, you thought full production one was going to

5    account for this number of individuals, is that correct?

6    A.   That's correct.

7    Q.   Okay.  And rather than count up here again, when we were

8    at your deposition, do you remember going through the process

9    of counting up all the numbers and all the names and totaling

10   them up?

11   A.   I do.

12   Q.   Okay.  Do you remember what that number was?

13   A.   Not really, no.

14   Q.   Okay.  Do you recall that that number was 50?

15   A.   (Indicating.)

16   Q.   You don't.  Okay.  Well, rather that even try to do it

17   that way, let's total it up right now.  Under principals there

18   are four individuals there, correct?

19   A.   Correct.

20   Q.   Under design there are eight individuals.  Am I getting

21   that right?

22   A.   Yes.

23   Q.   You have eight programming people?

24   A.   Correct.

25   Q.   Seven artists.  Seven art people, is that fair?

1  A.    Six.

2  Q.    Six.

3        MR. GERSH:  Your Honor, I'm not sure what the

4  relevance of the number of people are.  The document in

5  question doesn't require a number of people to be employed.

6  There is a dollar amount, if they want to talk about at issue,

7  I understand that but why are we wasting --

8        THE COURT:  He's now on the full scale development

9  end of things, as to how much people.  I understand what

10 they're getting at.  I'm not going to detail it.  I'll overrule

11 it.  I mean, obviously, I have the document right here too.

12       MR. GERSH:  My point being, Your Honor, there wasn't

13 testimony that you needed a hundred or 50 people previously.

14 It's just what the other, Mr. Leder testified to he had, not

15 what was required to be there.

16       THE COURT:  This is what this witness had predicted

17 he would need in 2007.  Weather he actually had it in April of

18 2009, I suppose they're going the argue.

19       MR. GERSH:  Okay.  Thank you, Your Honor.

20 Q.    So, I think I got down to art, and you corrected me.  I

21 got ahead of myself.  There are six under art.  Do you see

22 that?

23 A.    I to.

24 Q.    One under web technician support.  One under design.  Then

25 you've got content teams, A, B, C and D.  Those are four each.

1  Carries over to the next page. Do you see that?
2  A. Three for A, three for B. All right. Not four each.
3  It's three, three, four, four.
4  Q. Is that because you have a blank next to content designer
5  Curt Stocker? Is that why you're saying there are three under
6  content team A?
7  A. I'm looking at the numbers that are being paid, so. It
8  has a zero number. I'm assuming it's, no number, I'm assuming
9  nobody's there.
10 Q. All right. Three, three. Content team four, that's C is
11 four. Content team D is four. Programming is three. Art is
12 four. Is that right?
13 A. That's right.
14 Q. Okay. And you can do the math. Correct me, but I came up
15 with 51.
16 A. I trust you.
17 Q. You trust me. Okay. As of April, 2009, Interplay didn't
18 have 51 people working on the Fallout MMO, did it?
19 A. Not 51, no.
20 Q. And as you work forward in this document, it goes to a
21 full production two stage, and full production three stage, is
22 that correct?
23 A. Correct.
24 Q. And as you work forward, additional art -- additional
25 employees or developers are added, right?

1   A.   That's right.
2   Q.   So, 51 is the starting point for full production, right?
3   A.   That's what that document shows, yes.
4   Q.   You also talked at your deposition about a game design
5   document. Do you remember that?
6   A.   There was a game design document, yes.
7   Q.   We discussed it, right?
8   A.   Correct.
9   Q.   Okay. And would you agree, though, just having a game
10  design document doesn't mean that you're in full scale
11  development, right?
12  A.   That's right.
13  Q.   And earlier you mentioned the video that's been the
14  subject of some discussion earlier today. Do you remember
15  seeing that?
16  A.   Did I talk about it with you?
17  Q.   When you went the Masthead, when you saw the video, the 90
18  second video that you were so impressed with?
19  A.   I didn't see a video at Masthead. I took a video of what
20  the game, I was shown at Masthead, the game was there.
21  Q.   And what would, I'm sorry if I got the terminology wrong,
22  but you saw, was it a game demo?
23  A.   Well, it was more. It was an up and running game.
24  Q.   It was an up and running game you would say?
25  A.   That's what I just said.

1   Q.   Okay. I'm just making sure. I don't want to misconstrue
2   your words. I want to make sure the words are correct that I'm
3   using. So, when was that trip to Masthead?
4   A.   In March.
5   Q.   March of 2009?
6   A.   Correct.
7   Q.   And was that prior to entering into the Letter of Intent?
8   A.   The trip to Masthead was, yes.
9   Q.   Okay. And you said that that game was, was it fully
10  developed?
11  A.   No. It takes four years. It wasn't fully developed.
12  Q.   Okay. I'm sorry. I've lost the terminology. How did you
13  refer to that, up and running game?
14  A.   Correct.
15  Q.   Okay. Having that up and running game, did that mean that
16  you were in full scale development?
17  A.   Yes, it did.
18  Q.   So you were in full scale development before you signed
19  the Letter of Intend with Masthead?
20  A.   Not really.
21  Q.   Not really?
22  A.   Not really.
23  Q.   Well, help me. I thought you just said you were in full
24  scale development when there was the up and running game, and
25  that was before the Letter of Intent, correct?

1  A.  If we were to retain Masthead, and not until then we were
2  not interested in their work.  Once we retained them to make
3  the work, and the work that they have already done means we
4  were in full scale production at that time.
5  Q.  Interesting.  Do you have any documents from April, 2009,
6  that reflect that Interplay was in full scale development?
7  A.  I'm not sure what kind of documents you would be referring
8  to.
9  Q.  Did you ever send an email to Masthead saying "We're in
10 full scale development."
11 A.  I sent a letter to Bethesda.
12 Q.  Okay.  Other than the one, you're talking about the one
13 liner that says you're in compliance of the requirements.  Is
14 that what you're talking about here?
15         MR. GERSH:  Objection to characterization of the
16 letter, Your Honor.  It isn't a one line letter.
17         THE COURT:  Refer to the exhibit.
18         MR. MARBURY:  I will.
19 Q.  Do you have that exhibit book up with you still?
20         THE CLERK:  I have it.
21         MR. MARBURY:  I'm sorry.  Thank you.  I appreciate
22 that.
23         THE CLERK:  You're welcome.
24 Q.  Tab five, please.
25 A.  I'm there.