# Exhibit 36

## GAME PRODUCTION AGREEMENT

This Game Production Agreement (the "Agreement") is made and entered into as of this 30th day of June 2008 (the "Effective Date"), by and between INTERPLAY ENTERTAINMENT CORP., a Delaware corporation with a principal place of business at 100 North Crescent Drive, Suite 324, Beverly Hills, CA 90210 ("Publisher"), and INTERACTIVE GAME GROUP, a Delaware limited liability company with a principal place of business at c/o The Corporation Trust, 1209 Orange Street, Wilmington DE 19801 ("Producer").

### RECITALS

WHEREAS, Publisher is involved in the business of developing, publishing and licensing video Game products;

WHEREAS, Producer is in the business of acquiring, producing and financing video Game products;

NOW, THEREFORE, in consideration of the covenants and agreements set forth herein, and for good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties agree as follows:

**1. Submission of Games**

1.1 As used in this Agreement (including the preamble and the recitals), the terms in capital letters shall have the respective meanings ascribed to such terms in Exhibit 1.

1.2 From and after the Effective Date, Publisher may present to Producer games ("Games") and certain other information in the possession or control of Publisher applicable to such Games. Producer may request Publisher to provide additional information and materials regarding any Game, for Producer to determine whether such Game meets the "Qualifying Game Criteria", as defined in Section 1.3 below.

1.3 For a Game to qualify for production and funding under this Agreement, it must satisfy each of the following criteria (the "Qualifying Game Criteria"), each as determined or waived by Producer in its sole and absolute discretion:

(i) Development and Production Costs do not exceed $15.0 million and are not less than $0.5 million;
(ii) The Game has a clean chain of title;
(iii) Developer has been approved by Producer, Publisher, Completion Guarantor if any and Distributor;
(iv) A Development Agreement is executed between Publisher or Producer, and Developer and, if executed by Publisher, has been approved by Producer;
(v) The Development Agreement, Milestone Delivery Schedule and Payment Schedule have been approved by Producer, Publisher, Completion Guarantor if any and Financier if any;
(vi) The development of the Game is covered by a Completion Bond issued by a Completion Guarantor,

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT NO. 1
12/4/09
Wendy S. Schreiber

IPE- 0000470

(vii)  A Distribution Agreement is executed, with Distributor(s) having agreed to market and distribute the Game with royalties payable to Publisher and Producer and aggregate Minimum Guarantee(s) covering at least the Game Development and Production Costs,

(viii) The Distributor(s) have agreed to pay the Minimum Guarantees to Producer or any Financier;

(ix)   Credit worthiness of the Distributor providing the minimum guarantee, and of the Publisher, have been verified and accepted by Producer and Financier, if any at the time of acquisition of the Game;

(x)    Financing for the Game is available, under terms and conditions acceptable to Publisher and Producer;

(xi)   Sales projections have been made available by Publisher and Distributor;

(xii)  A supplement to the present Agreement (the "Supplemental Agreement"), covering the specific aspects of the relevant Game, the services to be provided by Publisher and Producer, and the compensation payable to Producer, shall have been negotiated and entered into by Publisher and Producer, to the satisfaction of Publisher, Producer, Financier as well as Completion Guarantor, if any.

1.4   Neither Publisher nor Producer makes a guaranty, whether implicit or explicit, that Games will be presented or will meet the Qualifying Game Criteria, and in particular that a Development Agreement will be executed, that a Distributor will provide Minimum Guarantees satisfactory to the parties and/or that funding will be available for a given Game.

**2. Purchase and Sale of Games**

2.1   Subject to the terms and conditions set forth herein, Publisher shall sell to Producer and Producer shall purchase and acquire from Publisher all of the Rights throughout the Territory with respect to each Game meeting the Qualifying Game Criteria, for the duration of the Supplemental Agreement. Such Rights shall automatically revert to Publisher upon fulfillment by Publisher of its obligations under the Supplemental Agreement, subject to any applicable restrictions under the Transaction Documents with Financiers. Producer's obligation to purchase a Game is subject to the satisfaction or waiver by Producer of each of the conditions set forth in Section 2.3 hereof;

2.2   Purchase Price; Payment. For each Game, the purchase price shall be an amount equal to the Development and Production Costs for such Game (the "Purchase Price"). Upon the consummation of Producer's acquisition of a Game and all Rights thereto, such Game shall be an Acquired Game. Subject to the terms and satisfaction of conditions set forth in this Agreement, the Purchase Price shall be payable by Producer to Publisher in accordance with the Supplemental Agreement on the applicable Acquisition Date for the Acquired Game.

2.3   Conditions Precedent to the Purchase of a Game. Producer's obligation to purchase a Game and the Rights thereto are subject to the satisfaction or waiver by Producer of the following conditions:

(i)    All materials in accordance with Section 1.2 have been presented by Publisher to Producer and applicable Financier;

(ii)   Each of the Qualifying Game Criteria has been satisfied or waived;

(iii)  Appropriate documentation has been executed, to the complete satisfaction of each of Publisher, Producer, Financier, if any, and Completion Guarantor, if any, covering in particular overruns of Budget, payment of royalties and other compensation to the parties involved;

- 2 -

CONFIDENTIAL
ATTORNEY'S EYES ONLY

IPE- 0000471

 (iv) There is no pending or, to the knowledge of Publisher or Producer, threatened, action, suit, investigation, litigation or proceeding affecting the Game or the ability of any of the Distributors to distribute the Game in accordance with the terms of the Distribution Agreements;

 (v) There are no events of default or potential events of default under this Agreement or the Supplemental Agreement, and such agreements are in full force and effect and constitute the legal, valid and binding obligation of the parties thereto and are enforceable against such parties in accordance with their respective terms, and all conditions precedent to the effectiveness of the same have been satisfied;

 (vi) In cases where external financing is to be used, satisfactory Transaction Agreements have been entered into between and among Producer, Financier, Completion Guarantor, and, where applicable, Publisher, Developer and/or Distributor;

 (vii) Publisher and Producer have entered into a Rights Agreement with respect to such Game; and

 (viii) A Completion Guaranty is in place with respect to such Game.

## 3. Services

3.1 Producer and Publisher shall cooperate in order to have the following services provided, such scope to be reviewed and allocated between Publisher and Producer on a Game by Game basis:

Development/Production.

 (i) Developing and/or reviewing the Game Design Document and Technical Design Document for each Game;

 (ii) Entering into a Development Agreement for such Acquired Game and performing its obligations thereunder;

 (iii) Causing the applicable Developer to perform all of its obligations under the Development Agreement and the applicable Completion Guaranty;

 (iv) Overseeing, supervising and reviewing the development of such Acquired Game and each Milestone Deliverable for such Acquired Game to ensure that such Milestone Deliverables are developed in accordance with the Game Design Document and Technical Design Document ;

 (v) Determining whether each Milestone Deliverable is acceptable under the applicable Development Agreement;

 (vi) Providing Publisher and Producer prompt notice of any default under any Development Agreement;

 (vii) Identifying, recruiting and negotiating contracts with third parties necessary for the development of each Acquired Game in accordance with the terms of the applicable Supplemental Agreement;

 (viii) Reviewing the Budget Delivery Schedule, Payment Schedule, and Milestone Delivery Schedule for such Game consistent with all restrictions and limitations set forth herein;

 (ix) With respect to each Game, testing (in accordance with the Delivery Schedule) to verify that:
   (A) all features and functionality described in the Game Design Document and Technical Design Document for such Game are implemented and working and are free from any software defects that prevent verification of such features and functionality;

- 3 -

CONFIDENTIAL
ATTORNEY'S EYES ONLY IPE- 0000472

|     |     |
| --- | --- |
|     | (B) such Game is complete in terms of assets, functionality, Game flow and in accordance with the Game Design Document and Technical Design Document and can be verified as such; |
|     | (C) such Game is ready for delivery to Publisher's or Distributor's quality assurance department or an outside provider of such quality assurance testing services for verification and the complete final testing cycle; |
|     | (D) the Game has been debugged, performance and memory have been optimized, and Game balancing and tuning are complete; and |
|     | (E) the Game is a Completed Game; |
| (x) | Producing and delivering (or arranging for the production and delivery of a Gold Master for each Completed Game to the Distributors; |
| (xi) | Causing such Game to be and remain a Game meeting all Game Qualifying Criteria; |
| (xii) | Delivering or causing the delivery to the Distributors all of the items set forth on the Delivery Schedule for such Game; |
| (xiii) | Complying with and causing the Developer of each Acquired Game to comply with all applicable labor and collective bargaining agreement requirements; and |
| (xiv) | Other publishing services necessary to deliver a Gold Master for each Acquired Game in accordance with interactive game industry practices. |

Funding of Game / Completion Guaranty.

| | |
| --- | --- |
| (i) | Identify potential sources of funding for the Game; |
| (ii) | Use such sources of funding to fund applicable accepted Milestone Deliverables; |
| (iii) | Cause each of the Distributors to deliver to Publisher a security agreement and all supplements thereto; |
| (iv) | Assist all parties and taking all reasonable actions to secure production insurance and a Completion Guaranty(ies) for each Acquired Game, all in form and substance consistent with the terms set forth in the Transaction Documents; |
| (v) | Collecting Minimum Guarantees from Distributor(s). |

**4. Development and Production costs and production fees**

4.1    The Development and Production Cost for each Game are defined in Exhibit 1 hereto.

4.2    Publisher may charge up to 20% of the Game Development and Production Cost as a production fee, subject to approval by Financier and Completion Guarantor, if any.

**5. Distribution Agreements**

5.1    Under the Distribution Agreement, Distributors will pay the Minimum Guarantee upon delivery of the Gold Master Candidate or at any other date jointly defined by Publisher, Producer and Financier, and then royalties in an amount defined on a Game by Game basis in the relevant Game Distribution Agreement.

5.2    The distribution rights shall include the right to sell, distribute, sub-distribute (subject to compliance with pre-approved contractual guidelines), license (subject to compliance with pre-

- 4 -

CONFIDENTIAL
ATTORNEYS EYES ONLY   IPE-0000473

approved contractual restrictions), sell and otherwise exploit each Game. Applicable restrictions, including as to formats, languages, channels of distribution, term and territory shall be specifically addressed in each Distribution Agreement on a Game-by-Game basis.

5.3   The Distributor(s) shall be responsible for any required manufacturer approvals/approval process, and for placing and funding all manufacturing orders with respect to each applicable Acquired Game.

### 6. Financing / Cost of financing

6.1   Publisher and Producer shall co-operate to optimize financing sources and financing costs.

6.2   For each Game, Publisher and Producer will aim at achieving the following objectives:

   (i)    Interest Rate: LIBOR increased by a margin of 300 to 700 basis points depending on the credit rating of the Distributor, the characteristics of the Game and other factors having a potential impact on the cost of capital;
   (ii)   Unused Commitment Fee: to be discussed with applicable Financier
   (iii)  Security Package: The security package shall include the following: (a) all of the rights, title and interest in and to the Game and all versions thereof; (b) a corporate guarantee of Publisher and of all its Affiliates, acceptable to the Financier; (c) for each Game, a deposit as a percentage of the Game Development and Production Costs, upon such Game becoming an Acquired Game; such percentage to be negotiated with the Financier; and (d) Completion Guaranty, if any.

### 7. Supplemental Agreement

7.1   For each Game, Publisher and Producer will enter into a Supplemental Agreement, defining and adapting the services set forth in Section 3 hereof, the sharing of responsibilities between Publisher and Producer, the compensation payable to Producer, as well as the financing for such Game.

7.2   Such Supplemental Agreement shall also contain covenants imposed upon Publisher, including but not limited to:

Affirmative covenants

   (i)    Compliance with laws;
   (ii)   Payment of taxes;
   (iii)  Corporate maintenance;
   (iv)   Maintenance and inspections of books and records;
   (v)    Performance of covenants;
   (vi)   Defense of rights and notices of infringement;
   (vii)  Solvency.

Negative covenants:

   (viii) No infringement;
   (ix)   No liens; no impairment of assets;

- 5 -

CONFIDENTIAL
ATTORNEY'S EYES ONLY
IPE- 0000474

(x)   Lender's security interest therein;
(xi)  No transfers, sale of Acquired Games or related Intellectual Property Rights.

7.3   Publisher will have the option to cancel a Game at any time, subject to the following terms and conditions: (i) immediate repayment to Producer or Financier of all Milestone Deliverables approved and funded, including interest and fees, and (ii) payment of a kill fee to Producer as specified in the relevant Supplemental Agreement.

## 8. Compensation of Producer

8.1   In consideration of the services provided to date by Producer to Publisher, including *inter alia* assistance to the negotiations of licensing deals and strategic advice, as well as a consideration for Producer to enter into the present Agreement, Publisher will issue to Producer a warrant (the "Warrant"), whose characteristics are set forth in Section 8.2 below.

8.2   The warrant enables I2G to purchase 2,000,000 shares of Common Stock of the Publisher as consideration for entering into the Game Production Agreement with Publisher. Such warrant was issued, and any underlying shares of Common Stock would be issued, in a private placement exempt from registration pursuant to section 4(2) of the Securities Act of 1933. Such warrant has a term of 10 years, an exercise price of $0.13, is immediately exercisable as to 400,000 shares of Common Stock and becomes exercisable at any time after 60 days with respect to 400,000 shares of Common Stock for each game up to 4 games that meets the requirements for production and funding under the Game Production Agreement between the Publisher and Interactive Game Group, LLC , and was otherwise issued in accordance with the terms of the Form of Warrant Agreement filed as Exhibit 10.07 to the Publisher's Form 10-Q for the period ended March 31, 2008.

8.3   The allocation of Warrants to Producer is in addition to any other compensation payable to Producer under any Supplemental Agreement.

## 9. Representations and warranties

Each party hereby severally represents and warrants to the other party and agrees as follows:

9.1   Existence; Good Standing; Power and Authority.  Such party (i) is duly organized, validly existing and in good standing under the laws of the applicable state and/or country in which it is organized and in each jurisdiction in which it is required by applicable law to be qualified to transact business; (ii) has all necessary power and authority to carry on its business as now being conducted and as contemplated by the Transaction Documents; and (iii) has the necessary power and authority to execute, deliver and perform this Agreement and the other Transaction Documents to which it is a party or by which its assets are bound.

9.2   Due Authorization; No Conflicts; Binding Effect.  Such party's execution, delivery and performance of this Agreement, the other Transaction Documents to which it is a party or by which its assets are bound has been duly and validly authorized by all necessary action on the part of such party and does not and will not require any consent or approval of any Person or governmental authority. This Agreement and the other Transaction Documents to which it is a party or by which its assets are bound constitutes the legal, valid and binding obligation of such party, enforceable against such party

- 6 -

CONFIDENTIAL
ATTORNEY'S EYES ONLY

in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar Laws and equitable principles relating to or limiting creditors' rights generally.

9.3 No Violation of Laws, Etc. Such party's execution, delivery and performance of this Agreement and the other Transaction Documents to which it is a party by which its assets are bound will not violate or constitute a breach or default (whether upon lapse of time and/or the occurrence of any act or event or otherwise) under (i) the Constitutive Documents of such party; (ii) any Law to which such party or by which any of its assets is subject; or (iii) any contract to which such party is a party that is material to the financial condition, results of operations or conduct of the business of such party.

9.4 Actions; Lawsuits. With respect to Publisher, there is no pending or, to the knowledge of Publisher, threatened, action, lawsuit, investigation, litigation or other proceeding affecting Publisher or any of its assets, other than those already disclosed in any regulatory filings.

## 10. Events of default

If any of the following events (each, an "Event of Default") shall occur and be continuing:

10.1 Breach of Representations and Warranties. Any representation or warranty made by each party under or in connection with this Agreement.

10.2 A party fails to perform or observe in any respect any other material term, covenant or agreement contained in this Agreement, the Development Agreements, the Distribution Agreements or other Transaction Documents on its part to be performed or observed, if such failure shall remain uncured for twenty (20) consecutive calendar days after receipt of notice.

10.3 Bankruptcy Event. A Bankruptcy Event with respect to Publisher or Producer;

10.4 Distribution Agreement Default. Any default shall have occurred and be continuing under any of the Distribution Agreements, including, without limitation, failure of such Distributors to pay the Minimum Guarantee and to remit cash receipts to Producer when and as required under the Distribution Agreements;

10.5 Development Agreement Default. Any default shall have occurred and be continuing under any of the Development Agreements.

10.6 Default of Debt Obligations. The failure of Publisher, Distributors and/or any Developer to pay any of their respective debt when due, after the expiration of all grace periods, and after giving effect to any amendments, waivers or other modifications to or under the agreement or instrument relating to such debt.

10.7 Defaults under Other Transaction Documents. An event of default under any of the other Transaction Documents.

then, and in any such event (after the expiration of any applicable cure periods), the other party, by written notice, may immediately terminate the present Agreement.

## 11. Indemnification

CONFIDENTIAL
ATTORNEY'S EYES ONLY

IPE- 0000476

11.1   Indemnities.   Each party (the "Indemnitor") shall indemnify, defend and hold the other party (the "Indemnitee"), and all of its employees, agents, officers, directors, parents, subsidiaries, owners, shareholders, affiliates, licensees, successors and assigns, harmless from and against any third party claim, liability, judgment, cost or expense, including reasonable outside attorneys' fees and disbursements (individually and collectively, a "Claim"), suffered or incurred as a result of or by reason of any breach by the Indemnitor of any of its representations, warranties, covenants or other obligations set forth in this Agreement, other than for Claims suffered or incurred as a result of the gross negligence or willful misconduct of the Indemnitee. All indemnities contained in this Section 11 shall survive the expiration or earlier termination of this Agreement.

11.2   Action or Proceeding.   Promptly after receipt by an Indemnitee of notice of the commencement of any action or proceeding involving a Claim, such Indemnitee shall promptly give notice to Indemnitor of the commencement of such action or proceeding; provided, however, that the failure of such Indemnitee to give any such notice shall not (i) relieve Indemnitor of its obligations, except to the extent that such failure results in the forfeiture of rights or defenses and Indemnitor incurs an increased obligation to such Indemnitee on account of such failure, and (ii) in any event relieve Indemnitor from any liability with respect to Indemnitee which Indemnitor may have otherwise on account of this Agreement or any other Transaction Document. If any such action or proceeding is brought against Indemnitee, unless in the reasonable opinion of counsel for such Indemnitee a conflict of interest between Indemnitee and Indemnitor may exist in respect of such action or proceeding and representation of both would be inappropriate, Indemnitor shall be entitled to participate in and to assume the defense thereof with counsel reasonably satisfactory to Indemnitee. Indemnitor shall not, without the prior written consent of Indemnitee, effect any settlement of any such pending or threatened action or proceeding, unless such settlement includes (x) an unconditional release of Indemnitee from all liability on claims that are the subject matter of such action or proceeding, (y) no admission or acknowledgment of culpability or wrongdoing by Indemnitee and (z) no provision for any non-monetary relief to any Person to be performed by Indemnitee. Indemnitor shall not, without the prior written consent of the Indemnitee, effect any settlement of any pending or threatened action or proceeding, which consents to any injunction against such Indemnitee.

12. Miscellaneous

11.1   Tax Matters.   The parties intend and agree that neither this Agreement nor the transactions contemplated herein shall be treated as or give rise to a partnership for federal income tax purposes or any other purpose. The parties agree not to take any position inconsistent with the foregoing on a tax return or otherwise except to the extent otherwise required under applicable law. The parties agree that if this Agreement were ultimately determined by a taxing authority to be treated as a partnership for any tax purpose, then all items of income, gain, deduction, loss and credit of such deemed partnership shall be allocated to the parties in the manner that will most closely cause the items of income, gain, deduction, loss and credit realized by them from the transactions contemplated by this Agreement to be the same as if such tax partnership treatment had not occurred. In such event, the parties shall file tax returns in a manner consistent with, and cooperate as necessary in order to give effect to, the preceding sentence.

11.2   Amendments and Waivers.   Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated except in writing. No delay or omission to exercise any right, power or remedy accruing to any party hereto shall impair any such right, power or remedy of such party nor be construed to be a waiver of any such right, power or remedy nor constitute any course of dealing or performance hereunder.

- 8 -

CONFIDENTIAL
ATTORNEY'S EYES ONLY

IPE- 0000477

11.3  Costs and Attorneys' Fees. In the event that any action, suit or other proceeding is instituted concerning or arising out of this Agreement, the prevailing party shall recover all of such party's costs and reasonable attorneys' fees incurred in each and every such action, suit or other proceeding, including any and all appeals or petitions therefrom.

11.4  Successors and Assigns; Assignment. Except as otherwise provided in this Agreement, all rights, covenants and agreements of the parties contained in this Agreement shall be binding upon and inure to the benefit of their respective permitted successors and assigns. Publisher may not assign this Agreement (or its rights) and/or assign or delegate its duties and obligations hereunder or under any other Transaction Document to which it is party without the prior written consent of Producer. Producer may not assign this Agreement (or its rights) and/or assign or delegate its duties and obligations hereunder or under any other Transaction Document to which it is party without the prior written consent of Publisher.

11.5  Notice. Any notice or demand which any party is required, or may desire, to give to the other parties shall be in writing and shall be given by addressing the same to the other parties at the address hereinafter set forth, or at such other address as may be designated in writing by any such party by notice given to the other in the manner prescribed in this Section 11.5 and shall be deemed effective (a) when delivered personally during normal business hours, (b) on the date of receipt specified in any return receipt if it shall have been deposited postage prepaid in the United States mail (certified or registered with return receipt requested), (c) on the second Business Day after dispatch by Federal Express, DHL, Airborne or other recognized international courier service, or (iv) when sent by facsimile transmission, if, and only if, such facsimile transmission is followed within two (2) Business Days by a written notice sent in accordance with clauses (a), (b) or (c) above, whichever of the foregoing shall first occur; provided, however, that any notice alleging a default must be given by the means set forth in clauses (a), (c) or (d) above.

    **To Publisher:**

    Interplay Entertainment, Corp.
    100 North Crescent Drive, Suite 324
    Beverly Hills
    CA 90210
    Attn: Chief Executive Officer
    Facsimile: (___)

    with a copy to:
    (___)

    **To Producer:**
    Interactive Game Group, LLC
    c/o The Corporation Trust Company
    1209 Orange Street, Wilmington, DE 19801
    Attn: General Manager
    Facsimile: (617) 395-0180

    with a copy to:
    Lawyers for Interactive Media & Entertainment
    132 Fayerweather Street

CONFIDENTIAL
ATTORNEY'S EYES ONLY

IPE- 0000478

Cambridge, MA 02138
Attn: Steven A. Bercu, Esq.
Facsimile: (617) 812-2554

11.6   Headings; References, Etc. In this Agreement, headings are for convenience only and shall not affect interpretation, and except to the extent that the context otherwise requires: (a) references to any legislation or to any provision of any legislation include any modification or re-enactment of, or any legislative provision substituted for, and all statutory instruments issued under, such legislation or such provision; (b) references to any document, agreement or other instrument (including this Agreement) include references to such document, agreement or other instrument as amended, novated, supplemented or replaced from time to time; and (c) references to any party to this Agreement or any other document, agreement or other instrument referred to herein includes its permitted successors and assigns.

11.7   Counterparts. This Agreement may be executed in one or more counterparts, each of which, when executed and delivered, shall be deemed an original but all of which together shall constitute one and the same instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto.

11.8   Severability. If any provision of this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. If, moreover, any restriction or other provision of this Agreement shall for any reason be held to be too broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing such provision or restriction so as to be enforceable to the extent compatible with applicable Law, the parties hereby agreeing that said restrictions and other provisions of this Agreement are fair and reasonable as at the date hereof. The parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

11.9   No Third Party Beneficiaries. This Agreement is not for the benefit of any third party and shall not be deemed to give any right or remedy to any such party whether referred to herein or not. The cost of such enforcement shall initially be borne by the party bringing the claim.

11.10   Governing Law; Jurisdiction. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO CONFLICTS OF LAW PRINCIPLES (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW). Each of the parties hereto hereby irrevocably submits to the non-exclusive jurisdiction of any New York State or Federal court sitting in the Borough of Manhattan, The City of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Transaction Document, and each of the parties hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State court or in such Federal court. .

11.11   No Consequential or Punitive Damages. IN NO EVENT SHALL A PARTY HERETO (OR ANY AFFILIATE OF A PARTY HERETO) BE LIABLE FOR ANY CONSEQUENTIAL DAMAGES OR LOSS WHICH THE OTHER PARTIES HERETO (OR ANY OF THEIR AFFILIATES) MAY SUFFER OR SUSTAIN AS A RESULT OF ANY BREACH BY SUCH FIRST-MENTIONED PARTY HERETO (OR AN AFFILIATE OF SUCH FIRST-MENTIONED PARTY HERETO) OF THIS AGREEMENT. IN NO EVENT SHALL A PARTY HERETO (OR AN

CONFIDENTIAL
ATTORNEY'S EYES ONLY

IPE- 0000479

AFFILIATE OF SUCH PARTY HERETO) BE LIABLE FOR PUNITIVE DAMAGES, THE RIGHT TO WHICH IS EXPRESSLY WAIVED BY EACH PARTY HERETO.

11.12 <u>Waiver of Jury Trial</u>. Each of Producer and Publisher hereby irrevocably and unconditionally waives all rights to trial by jury in any action (whether based on contract, tort or otherwise) arising out of or relating to this Agreement or any other Transaction Document or the actions of any party, Publisher or any Indemnified Party in the negotiation, administration, performance or enforcement hereof or thereof and for any counterclaim therein.

11.13 <u>Entire Agreement</u>. This Agreement and the attached Exhibits and Schedules together contain the entire understanding of the parties, and there are no further or other agreements or understandings, written or oral, in effect between the parties relating to the subject matter hereof unless expressly referred to herein. No party to this Agreement makes any representation or warranty except as expressly set forth herein.

[Remainder of page intentionally left blank]

CONFIDENTIAL
ATTORNEY'S EYES ONLY

IPE- 0000480

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

INTERPLAY ENTERTAINMENT, CORP.

By: _____

Name: Hervé Caen

Title: CEO

INTERACTIVE GAME GROUP, LLC

By: _____

Name: Frédéric Chesnais

Title: General Manager

CONFIDENTIAL
ATTORNEY'S EYES ONLY

IPE- 0000481

EXHIBIT A - Definitions

"Acquired Game" means a Qualifying Game for which Producer has purchased the Rights from the Publisher.

"Acquisition Date" means, with respect to an Acquired Game, the date of Producer's acquisition of such Game and the Rights thereto.

"Affiliate" means, as to a Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person. The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and polices of a Person, whether through the ownership of Voting Stock, by contract, or otherwise.

"Bankruptcy Event" means, with respect to a Person, the occurrence of either of the following:

(i) a case or other proceeding shall be commenced, without the application or consent of such Person, in any court, seeking the liquidation, reorganization, debt arrangement, dissolution, winding up, or composition or readjustment of debts of such Person, the appointment of a trustee, receiver, custodian, liquidator, assignee, sequestrator or the like for such Person of all or substantially all of its assets, or any similar action with respect to such Person under any Law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, and such case or proceeding shall continue undismissed, or unstayed and in effect, for a period of sixty (60) consecutive days; or an order for relief in respect of such Person shall be entered in an involuntary case under the federal bankruptcy Laws or other similar Laws now or hereafter in effect; or

(ii) such Person shall generally not pay its debts as such debts become due or shall admit in writing its inability to pay its debts generally or such Person shall commence a voluntary case or other proceeding under any applicable bankruptcy, insolvency, reorganization, debt arrangement, dissolution or other similar Law now or hereafter in effect, or shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee (other than a trustee under a deed of trust, indenture or similar instrument), custodian, sequestrator (or other similar official) for, such Person or for any substantial part of its property, or shall make any general assignment for the benefit of creditors, or shall be adjudicated insolvent, or admit in writing its inability to pay its debts generally as they become due, or, if a corporation or similar entity, its board of directors shall vote to implement any of the foregoing.

"Budget" means, with respect to a Qualifying Game, the line item presentation of all Development and Production Costs for such Qualifying Game prepared by the Developer and the Producer in accordance with standard practices in the United States interactive game software industry and approved by the Producer and, where applicable, Completion Guarantor.

"Completed Game" means an Acquired Game that (i) is free and clear of all Liens (other than Liens created pursuant to this Agreement or the Transaction Documents), (ii) with respect to which the Distributors have received and accepted all delivery items (as described in the applicable Completion Guaranty) listed on the Milestone Delivery Schedule for such Acquired Game which are required to enable the Distributors to commence manufacturing or to allow suppliers or manufacturers to commence manufacturing, as acknowledged in writing by the Distributors and the Completion Guarantor, and (iii) has been approved for manufacturing by all applicable manufacturers.

"Completion Guaranty" means a completion guaranty agreement (including the principal agreement and standard terms and conditions related thereto, an interparty agreement and each other agreement executed pursuant to the terms thereof), by and among Producer and Publisher (and Financier if applicable), on the one hand, and the Completion Guarantor, on the other hand, which shall have a payoff amount equal to at

- 13 -

CONFIDENTIAL
ATTORNEY'S EYES ONLY

IPE- 0000482

least the Development and Production Costs; and (ii) which completion guaranty agreement and related documents shall be in the form satisfactory to all parties involved.

"Completion Guarantor" means a third party entity (or entities) acceptable to Producer, Publisher and Financier, if any, which provides a Completion Guaranty for an Acquired Game.

"Constitutive Documents" means, as to a Person, such Person's certificate of incorporation, formation or registration (including, if relevant, certificates of change of name), memorandum of association, articles of association or incorporation, charter, by-laws, trust deed, partnership, limited liability company, joint venture or shareholders' agreement or equivalent documents constituting the organization or forming of such Person, in each case as the same may from time to time be amended, supplemented or otherwise modified pursuant to the terms hereof.

"Copyright" means all United States and non-U.S. copyrights, whether registered or unregistered, and pending applications to register the same.

"Cost to Complete" means, with respect to a Game as of any date of determination, the anticipated amount of remaining Development and Production Costs required in order to deliver such Game as a Completed Game, consistent with the Budget, the Technical Design Document, the Game Design Document, and the Completion Guaranty for such Game.

"Delivery Schedule" shall have the meaning set forth in the Development agreement and the Completion Guaranty applicable to each Game.

"Development and Production Costs" means with respect to a Game, and as set forth in the Budget, the aggregate of the following costs incurred or to be incurred by Developer, Publisher and/or Producer to deliver a Completed Game, without duplication: charges and expenses incurred by Developer, Publisher or Producer directly in connection with development and production of each such Game, all Completion Guaranty fees (including the Contingency and the Guaranty Fee), financing costs, administrative costs, and other actual out-of-pocket costs.

"Developer" means, with respect to a Game, the third-party entity engaged in the development of such Game.

"Development Agreement" means, with respect to an Acquired Game, the Development Agreement, by and between the applicable Developer and Producer or Publisher.

"Distribution Agreements" means, with respect to a Game, a distribution agreement or agreements between and among Producer and the applicable Distributor(s).

"Distributor" means an entity involved in the business of distribution interactive software.

"Domain Names" means all Internet domain names, whether active or inactive, registered or under pending registration.

"Financier" means, with respect to the applicable Game, in cases where external financing is to be used, one or more financial institutions providing the financing for such Game.

"Game" means an interactive entertainment software.

"Game Design Document" has the meaning set forth in the applicable Development Agreement.

"Game Rights" means all Rights in and to an Acquired Game.

"Gold Master" shall have the meaning specified in the applicable Distribution Agreement.

- 14 -

CONFIDENTIAL
ATTORNEY'S EYES ONLY

IPE- 0000483

"Indebtedness" of a Person means, without duplication:

(i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person for the deferred purchase price of property or services (other than any portion of any trade payable obligation that shall not have remained unpaid for ninety-one (91) days or more from the later of (a) the original due date of such portion and (b) the customary payment date in the industry and relevant market for such portion and other than trade payables incurred in the ordinary course of such Person's business being contested in good faith), (iii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iv) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (whether or not the rights and remedies of the seller or lender under such agreement in an event of default are limited to repossession or sale of such property), (v) all leases which are capitalized in accordance with GAAP to which such Person is a party, (vi) all obligations, contingent or otherwise, of such Person under acceptance, letter of credit or similar facilities, (vii) all obligations of such Person to purchase, redeem, retire, defease or otherwise acquire for value any equity interests of such Person, (viii) the net amount of all financial obligations of such Person in respect of any interest rate swap, hedge or cap agreement, (ix) the net amount of all other financial obligations of such Person, which would be considered debt in accordance with GAAP, under any contract or other agreements to which such Person is a party, (x) all indebtedness of other Persons of the type described in clauses (i) through (ix) above guaranteed, directly or indirectly, in any manner by such Person, or in effect guaranteed, directly or indirectly, by such Person through an agreement (a) to pay or purchase such indebtedness or to advance or supply funds for the payment or purchase of such indebtedness, (b) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such indebtedness or to assure the holder of such indebtedness against loss, (c) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (d) otherwise to assure a creditor against loss, and (xi) all indebtedness of the type described in clauses (i) through (ix) above secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for payment of such indebtedness.

"Intellectual Property Rights" means all Copyrights, Trademarks, Domain Names and other intellectual property rights, and all national, foreign, state and common-law registrations, applications for registration, renewals and extensions of the foregoing, together with all goodwill symbolized by the foregoing, and all so-called "moral rights of authors" or "droit moral" rights (and/or any similar or analogous rights under any applicable Law of any jurisdiction) with respect to any of the foregoing, and the right to make such changes therein, and/or uses thereof, as the owner shall from time to time determine in its sole discretion, regardless of whether any such rights arise under the Laws of the United States or any other state, country or jurisdiction, and all rights and remedies against infringement or other violation thereof.

"Law" means any present or future statute, regulation or ordinance, whether municipal, county, state, national or territorial; any executive, administrative or judicial regulation, order, judgment or decree; any treaty or international convention; any rule or principle of common law or equity; or any requirement with force of law, each as amended from time to time.

"Liens" means any lien (statutory or other), claim, charge, security interest, mortgage, deed of trust, pledge, hypothecation, assignment, conditional sale or other title retention agreement, preference, priority or other security agreement or preferential arrangement of any kind, and any easement, encroachment, covenant, restriction, right of way, defect in title or other encumbrance of any kind.

"Milestone Deliverable" means, for each Acquired Game, each deliverable item/service to be delivered/provided by Publisher, Producer, the applicable Developer and/or the applicable third party(ies) in connection with the development and production of such Acquired Game.

- 15 -

"Milestone Delivery Schedule" means, for each Acquired Game, the schedule of each Milestone Deliverable, as prepared and approved by Producer.

"Minimum Guarantee" means the non-refundable but recoupable amount to be paid by a Distributor as an advance against cash receipts with respect to an Acquired Game as set forth in the Distribution Agreement for such Acquired Game.

"Payment Schedule" means, for each Acquired Game, the schedule of Milestone Payments to be made to the applicable Developer, Publisher, Producer or the applicable third party(ies) with respect to the delivery and acceptance of each Milestone Deliverable for such Acquired Game, as such payment schedule is approved by the parties involved and the applicable Completion Guarantor and as such payment schedule may be accelerated as provided in the applicable Completion Guaranty.

"Person" means any individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company, or other entity, or a government or any political subdivision or agency thereof.

"Qualifying Game" means a Game that meets all of the Qualifying Game Criteria.

"Rights" means, with respect to an Acquired Game, all rights purchased, assigned and licensed to Producer pursuant to a Rights Purchase Agreement, including without limitation, the distribution rights and Intellectual Property Rights with respect to such Acquired Game, and all benefits, privileges, causes of action and remedies relating to any of the foregoing, whether before or hereafter accrued, including without limitation, the exclusive right to apply for and maintain all such Rights; to sue for all past, present or future infringements or other violations of any Rights and to settle and retain proceeds from any such actions.

"Rights Purchase Agreement" means, with respect to an Acquired Game, the agreement between and among Producer, Publisher and, where applicable, Developer, pursuant to which Producer acquires the rights for such Acquired Game.

"Technical Design Document" means the document with respect to each Game setting forth in detail the technical specifications with respect to such Game, as approved by the Producer and the Completion Guarantor.

"Territory" has the meaning ascribed to it in the applicable Distribution Agreement.

"Trademarks" means all United States, state and non-U.S. trademarks, service marks, trade names, designs, logos, slogans and general intangibles of like nature, whether registered or unregistered, and pending registrations and applications to register the foregoing, together with all goodwill symbolized by the foregoing.

"Transaction Documents" means this Agreement, the Development Agreement, the Distribution Agreements, the Completion Guaranty for each Game, the Supplemental Agreements, the Rights Purchase Agreements, the security agreements, and any and all other agreements, instruments or documents ancillary to any of the foregoing, all as may be executed and delivered and as may be amended from time to time.

"Voting Stock" means capital stock or shares issued by a corporation, or equivalent interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or Persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

CONFIDENTIAL
ATTORNEY'S EYES ONLY

IPE- 0000485