# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| BETHESDA SOFTWORKS LLC<br><br>Plaintiff,<br><br>v.<br><br>INTERPLAY ENTERTAINMENT CORP.<br><br>Defendant | Case No. 09 CV 2357 (DKC)<br><br>**DEFENDANT/COUNTERCLAIMANT INTERPLAY ENTERTAINMENT CORPORATION'S MEMORANDUM RE DELAWARE LAW OF CONTRACT FORMATION** |
| INTERPLAY ENTERTAINMENT CORP.<br><br>Counter-Plaintiff,<br><br>v.<br><br>BETHESDA SOFTWORKS LLC, and Roes 1 through 20, Inclusive,<br><br>Counter-Defendants. | |

**DEFENDANT/COUNTERCLAIMANT INTERPLAY ENTERTAINMENT CORPORATION'S MEMORANDUM RE DELAWARE LAW OF CONTRACT FORMATION**

## INTRODUCTION

The validity of the contract is a significant issue, which must be addressed by the Court in this matter. Under Delaware law, a valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration. *Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010). All three elements are required.

Here, both parties signed the Asset Purchase Agreement (APA) and Trademark License Agreement (TLA) indicating an intent to be bound and both parties purported to exchange promises of performance. The inquiry does not end with the intent to be bound, however, even if the contract is writing. To be binding and enforceable, the contract must clearly express the terms of the parties' agreement. A fatal flaw in the TLA arises because the terms of the TLA are not sufficiently definite to establish there was a meeting of the minds as to certain very material terms.

As consideration for the APA and as a condition of Interplay's sale of the Fallout intellectual property to BSW, Interplay licensed back the rights to create a "Fallout-branded MMOG," which Interplay always understood to be a massively multiplayer game (MMOG) that includes essential characters, back story and other references sufficient to be recognizable as a Fallout game. Specific language intrinsic to the TLA objectively supports Interplay's reasonable interpretation. Yet BSW contends the same language shows that it intended something entirely different: that Interplay's Fallout MMOG should be just a word on a box.

The Court may not substitute its own views for those of the parties if the transactions at issue contain terms that are too indefinite to be enforced. *See, e.g., Pharmathene, Inc. v. SIGA Tech., Inc.*, 2010 WL 4813553 (Del. Ch. 2010) at *7, 10 ("Where essential terms are lacking, a

**DEFENDANT/COUNTERCLAIMANT INTERPLAY ENTERTAINMENT CORPORATION'S
MEMORANDUM RE DELAWARE LAW OF CONTRACT FORMATION**

court is not permitted to insert its own judgment and terms...")(internal quotation omitted).  In this case, although Interplay believes that an objective reading of the TLA comports with its interpretation, Delaware law provides that the TLA is void and unenforceable if the Court cannot objectively determine what rights were conveyed under the TLA.  If the TLA is void, the APA also is void and should be rescinded because the TLA is a material term of the APA.  If the TLA itself is too indefinite to bind the parties, the APA suffers from the same infirmities because it incorporates the TLA as a material term, as if it were set forth in full within the APA.  The TLA, because it is invalid, also constitutes an unfulfilled condition precedent to Interplay's sale of the intellectual property.   The parties should be restored to the pre-APA status quo and their relationship should be governed by the 2004 Exclusive Licensing Agreement (ELA) that was in effect prior to April 4, 2007

## I.   THE APA AND TLA ARE VOID UNDER DELAWARE LAW

Delaware follows the 'objective' theory of contracts, which requires the Court to construe a contract as it would be understood by an objective, reasonable third party. *Osborn*, 991 A.2d at 1159.  The Court must read the contract as a whole and give effect to each provision and term so as not to render any part of the contract mere surplusage and so as not to render a provision or term "meaningless or illusory." *Ibid*.  Clear and unambiguous contracts are given effect based on the plain-meaning of their terms and provisions. *Id.* at 1160.

Contracts that are reasonably susceptible to multiple and different interpretations, however, are held to be ambiguous. *Ibid*.  Where essential terms of an agreement are indefinite, "a court is not permitted to insert its own judgment and terms." *Min. Invco No. 7, Inc. v. Midwest Wireless Hldgs.,* 902 A.2d 786, 793 (Del.Ch. 2006). Where terms in an agreement are so vague that a court cannot determine the existence of a breach, Delaware law provides that the parties

have not reached a meeting of the minds. *Continental Ins. Co. v. Rutlidge & Co., Inc.*, 750 A.2d 1219, 1230 (Del. Ch. 2000). In that instance, the court should deny the existence of the alleged agreement. *Ibid*.

Delaware courts have relied on these principles to void contracts in a number of cases. In *Most Worshipful Prince Hall Grand Lodge of Free and Accepted Masons of Delaware v. Hiram Grand Lodge Masonic Temple,* 80 A.2d 294, 296 (Del.Ch. 1951), the court held that a written contract was void because its terms were too indefinite. The *Most Worshipful* court held that well-settled Delaware law requires an agreement to contain reasonably definite and certain terms to be legally binding. *Id*. at 295. The court determined that a written stock holders agreement providing that stock was not to be voted except in cases of misgovernment "or anything that would work harm" to the plaintiff was ambiguous. *Ibid*. The term "anything that would work harm" was too indefinite and the agreement did not contain any other language by which it could be made more definite. *Ibid*. Because the court objectively could not determine whether the parties' conduct was permitted by their agreement, the court held that the agreement must be declared invalid. *Id.* at 296.

In *Hindes v. Wilmington Poetry Society*, 138 A.2d 501, 503 (Del.Ch. 1958), the court again recognized that material provisions of a contract can be so indefinite as to void a contract. The court declared a publishing agreement invalid for indefiniteness where the parties did not sufficiently define an essential provision related to royalty payments. The court held the agreement void because the parties had not agreed on the basic consideration. *Id.* at 504.

In *Biasotto v. Spreen*, 1997 WL 527956, 4-5, a Delaware court invalidated a contract in a dispute over an alleged employment agreement. Although the agreement allegedly promised long-term employment, the court determined that the conditions of that employment were not

sufficiently defined to enable the court to "discern the obligations and responsibilities which would inure to the parties" under the contracts. *Ibid*. The court held that where an agreement is not definite and certain in its material terms, it is not legally binding. *Ibid.*

In *Lynch & Assoc. v. Sweeten Contracting*, 1999 WL 743953 at 1(Del. Super. 1999), the trial court determined that a contract related to the construction of a karate studio was unenforceable. . The court of appeals affirmed. *Id.* In *Lynch*, the dispute arose with respect to the commission term in the parties' written agreement. *Ibid*. Relying on *Most Worshipful*, *supra*, the court held that the contract was ambiguous and unenforceable because it was impossible to determine from the face of the contract how the commission was to be calculated. *Lynch*, 1999 WL 743953 at 2.

Delaware court's voided another agreement due to indefiniteness in *In re Radiological Assoc.*, 1990 WL 67839 (Del. Ch. 1990). There the trial court determined that despite the parties intent to enter into a contract, their agreement was not binding or enforceable because it was neither certain nor definite in its terms related to where, how long, or even what specifically the plaintiff was employed to do. *Id*. at 7. When the court cannot understand exactly what it is the parties have undertaken, it cannot find a binding contract.

> A. **Material terms of the TLA are indefinite and render the TLA void.**

"[T]he terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Restatement (Second) of Contracts* § 33 (1981). In this case, the TLA is too contradictory, confusing and vague to constitute an enforceable contract. Like the parties in *Hindes*, *supra*, the parties here objectively failed to define essential terms in their agreements. *Hindes*, 138 A.2d at 503.

### i.     The TLA is invalid if the Court cannot determine what Interplay was licensed to do.

Section 2.1 of the TLA authorizes Interplay to use the Fallout trademark, "on and in connection with its FALLOUT-branded MMOG."  What constitutes the scope of the "Fallout-branded MMOG" on which Interplay is authorized to use the trademark is not defined in either the TLA or APA.  Interplay and BSW contend this provision means completely different things based on the language of the TLA.

The Court must construe the agreement as a whole, however, and looking to other provisions of the TLA demonstrates that what constitutes a "Fallout-branded MMOG" is objectively and reasonably susceptible to mean an MMOG that includes copyrighted elements of the original Fallout games.  BSW argues that the Court must rely on a dictionary definition of the word "brand" to mean "name."  Under such a construction, Section 2.1 circularly only permits Interplay to use the trademark on or in connection with itself.  BSW's reading of the TLA demonstrates that the grant of rights in the agreement is indefinite and uncertain because it directly conflicts with Section 3.4.

### ii.     The terms of the TLA are materially inconsistent.

Section 3.4 is a material term of the TLA because it governs ownership of the intellectual property in the MMOG and its content following a termination.  The contract addresses the possibility that the license may terminate prior to the commercial release of Interplay's Fallout-branded MMOG.  Section 3.4 of the TLA details the elements of Fallout Intellectual Property - in addition to the trademark - Interplay must cease to use in its MMOG should the TLA terminate. It details the Fallout MMOG elements that Interplay may continue to use in a "*non*-Fallout MMOG." (Emphasis added.)

Such materials, deemed "Interplay-Derived MMOG Elements" include:

> *inter alia*, any or all locations, graphic representations, creatures, monsters, names, likenesses, behaviors, religions, deities, environments, legends, fairy tales, stories, universes, character classes or character professions that are in the public domain, are owned by any entity other than Bethesda and/or its affiliates and/or licensors or otherwise are not subject to [Bethesda's] copyright or trademark protection.

Section 3.4 of the TLA further explains that the Interplay-Derived MMOG Elements are those which:

> ***do not use***, incorporate, trade on or otherwise exploit ***any Fallout-related intellectual property created by Interplay or by Bethesda*** or by their respective parents, subsidiaries, affiliates, successors or assigns, ***including without limitation any Fallout artwork, locations, graphic representations, story lines, creatures, monsters, names, likenesses, behaviors, environments (e.g., vaults), universes, settings, legends, characters, character classes, character professions, packaging, advertisements, text and translations, and any and all Fallout proprietary characters, trademarks, copyrights and artwork*** listed in Exhibit C-2 to the APA, it being understood and agreed by the parties that all such property is and shall remain exclusively owned by Bethesda. (Emphasis added.)

Thus, when declaring what rights each party would continue to hold and exploit following a termination of the TLA, the parties explicitly agreed that Interplay would continue to exploit only those elements of the MMOG that do not use elements of Fallout-related intellectual property created by Interplay or BSW.

There is no logical reason to define "Interplay-derived MMOG Elements" if Interplay does not hold any rights to use any elements of the Fallout brand to create a Fallout-branded MMOG as BSW contends. All game elements would be Interplay-derived. If Interplay never had any right to use the Fallout elements, the parties would not have set forth in such detail which elements of the Fallout-branded MMOG (i.e. those elements specifically unrelated to the Fallout universe) Interplay may continue to use if the TLA terminates. To read Section 3.4 of the TLA otherwise would render this section nugatory.

The Grant of Rights in Section 2.1, if it includes only a trademark, also conflicts with Section 9.3.4, which requires Interplay to "wind down the operation of the Fallout MMOG" in the event the TLA is terminated or expires and to cancel all user agreements in the event the TLA terminates.  BSW's assertion that Interplay only holds a right to call a game "Fallout," but not to use any of the related Fallout game elements flies in the face of this provision, which would be unncessary.

If  Section 2.1 of the TLA never authorized use of any Fallout-related intellectual property, the MMOG could never contain material that was not original to Interplay.  It never would contain any material that was not "Interplay-derived."  Because Section 3.4 recognizes Interplay's rights to continue using the Interplay-derived MMOG Elements of its Fallout-branded MMOG, but not those owned by BSW or otherwise subject to copyright or trademark protection by BSW, there never would be a need for Interplay to wind down its MMOG or cancel user agreements.  Interplay could just rename the game.

### iii.     The Quality Control provisions do not make sense.

The Quality Control provisions of the TLA also are material.  Quality provisions are very important in a trademark license because the mark owner is obliged to police the quality of the licensed product or risk the destruction of the mark through the grant of a naked license.  Here though, TLA Section 5.1.2 states that the Licensed Product (which is defined elsewhere in the agreement as the Fallout MMOG) shall be the "same quality as, or exceed in quality, the quality of the Licensed Products..."  What standard applies when the Fallout MMOG only has to be at least as good as the Fallout MMOG? There is no way to tell.

### B. Because the TLA is invalid, the APA also fails.

The indefiniteness and uncertainty of the TLA renders the APA unenforceable, too. Section 7.13 of the APA states in relevant part:

"this Agreement is deemed to include all of the exhibits, annexes, and schedules hereto, which expressly are made a part hereof and incorporated herein and will be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein."

The TLA is Exhibit B-1 to the APA, and so is incorporated into the APA by virtue of Section 7.13.

The TLA is absolutely material to the entire transaction contemplated by the APA. The TLA is an essential part of the consideration (in addition to the Merchandising Rights for Pre-Existing Fallout Games and monetary payments) that Interplay negotiated in exchange for the transfer of rights to BSW. It is enumerated in Section 2.6 as first on the list of the Closing Deliveries that BSW was to provide to Interplay. Section 6.2 of the APA explicitly and definitively states that Interplay's obligations under the APA -- including to convey ownership of the intellectual property to BSW -- is expressly conditioned on BSW having delivered the TLA prior to the Closing. BSW warranted that the TLA would be a "legal, valid, and binding obligation of Purchaser [i.e. BSW]." *See*, APA at Section 3.23(c).

As set forth above and as will be shown at trial, however, the TLA is not a valid and binding agreement. Therefore, the APA also is void because:

1. the TLA is a material term of the APA and a material part of the consideration but is too uncertain and indefinite to be enforced;

2. Interplay did not receive all of the consideration for transfer of the Fallout intellectual property because the TLA is void; and

- 9 -

3. delivery of the TLA as a valid and binding agreement was an express condition precedent to transfer of the intellectual property.

Upon the Court's finding the TLA and APA void, the parties' relationship will revert to the ELA.  It is important for the Court to understand that none of BSW's conduct to date contravenes the rights it holds under the ELA.  BSW has released two single player Fallout games since 2007; this is within the scope of its license under the ELA.  The ELA grants BSW a perpetual option to create Fallout single player games, which means BSW can continue to create and exploit Fallout games into the indefinite future.  Similarly, all of Interplay's conduct also is within the scope of the ELA.  Interplay only has sold the Pre-Existing Fallout Games and developed the Fallout MMOG, both of which it is permitted to do under the ELA.

DATED:  December 11, 2011            GERSH | DERBY, Attorneys at Law


By:_____/s/_____
     JEFFREY F. GERSH

Attorneys for Defendant/Counter-Claimant Interplay Entertainment Corp.