UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION


BETHESDA SOFTWORKS, LLC          .   DOCKET 09-CV-2357-DKC

          vs.                    .   GREENBELT, MARYLAND

INTERPLAY ENTERTAINMENT          .   DECEMBER 12, 2011

CORPORATION                      .


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DEBORAH K. CHASANOW
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S

FOR THE PLAINTIFF:          HOWARD STAHL, ESQ.
                            JOSEPH LOBUE, ESQ.
                            AARON TUCKER, ESQ.

FOR THE DEFENDANT:          JEFFREY GERSH, ESQ.
                            GEOFFREY HERVEY, ESQ.



Court Reporter:             Sharon O'Neill, RMR
                            Official Court Reporter
                            United States District Court
                            6500 Cherrywood Lane
                            Greenbelt, Maryland 20770
                            301-344-3227

1                               INDEX

2    DEFENDANT'S WITNESSES        DIRECT   CROSS   REDIRECT   RECROSS

3    Herve Caen                     39

1          THE COURT:  Good morning.

2          VOICES:  Good morning.

3          THE CLERK:  Good morning, Your Honor.

4          THE COURT:  Please be seated.

5          THE CLERK:  The matter now pending before the

6   Court is DKC 2009-2357, Bethesda Softworks, LLC vs.

7   Interplay Entertainment Corporation.  The matter now comes

8   before the Court for a bench trial.

9          Counsel, would you please identify yourselves for

10  the record.

11         MR. STAHL:  Good morning, Your Honor.  Howard

12  Stahl, Joseph LoBue and a new addition, Aaron Tucker from

13  Fried Frank, on behalf of the plaintiff, Bethesda

14  Softworks.

15         MR. GERSH:  Good morning, Your Honor.  Jeffrey

16  Gersh and Geoffrey Hervey on behalf of Interplay

17  Entertainment, the cross-complainant.

18         THE COURT:  Very good.  Thank you.

19         Well, last I checked, I had received late last

20  night an additional pretrial memorandum from Interplay.  On

21  Friday, I had -- I don't know if it was Friday or

22  Thursday -- I had received one from Bethesda.  I've also

23  received some deposition copies.

24         As I think you probably know, I thought I was

25  waiting for some counter-designations on Mr. Caen, so I

1    didn't read all of that.  I had started it, but I have not

2    read all of what I was presented with ahead of time.

3         I have read the designations on Frederick

4    Chesnais -- I don't know how to pronounce that -- because I

5    had both designations on that, and just this morning, I

6    understand, an additional deposition has been given to the

7    clerk.  Obviously I haven't had a chance to read that one.

8         That's where I'm in preparation for today.

9         MR. GERSH:  If I could just address that.  There

10   won't be any counter-designations on Mr. Caen because we

11   can't designate anything to be read into the record.

12        THE COURT:  Well, I'm not sure that's true if you

13   felt there were other portions that would make complete or

14   clarify what had been designated by the plaintiff.  I

15   understand you can't affirmatively use the deposition, but

16   I didn't know whether there were designations that you felt

17   were completeness type.

18        MR. GERSH:  There are, and we approached it based

19   upon what affirmatively would be put forth.  We will

20   certainly provide for Your Honor tonight the

21   counter-designated portions.

22        THE COURT:  Okay.  And he's available and will be

23   called.

24        MR. GERSH:  Yes.

25        THE COURT:  I'm sure before we're all finished

 1    I'll have a full idea of what each side believes, but

 2    that's why I decided I -- I really couldn't, because I

 3    don't want to have to go back and say, oh, well, that was a

 4    couple of lines before or after what I did read.

 5              MR. GERSH:  Understood.  Thank you.

 6              THE COURT:  But I will undertake to read them as

 7    soon as I can.  Whether it's at a lunch break or this

 8    evening, I certainly will do that.

 9              Are there going to be any counter-designations --

10    what was the one that was handed today?

11              MR. GERSH:  James Leder.

12              THE COURT:  Leder?

13              MR. STAHL:  Your Honor, I don't believe there

14    will be, but, again, we'll look again tonight if that's

15    Your Honor's preference, is to have things that will

16    clarify, either before or after request.  We'll give them

17    to you first thing in the morning if there are any, but I

18    don't think there will be.

19              THE COURT:  Right.  Okay.  This is James Leder

20    that was just given to me.  All right.

21              Okay.  Well, that's what I've been able to do in

22    advance of today.  So, Mr. Stahl, are you ready to begin?

23              MR. STAHL:  Good morning, Your Honor.  The first

24    matter, I believe, Your Honor, and it may be completely

25    moot --

1          THE COURT:  We need to -- I hope I don't have to

2    remind you all the time.  These microphones need to be

3    adjusted so that I and Ms. O'Neill and everyone else can

4    hear.

5          MR. STAHL:  Okay.  Thank you, Your Honor.

6          THE COURT:  Um hum.

7          MR. STAHL:  This may be an academic request, and

8    I was going to ask the Court to invoke the rule on

9    witnesses.  On our side, on the plaintiff's side, we have

10   Mr. Leder here as the corporate representative.  Mr. Bidaux

11   is the expert, and he's obviously entitled to remain in the

12   courtroom during the proceedings.  And the others folk are

13   lawyers with me, or paralegals, so I think they're exempt.

14         I believe, based on what counsel for Interplay

15   said this morning, that the corporate representative for

16   Interplay was Mr. Caen and that everybody else that's in

17   the courtroom are lawyers for Interplay, and if that's

18   correct, I think the rule could be invoked, but no one will

19   have to leave.

20         THE COURT:  Right.  Okay.

21         MR. GERSH:  I don't have any problem.  My only

22   question was whether or not it was appropriate for

23   Mr. Bidaux to be here given the deposition issues that we

24   had concerning the ability to take it and whatnot.  I would

25   ask that he actually be excluded during the testimony.

1          MR. STAHL:  Your Honor, the --

2          THE COURT:  Right.  Yeah, I -- frankly, I don't

3  know that it matters because it's my understanding he is

4  not going to be testifying based on the evidence that's

5  applicable to the dispute directly to the people here, that

6  he's -- I mean I'm not sure that it matters because he's

7  not going to be opining as to anything based upon the

8  evidence presented here in court.

9          MR. GERSH:  My only issue is that --

10          THE COURT:  He then doesn't really need to be

11  here because he isn't going to be commenting on anything

12  here.

13          MR. STAHL:  Your Honor, he's here to assist the

14  Court in explaining whatever questions the Court has about

15  the --

16          THE COURT:  No, he's your expert.  He's not mine.

17          MR. STAHL:  But he's here only for the purpose of

18  helping to inform the Court as to --

19          THE COURT:  But you'll be the one asking the

20  questions --

21          MR. STAHL:  That is correct.

22          THE COURT:  -- as to what you think will help me.

23          MR. STAHL:  That's correct.

24          THE COURT:  How early in this process is he going

25  to be called?

1    MR. STAHL:  I think it all depends on how long it

2  is that the defendant's case takes, given where the burden

3  is in proving license.

4    But, Your Honor, under the rules, under the

5  federal rules and the local rules, an expert is entitled to

6  remain in the courtroom.

7    THE COURT:  Because an expert usually is

8  expressing an opinion based upon matters in evidence, and

9  this is a different type of expert.

10    I'm not going to exclude him.  I know he's here,

11  but I would suggest that the better approach is just to get

12  him on and off if he's not going to be -- if his testimony

13  is not dependent on the other evidence that I hear.

14    MR. STAHL:  Your Honor, in light of the Court's

15  ruling a week ago on the burden, he'll go on and off, I

16  believe after the defendants have put on their evidence as

17  to full-scale development in an MMOG and the building of

18  it.

19    I believe, Your Honor, given that we are the

20  plaintiff, we have the burden, at least with respect to the

21  counts we've alleged on infringement, copyright

22  infringement, trademark infringement and our request for a

23  declaratory judgment on lack of the license or the

24  expiration of the license under the terms of the APA.  All

25  of the exhibits, Your Honor, that would establish the

 1   elements of those counts from our perspective have been

 2   agreed to in the sense that there are, I don't believe, any

 3   objections to them, with the exception of, perhaps, one.

 4   And with the Court's permission, we would just offer those

 5   into evidence now to put the plaintiff's case in on the

 6   parts that we have to prove, and then the burden would, of

 7   course, shift to the defendants to prove license.

 8            So with the Court's permission, I would do that.

 9            THE COURT:  All right.  I have your exhibit list

10   here in front of me, and let's go slowly so that we -- the

11   local rule is that when an exhibit number is mentioned, it

12   is received in evidence unless there is a contemporaneous

13   objection.

14            MR. STAHL:  Very well, Your Honor.

15            THE COURT:  Let's take it slowly so we can all

16   make sure we're ...

17            MR. STAHL:  The first question I had for the

18   Court, Your Honor, relative to the offering of evidence,

19   the parties have entered into stipulations of fact under

20   the Pretrial Order.

21            THE COURT:  Um hum.

22            MR. STAHL:  Do we move those -- is it the Court's

23   preference to move those into evidence right now so that

24   all of the stipulated facts are in evidence?  And if so, we

25   would move at this time that the stipulated facts be

1    allowed into evidence.

2            THE COURT:  All right.  Let's -- the stipulated

3    facts are in Section 7 of the Pretrial Order, and I believe

4    there was one additional one, but let's go through them.

5    I'm not going to read them.  It's on page 10, begins on

6    page 10 of the Pretrial Order.

7            MR. STAHL:  That's correct, Your Honor.

8            THE COURT:  It's A through -- A1 through 36.  And

9    let me get it in front of me.

10           MR. STAHL:  Your Honor, I believe the only other

11   one that's been agreed to is on page 23, Item 28, which is

12   the APA and the exhibits to it, and the annexes and

13   schedules, that it constitutes the entire agreement.

14           THE COURT:  Yes.  Those are the ones that my

15   notes reflected.  Is that understood, Mr. Gersh?

16           MR. GERSH:  Yes, Your Honor, with just one

17   clarification.  There's been a number of counts that have

18   been, as I understand from speaking to counsel, been

19   withdrawn.

20           THE COURT:  Um hum.

21           MR. GERSH:  And there's a number of facts that

22   apparently were stipulated to before that that are of no

23   relevance any longer to this matter.

24           THE COURT:  We won't worry about relevance.  We

25   can talk about that in your argument.  Is there a problem,

 1   though, if they --

 2           MR. GERSH:  I don't mean relevance in the legal

 3   sense.  I mean they don't apply to the case any longer

 4   because they're no longer pursuing those causes of action.

 5   I don't know if the Court needs to consider that now or

 6   just allow it to stay in and we'll move forward.

 7           THE COURT:  We'll just move forward at this

 8   point.  That will be the tail wagging the dog if we do

 9   that.

10           All right.  Those stipulated facts, as just

11   stated, are now on the record.

12           MR. STAHL:  Thank you, Your Honor.

13           Your Honor, as to the first count that we would

14   be pursuing, which is Count 2 of the First Amended

15   Complaint of Copyright Infringement, the elements of that

16   count are ownership of a valid copyright and infringed the

17   use of the protected works by the defendant.

18           To establish our ownership, we would offer

19   Plaintiff's Exhibit 1, which is the Asset Purchase

20   Agreement.  We would also offer Plaintiff's Exhibit 3,

21   which is the Copyright Assignment.

22           To establish, Your Honor, the validity of the

23   copyrights, again, it would be Plaintiff's Exhibit 1, the

24   Section 3.12.  And I should, Your Honor, just for

25   clarification, for the Court's information, as to the first

1    count on -- or the first element of ownership of the

2    copyrights, in Plaintiff's Exhibit 1, it was 2.1, 3.9, 5.9

3    and Exhibit A are the portions of Exhibit 1 which we were

4    relying on.

5              As to the validity of the copyrights as to

6    Exhibit 1, again, it's Section 3.12, and then it would be

7    Plaintiff's Exhibits 5 through 17, Your Honor, which are

8    certified copies from the Copyright Office of the

9    certificates of registration for all of the Fallout-related

10   copyrights.

11             MR. GERSH:  As to -- understanding the court

12   rules that if no objection is made, they're in evidence

13   already.  As to the copyright registrations, we do not have

14   complete copies of those, including the deposit receipts

15   for each one of the copyrights, so at this point we would

16   object to the copyright registrations being admitted as

17   incomplete.

18             MR. STAHL:  Your Honor, those have been emailed

19   to counsel for the defendants -- for the defendant.

20             THE COURT:  When were they emailed?

21             MR. STAHL:  I'm being told by my colleague

22   Mr. LoBue that this was discussed last week between the two

23   of you and you said you didn't need to see them but Joe

24   emailed them anyway to you.  And we have them here if you

25   want to see a copy of them.

1    MR. GERSH:  At no time did I ever say I didn't

2    need to see the deposit receipts.  As a matter of fact,

3    that's one of the things I need to see to make sure they're

4    complete.

5         The copyright registrations themselves are what

6    they are, but what goes with them is -- needs to be there

7    or we do not have a complete registration.  And I would

8    object to it if it's not complete because we don't know

9    what, in fact, the copyright is based upon the registration

10   document on the front, and we don't have the deposit

11   receipts.

12        THE COURT:  All right.  Are they here in the

13   courtroom?

14        MR. STAHL:  Yes, Your Honor, they're here.

15        THE COURT:  All right.  Then subject to them

16   being provided and having a chance to examine them, they're

17   conditionally received.

18        MR. STAHL:  Your Honor, for Interplay's

19   infringement, we have Plaintiff's Exhibit 32, which is an

20   admission by Interplay in its Interrogatory responses dated

21   February 8, 2011, at page 7, that it's using the

22   copyrighted Fallout works in its MMOG, and I quote, "By and

23   through its employees, officers and managing agents,

24   Plaintiff possessed both actual and constructive knowledge

25   of Interplay's development efforts with respect to the

1  Fallout brand at MMOG, including knowledge that the

2  contents thereof were derived from and contained elements

3  of the Fallout universe (originally created by Interplay),

4  including copyrighted or copyrightable content related to

5  characters, back story, et cetera."

6          We would also offer Plaintiff's Exhibit 30, which

7  is an admission by Interplay in its Form 10-K Annual Report

8  for the Fiscal Year ended December 31, 2010, at page F-21,

9  of its intent to continue to use the copyrighted elements

10  of the Fallout series in its purported Fallout-branded

11  MMOG.

12          Additionally, Your Honor, we would cite the

13  transcript of the August 4, 2011 preliminary injunction

14  hearing at page 76 -- just to refresh the Court's

15  recollection -- where the Court said, "There is no doubt

16  that Bethesda" -- and that's in brackets -- "owns the

17  copyrights, and I believe there is no doubt that as well

18  that Interplay concedes that in some fashion it's using

19  them in the development of the Fallout MMOG."

20          And that's not, obviously, evidential, but it's

21  to remind Your Honor of where we were on the 4th of August

22  of this year on this very issue.

23          THE COURT:  Are you suggesting that I should take

24  into account any evidence that I received on the

25  preliminary injunction hearing?  Because, otherwise, I

1    don't know why a finding I made at that time --

2            MR. STAHL:  Well, I think, Your Honor, a lot of

3    the evidence you're hearing right now --

4            THE COURT:  Probably the same.

5            MR. STAHL:  -- is very much the same evidence.

6    It certainly wasn't intended, Your Honor, to be evidence to

7    the Court, but it was a reminder as to where we were after

8    the evidence was adduced at the preliminary injunction

9    hearing on this very topic.

10           Plaintiff's Exhibit 40, which is the Interplay

11   website -- and it's the content of www.fallout-on-line.com,

12   and it's the actual content -- which reproduces elements of

13   Bethesda's copyrighted works or derivatives of that -- of

14   those works, including, but not limited to, Bethesda's

15   copyrighted Vault Boy character.

16           THE COURT:  How are we capturing this?

17           MR. STAHL:  We have printed it all, Your Honor.

18   Everything that's on the website, all of it, has been

19   printed.

20           THE COURT:  As of -- all right.  Well, let me

21   look at it.

22           MR. STAHL:  We have a disc of it, and the parties

23   have agreed that this disc is, in fact, what is on the

24   website.

25           Plaintiff's Exhibit 47, Your Honor, is the

1   copyright of the Vault Boy characters, and Plaintiff's

2   Exhibit 43 --

3           MR. GERSH:  Again, Your Honor, as to 47, same

4   objection as to 47 because we don't have the copyright on

5   that with the deposit receipts.

6           THE COURT:  All right.  You mean based upon the

7   earlier objection.

8           MR. GERSH:  The indication just says copyrighted

9   Vault Boy characters.  I don't believe it's complete with

10  all the documents.  Some of them were even unlegible.

11          MR. STAHL:  Your Honor, these are the documents

12  that are certified by the Government, that they've given to

13  us certifying that these copyrights have, in fact, been

14  registered.  They're --

15          THE COURT:  Are the packets complete that I have?

16          MR. STAHL:  Yes, Your Honor.  They're exactly

17  what the Copyright Office gives you when you want to

18  establish that you have the copyrights.

19          Your Honor, if it would be helpful to show you

20  the originals, they're now with the clerk, and these are

21  the certified copyright filings from the Government of what

22  these copyrights are.

23          MR. GERSH:  Your Honor, as to 47, I'm sorry.

24  That one does have the deposit receipts attached.  I just

25  looked at it.  I apologize.

1          THE COURT:  47 is okay then.  Okay.

2          MR. STAHL:  And 43, Your Honor, is the same.

3 It's copyrighted Fallout 3 game property, again as

4 certified from the Government as to be the certified

5 copyrights of that game.

6          MR. GERSH:  One moment.

7          (Pause.)

8          MR. GERSH:  Your Honor, I'm a little confused.

9 Maybe this goes to my examination, but that Exhibit 43

10 is -- is source code.  There's no allegation that we've

11 copied any source code.

12          MR. STAHL:  That's what's filed, Your Honor.

13 This is going to be an issue in this entire proceeding,

14 that all of these things we're talking about, the game and

15 the characters and all of it, other than the trademark, is

16 source code, which is computer software.

17          And what we've given to Your Honor are the

18 actual -- the governmental receipts to us, the governmental

19 certifications to us that the items identified are, in

20 fact, copyrighted.  And under Rule 901(7)(A)(7) that's all

21 that's required, is that we give to the Court the

22 certification from the Government.

23          And 902(4) is to the same effect, certified

24 copies of public records.

25          THE COURT:  I think you're talking apples and

1    oranges here, Mr. Gersh.  If this is what was filed, then

2    this is what was filed.  If you think I can't understand

3    it, that's a different problem.

4            MR. GERSH:  That's why I said it may go -- may go

5    to argument and questions.

6            THE COURT:  Um hum.

7            MR. GERSH:  But just so that it's clear, there's

8    no allegation in this complaint that we copied the game,

9    that we copied source code or any of that.  This had to do

10   with characters and images and trademarks.

11           THE COURT:  Okay.  Well --

12           MR. GERSH:  So, you know, while I understand the

13   document may be what it is --

14           THE COURT:  Um hum.

15           MR. GERSH:  -- and they may want it for some

16   purpose, and obviously I would have an opportunity to argue

17   concerning that, I guess my objection would be I don't know

18   what the relevance of the -- at least at this point, for

19   this document, would be to this case since there isn't any

20   allegations that we have, in fact, copied the game, copied

21   the source code or things of that nature.  That's all.

22           MR. STAHL:  Your Honor, our problem has always

23   been, as the Court will recall from prior arguments, we

24   don't know what they've done because they've never given us

25   a shred of source code or of software of a game that shows

1    how they've used these materials that belong to Bethesda,

2    but what we know from their admissions and Interrogatory

3    answers and testimony in the proceedings and statements of

4    counsel is they're using them.  And they're conceding

5    they're using copyrighted materials that belong to Fallout.

6            THE COURT:  Okay.

7            MR. STAHL:  As to the second count, Your Honor,

8    where we would offer evidence, again, I think this is all

9    without objection.  The First Amended Complaint on

10   Trademark Infringement, the elements are ownership of a

11   valid trademark; that the defendant used the mark or an

12   imitation of it; the use occurred in commerce in connection

13   with the sale, offering for sale, distribution or

14   advertising of goods and services; and the defendant used

15   the mark in a manner likely to cause confusion.

16            The first element would be to establish

17   Bethesda's ownership of the marks, and that's, again, the

18   Asset Purchase Agreement, Your Honor, Exhibit 1.  And,

19   again, it's Sections 2.1, 3.9, 5.9 and Exhibit A.

20            The second exhibit we'd offer, Your Honor, in

21   support of that proposition is Plaintiff's Exhibit 4, which

22   is the Trademark Assignment.

23            As to the validity of the trademarks, Your Honor,

24   again, it's Plaintiff's Exhibit 1, and it's Section 3.12,

25   that all of the -- this is in the agreement -- "All

1    registered copyrights, trademarks and service marks, and

2    all applications relating to any of the foregoing included

3    in the" -- capitalized -- "Fallout intellectual property,

4    are subsisting and valid under applicable law for those

5    respective categories of intellectual property.  There are

6    no facts or circumstances that would render any of the

7    purchased intellectual property invalid or unenforceable."

8            The second piece of evidence, Your Honor, we

9    would offer are Plaintiff's Exhibits 18 through 22, which,

10   again, are certified copies from the United States Patent

11   and Trademark Office of the registrations and notices

12   relating to Fallout.

13           As to infringement, Your Honor, we would offer

14   Plaintiff's Exhibit 40, which is the website, again, where

15   Interplay displays Bethesda's Fallout trademark, both in

16   its domain name and in its website content, and uses

17   Bethesda's Vault Boy design mark in a manner likely to

18   cause confusion.

19           The last count, Your Honor, that is still before

20   the Court, the others having been dropped, is Count 1 of

21   the First Amended Complaint, and that's the count for

22   declaratory judgment, which is that the license -- the

23   Trademark License Agreement expired on its face on April 4,

24   2009.

25           And the evidence on that, Your Honor, is

 1    Plaintiff's Exhibit 2, which is the Trademark License

 2    Agreement, which, as the Court knows, is attached to and is

 3    part of the Asset Purchase Agreement.  And in the case of

 4    the Trademark License Agreement, it's Section 2.3.

 5            And with that, Your Honor, I believe the

 6    plaintiff --

 7            THE COURT:  Okay.  There were three other

 8    declarations sought in Count 1.  Are those no longer at

 9    issue?  Declaration --

10            MR. STAHL:  They're now out -- they're now out of

11    the case, Your Honor.  I believe it's correct to say, and I

12    stand corrected if counsel for Interplay says I'm wrong,

13    the merchandising counts that were historically in the case

14    on both sides have now been dropped, that the case is now

15    about, singularly, the issues that we typically talk about

16    of full-scale development and the minimum financing of

17    $30 million and the scope of any license, to the extent one

18    exists, beyond the trademark.

19            Thank you, Your Honor.

20            THE COURT:  Um hum.

21            Mr. Gersh.

22            MR. GERSH:  Am I understanding plaintiffs to be

23    resting their case?

24            THE COURT:  Um hum.

25            MR. STAHL:  That's correct.

1          MR. GERSH:  We would move to dismiss, Your Honor.

2          THE COURT:  Okay.  I'll hear you on that.

3          MR. GERSH:  Your Honor, on a number of bases.

4  Primarily, Mr. Stahl completely has ignored the fact of the

5  ambiguity of the agreement and the vagueness of the

6  agreement, the lack of meeting of the minds.

7          We believe that Your Honor can review the

8  contracts.  You've already -- you've indicated previously

9  they're susceptible of multiple interpretations.  Mr. Stahl

10 has completely failed to deal with that entirely, and he

11 just assumes they're valid.

12          Contrary to his belief, we believe that if you

13 look at the contract themselves, on what was granted in

14 terms of the rights, if you start with paragraph 2.1 on the

15 Grant of Rights, it is vague, it is ambiguous, and it is

16 unenforceable because of a lack of meeting of the minds.

17          Now, Your Honor, there are three elements here in

18 Delaware to deal with concerning contract formation,

19 intent, consideration and what -- what did the parties

20 understand that they were contracting for, and there are

21 many cases which we've cited to Your Honor in the brief.

22 Obviously it was given to you late last night, and I

23 apologize, but we got a little messed up with our traveling

24 schedule in getting here and getting things to the Court,

25 but if I could point out a couple of things to the Court.

1          The issue -- maybe I should do this from the

2     lectern, Your Honor.  I apologize.

3          The Supreme Court in Delaware, in Lucille Osborn

4     vs. Michael Kemp, at 991 A.2d 1153, discusses ambiguity and

5     lack of meeting of the minds.  And it talks about that when

6     the Court can reasonably ascribe different meanings or

7     different interpretations to a contract, it will find the

8     contract to be ambiguous.

9          Starting just from that premise, and that case,

10    and even though we understand that the Court, under

11    Delaware law, looks to the objective test to determine

12    whether or not contract construction is what somebody

13    claims it to be, and it has to be a reasonable standard --

14    obviously the Court in this situation -- what we have here

15    are numerous material provisions in the Trademark License

16    Agreement that are so vague and so ambiguous as to render

17    the contract unenforceable as to there being a lack of

18    meeting of the minds, particularly, you know, in paragraph

19    2.1, as I've indicated.

20         2.1 discusses whether or not there was a -- what

21    a Fallout-branded MMOG is.  You have no evidence before you

22    as to what a Fallout-branded MMOG is, and I don't believe

23    that you can look at the contract and make a determination

24    in and of itself as to what a Fallout-branded MMOG is.

25         There have been -- there's testimony or there's

1    evidence before you in terms of at least the depositions --

2    and you've heard other testimony in this case previously;

3    I'm not sure I need to go through all of it -- that the

4    parties have a completely divergent view on.  As a matter

5    of fact, Mr. Stahl has indicated parol evidence is not

6    necessary in the case, and we've said we don't have a clear

7    understanding of what goes into that.

8            THE COURT:  Well, tell me why I look at anything

9    other than the exhibits that have been produced now to

10   decide whether they've provided a prima facie case of their

11   claim.  You're now asking me to look at deposition

12   testimony that I don't have, or argument of counsel that's

13   not evidence, maybe admissions on behalf of a party, but it

14   hasn't been articulated as such.

15           MR. GERSH:  I'm asking you --

16           THE COURT:  Just because the parties disagree as

17   to what a contract means didn't mean it's ambiguous.

18           MR. GERSH:  I agree with you.  I'm asking you to

19   take a look at the Trademark License Agreement.  That's

20   been put into evidence.

21           THE COURT:  Right.

22           MR. GERSH:  Okay?  The Trademark License

23   Agreement, just looking at that, in and of itself --

24           THE COURT:  Um hum.

25           MR. GERSH:  -- is an ambiguous document.  It

1    doesn't describe what it is Interplay was getting in terms

2    of a Fallout-branded MMOG.  And we believe that by looking

3    at that document, when you look at paragraph 2.1 and the

4    totality of the document, that you can't determine what it

5    is.  What goes into that Fallout MMOG?

6             Just one moment.  Excuse me one second.

7             Under paragraph 2.1, it deals with the grant of

8    license, a very material term, obviously, under this

9    agreement.  And it talks about, on page 2, that they're

10   allowing Interplay the right to use licensed marks on and

11   in connection with Interplay's Fallout-branded MMOG and for

12   no other purpose.  But we don't know what that is.  We have

13   no idea what their Fallout-branded MMOG is or what can be

14   contained in it, and there's been disputes before the Court

15   concerning what can go in it and what can't.

16             But that, in and of itself, is vague as to what

17   is supposed to be in that document.

18             If you then look at paragraph 2.3, paragraphs

19   that we will have to address here, we have this issue of

20   full-scale development.  There's no objective standard by

21   looking at this agreement.  What does full-scale

22   development mean?

23             If you look at paragraph 3.4, dealing with

24   Interplay-derived MMOG elements, it talks about what can be

25   taken out of the agreement and kept by Interplay.

1    Obviously, it seems to have some kind of conflict with

2    what's going in in the Grant of Rights, and I don't know

3    that they can be necessarily -- at this point, be

4    reconciled.

5            More importantly, if you look at the quality

6    control under paragraph 5, Bethesda -- there's a reference

7    in the agreement to goodwill and public maintenance of high

8    uniform standards of quality.  And then you go down to

9    paragraph 5.1.2.  That, again, is a material term because

10   it deals with quality, and it says that the quality must

11   be -- the quality of the licensed product must be the same

12   as the licensed product.  It's ambiguous.  Nobody knows

13   what that is.

14           If you look at paragraph 5.4, which is supposed

15   to deal with content and what goes into the document, all

16   it says is you can't have material that's offensive,

17   including nudity, offensive language.

18           And then Bethesda finally gets to approve the

19   agreement not to be -- I'm sorry, approves the ultimate

20   game not to be unreasonably withheld.  No standard, really,

21   other than this not to be unreasonably withheld.

22           If you look at paragraph 9.3.4, it talks about

23   termination of the agreement.  Interplay will, in 90 days,

24   wind down the operations of Fallout MMOG.  Why do they have

25   to wind down operations of something that could be removed

1    from the agreement -- removed from the game, okay, if they

2    have the right to keep something from it?  It makes no

3    sense.

4              There's just one material provision after the

5    other, the most important being what is the rights that

6    Interplay was granted?  What is a Fallout-branded MMOG?

7    And, Your Honor, I believe that that's not only susceptible

8    of multiple meanings, I don't believe there's an objective

9    basis from the contract upon which to determine that.  And

10   as such, that, given the other provisions that I have

11   discussed with the Court, would render the TLA ambiguous

12   and a nullity.

13             The TLA, as you know, is an integral part, a

14   material term, of the APA.  It is referenced in the APA as

15   one of the ancillary agreements to that document, and it

16   was part of what Interplay believed it was receiving as

17   consideration for the entire transaction.

18             In fact, under Exhibit 1, if you -- which is the

19   APA, specifically paragraphs 7.4 and 7.11 reference the --

20   they talk about transaction documents and what constitutes

21   the entire agreement between the parties, including the

22   TLA.

23             Therefore, this house of cards comes down on the

24   APA when you pull out the TLA, which is ambiguous, because

25   you take out a material agreement, a material term that

1    Interplay bargained for as part of this entire transaction.

2            Specifically, paragraph 7.11 talks about the --

3    this agreement, with the ancillary agreements in all

4    exhibits, annexes and schedules, are the transaction

5    agreements, and they -- the parties agree that they

6    collectively constitute the complete and entire agreement

7    of the parties relating to the sale, assignment, transfer

8    and conveyance.

9            So, Your Honor, as I've indicated, if -- if, in

10   fact, as we believe, the TLA is ambiguous under Delaware

11   law, where there has been no meeting of the minds on this

12   material term as to even what the scope is of the rights

13   that Interplay had, then -- and as the Court has indicated

14   previously, subject to different interpretations, you've

15   heard no evidence on it that it isn't, that it is -- I'm

16   sorry.  You've heard no evidence that it's clear and

17   unambiguous.

18           We believe that by reading the agreement, you,

19   yourself, cannot say objectively what are those rights that

20   were granted.  As such, it should be deemed ambiguous, it

21   should be not -- deemed unenforceable, and the TLA goes and

22   the APA goes.

23           Thank you.

24           THE COURT:  Don't you have another step?  Because

25   if they -- the plaintiff is alleging that they own the

 1    copyright, and you're saying they can't own it because the

 2    APA is out trademarks and copyrights?  Is that where you

 3    go?

 4              MR. GERSH:  Exactly, Your Honor.  If the --

 5              THE COURT:  Okay.

 6              MR. GERSH:  -- agreement is -- if the TLA is

 7    terminated --

 8              THE COURT:  Um hum.

 9              MR. GERSH:  -- because it's ambiguous, lack of

10    meeting of the minds of the parties --

11              THE COURT:  Um hum.

12              MR. GERSH:  -- then the APA is terminated.

13    Therefore, they don't own all of these copyrights.  We end

14    up back at the ELA, which is --

15              THE COURT:  Well, it doesn't matter where you end

16    up back.

17              MR. GERSH:  Well, that's correct.

18              THE COURT:  According to this argument for

19    your -- you're responding only to the complaint.  You're

20    not yet --

21              MR. GERSH:  That is -- I'm not yet --

22              THE COURT:  -- doing any counterclaim.

23              MR. GERSH:  -- talking about our claim.  Yes,

24    Your Honor.  I apologize for interrupting.

25              But you are correct.  If that all goes, they

 1   don't own these copyrights, they don't properly have a

 2   right to the trademarks, this is terminated, and we -- and

 3   that is the end of it.

 4          So based upon what -- the evidence they've put

 5   before you, our position is, is that this has been

 6   terminated -- or I'm sorry.  This is so ambiguous as to be

 7   unenforceable.  No meeting of the minds.  That you,

 8   yourself, cannot objectively determine what the material

 9   term is as a Fallout-branded MMOG, not to mention the other

10   paragraphs that I went through -- quality control,

11   paragraph 3.4, what goes in, what comes out.  That

12   everything goes; therefore, we have to terminate the TLA.

13   It's unenforceable.  The APA is unenforceable.

14          They do not have the rights that they say they

15   have by virtue of that.

16          MR. STAHL:  Might I be heard, Your Honor?

17          THE COURT:  Certainly.

18          MR. STAHL:  I think we've heard this before but

19   in a different format.  The last time I think it was raised

20   was to say that the contract was ambiguous.  We ought to

21   allow parol evidence to help inform the Court as to what

22   the term branded meant.

23          Our position always has been with Your Honor that

24   branded is a word of common meaning.  It's not upper case.

25   It's branded.  It means name identification.

1            And in all the times, Your Honor, this issue has

2    been raised, which is virtually every time we've been

3    before Your Honor, the defendant has never offered a shred

4    of evidence, not a piece of testimony, not an affidavit,

5    not a dictionary definition, not a case, not anything, to

6    say that the word branded means anything different than

7    name or identification.

8            The section is clear on its face.  It's a

9    limitation.  You can use the Fallout mark, but only in

10   connection with an MMOG that is named Fallout.  Not on a

11   cereal box.  Not on another game.  But it's limited to

12   that.

13           But a few other arguments that I think really

14   proceed the merits, Your Honor.  The burden is on the

15   defendant, if they want to argue that a contract is vague

16   or ambiguous, to allow parol evidence.  But to take the

17   leap that something may be ambiguous, which this is not,

18   and say that, ergo, it's unenforceable, I don't think I've

19   ever seen a case where that's ever occurred in my career.

20   I've seen plenty of cases where a Court has held a term to

21   be ambiguous and has allowed parol evidence and then has

22   listened to the testimony and interpreted the contract to

23   determine what it means, and that's always been the

24   defendant's position here.

25           If you go back, Your Honor, to the Pretrial Order

1   that's before Your Honor, they never raised the argument

2   that 2.1 or 3.4 were so ambiguous as to be unenforceable.

3   If you look at page 7 of the Order, they're talking about

4   Section 2.3, about full-scale development.  They don't even

5   reference 2.1, and they don't certainly reference any of

6   the other sections, 9 or any of the other that are raised

7   today for the position that the rest of the contract is

8   somehow ambiguous.  This has never, ever come up before.

9        Your Honor, you ruled a week ago, or thereabouts,

10  on this very same issue, but sort of wearing a different

11  set of clothes, about mistake.  That, hey, this was a

12  mistake.  What I really thought is I got all of this

13  intellectual property when I got the Fallout trademark, and

14  the Court ruled that mistake's not coming in at this late

15  date in this case.  And it was never pled, just like this

16  was never pled, ever in this case, that 2.1 is so ambiguous

17  that somehow on its face, the Court ought to rule in a

18  motion to dismiss, before any evidence has come in as to

19  even whether there's an ambiguity, that the contract is

20  unenforceable, let alone that it becomes unenforceable and

21  all the parties' rights get unwound, we go to the Copyright

22  Office and we ask for all the copyrights back.  This is

23  sort of a Hail Mary times two.

24       There isn't, as I said, Your Honor, in any of the

25  exhibits that the defendants have proposed to introduce

1   today, a shred of evidence that the word brand means

2   anything other than name.  There's not a document.  There's

3   not a deposition excerpt.  There's not a stipulation.

4   There's not anything that even deals with this question.

5           None of -- none of these arguments go to anything

6   other than an argument that they would like to rewrite the

7   contract during this trial.  And if the Court -- I don't

8   believe the Court has ruled finally as to whether any term

9   in this contract is ambiguous so as to allow the

10  introduction of parol.  The Court has indicated it may

11  allow parol evidence and then, at the end of the

12  proceedings, determine whether there was an ambiguity and

13  if the evidence should have been admitted or should be

14  admitted.

15          But to elevate that now on documents which have

16  come into evidence, that on their face are, in fact, signed

17  by the parties, valid agreements -- Your Honor, we're now

18  in December of 2011.  This contract was signed in April of

19  2007.  Have you ever seen any evidence in this case that

20  Interplay ever took the position it was invalid,

21  unenforceable?  They took the $5.75 million.  They

22  represented -- you're going to hear this evidence,

23  depending on how far this case goes, that they represented

24  to the Bankruptcy Court in 2007 that this agreement was

25  fair and reasonable, that it was the product of long, arm's

 1   length negotiations between Interplay and Bethesda where

 2   Interplay was represented by counsel.  We have the evidence

 3   of who their corporate counsel were reviewing drafts.

 4        They -- for four years -- they sent us a letter,

 5   Your Honor, in April of 2009 saying we have complied.  We

 6   have met full-scale development, and we have 30 million --

 7   we have the financing.  You've seen that before.  That's

 8   strange conduct for a party that now says it's so unclear,

 9   it's unenforceable.

10        Your Honor, at this point, the most, I think,

11   that the defendant can argue is that it wants to take the

12   position that the term branded is ambiguous.  It's

13   obviously a question of law for Your Honor, first, to

14   decide whether the term is even remotely ambiguous, and I'm

15   telling you, as I stand here today, having been before you

16   for over a year in this case, the defendant has yet to

17   offer a single shred of evidence, other than the argument

18   of counsel, that the term is ambiguous in the least.

19        So rather than moving to dismiss on the basis of

20   unenforceable contract, I would propose and suggest that

21   perhaps the best way to proceed is to allow the defendants

22   an opportunity to put on evidence of whatever they think is

23   appropriate, admissible and relevant, based on Your Honor's

24   rulings, to make that argument factually.

25        MR. GERSH:  Your Honor, may I raise a couple

1    things?

2            THE COURT:  Um hum.

3            MR. GERSH:  First of all, contrary to what

4    Mr. Stahl has told you, on page 3, Section 2(A)(1), we have

5    contended in the document filed with the Court, the

6    pretrial document, that the Asset Purchase Agreement signed

7    by Bethesda is void ab initio.  There was no meeting of the

8    minds with respect to the rights and obligations.

9            As you know, the TLA is a material exhibit to the

10   Asset Purchase Agreement, and we've also indicated it

11   should be rescinded, et cetera, et cetera.

12           THE COURT:  Right.  That generated part of the

13   discussion about whether you would be allowed to amend your

14   answer --

15           MR. GERSH:  That's correct.

16           THE COURT:  -- to include mistake.

17           MR. GERSH:  And, Your Honor, we are not, as

18   you've indicated, raising the defense of mistake.

19           THE COURT:  Okay.

20           MR. GERSH:  What we have raised is completely

21   different, and you acknowledged it during our telephone

22   call -- or our telephonic hearing, I should say, where you

23   said the contract construction is different.

24           THE COURT:  Um hum.

25           MR. GERSH:  And I point out in a case called

1    Gleason vs. Ny, which is an unpublished opinion that we've

2    cited the Westlaw cite to the Court, the Court has

3    specifically said, "An express contract cannot arise in the

4    absence of a agreement or mutual assent of the parties.  In

5    order for there to be an agreement, the parties must have a

6    distinct intention common to both and without doubt or

7    difference.  Until all understand alike, there can be no

8    assent and, therefore, no contract.  Both parties must

9    assent to the same thing in the same sense at the same

10   time.  Their minds must meet on all essential terms."

11        Now, previously Mr. Stahl has vociferously argued

12   to this Court parol evidence is inadmissible.  It's

13   unnecessary and inadmissible.  The contract is clear.

14   Okay?

15        We believe that you can objectively look at the

16   contract and determine, without any other evidence

17   necessary, that the contract is not clear.  And when you

18   talk about branded, that is not the word alone in the

19   contract that Mr. Stahl wants to refer to.  It is a

20   Fallout-branded MMOG, and then there are provisions that

21   dovetail with that that must be considered, and that is the

22   provisions that I've cited to the Court.  What can be taken

23   out?  If something can be taken out, how come it didn't go

24   in?  What really went in?  What is the content supposed to

25   be?  You know, what -- what was really bought?

1          The Court's well aware of evidence previously in

2     the case.  I'm not saying it's put before you right now.

3     What I am saying is that for purposes of what I'm asking

4     the Court to do, there's -- there's no evidence of the

5     clarity necessary for you objectively to pick this contract

6     up and say, "I can tell you exactly, Interplay, what you're

7     supposed to do under this agreement."  And if you can't do

8     that, then we believe the contract is so ambiguous that it

9     should be unenforceable.

10          Second of all -- or lastly, I should say, the law

11     doesn't say you should, Your Honor, rewrite the contract to

12     express the terms.  It's for you to interpret the contract

13     formation of the parties, and looking at the contract as it

14     is, I don't think that you can expressly say what the

15     parties' understanding was from the terms of the agreement.

16          Thank you.

17          THE COURT:  All right.  Although termed a motion

18     to dismiss, I believe what Interplay has just done is make

19     a motion for judgment on partial findings under Rule 52(C),

20     where if a party has been fully heard on an issue during a

21     non-jury trial and the Court finds against the party on

22     that issue, the Court may enter judgment against the party

23     on a claim or defense that, under the controlling law, can

24     be maintained or defeated only with a favorable finding on

25     that issue.  The Court may, however, decline to render any

 1  judgment until close of the evidence.

 2          I am not ruling that the plaintiff is foreclosed

 3  from proceeding on its claim on either the copyright

 4  trademark or declaratory relief requests.  We're going

 5  forward.  Okay?

 6          MR. GERSH:  And I'm understanding that to mean

 7  you're also not ruling as to whether or not the contract is

 8  ambiguous?

 9          THE COURT:  I am not.  I told you -- I think I

10  said on the phone my preference at that time and continuing

11  is I'll hear the evidence and we'll sort it out later.  I'm

12  not ruling right now.

13          MR. GERSH:  Understood.

14          THE COURT:  Okay?

15          MR. GERSH:  Thank you.

16          THE COURT:  All right.  So I'll turn to you,

17  Mr. Gersh.

18          MR. GERSH:  We'll call Mr. Caen to the stand,

19  Your Honor.

20          (The oath was administered.)

21          THE CLERK:  Please be seated.

22          Please speak loudly and clearly into the

23  microphone.  State your name for the record and spell your

24  first and last names.

25          THE WITNESS:  Herve Caen.  Herve, H-E-R-V-E.

1    Caen, C-A-E-N.

2                    THE CLERK:  Thank you.

3                    THE COURT:  Mr. Gersh.

4                    MR. GERSH:  Thank you, Your Honor.

5                        DIRECT EXAMINATION

6    BY MR. GERSH:

7    Q.    Mr. Caen, could you tell us what is your current

8    position with Interplay?

9    A.    I'm the CEO of the company.

10   Q.    How long have you been the CEO?

11   A.    Since 2001.

12   Q.    How long have you worked in the video game industry?

13   A.    Since 1985, 26 years.

14   Q.    Can you explain to the Court your background in the

15   video game industry, please.

16   A.    Well, I've been involved in the video game industry

17   since the early days of the game industry, when you had

18   computers like Commodore 64 and Spectrum and Nintendo,

19   8-bit console, so I've overseen development of games and

20   running video game companies since.

21   Q.    Has Interplay ever developed what's called an MMOG or

22   a Massively Multiplayer Online Game before?

23   A.    No, we haven't.

24   Q.    What is Interplay -- well, strike that.

25                    Is Interplay currently developing an MMOG?

1    A.    Yes.

2    Q.    What is it -- under what agreement are you -- strike

3    that.

4          Do you have an agreement that you're aware of --

5    that Interplay has, I should say, with Bethesda for

6    development of an MMOG?

7    A.    Yes.

8    Q.    Is that what we referred to as the Trademark License

9    Agreement?

10   A.    Yes, it is.

11   Q.    Do you have Exhibit 2?

12         MR. GERSH:  May I approach and maybe help, Your

13   Honor?

14         THE COURT:  Okay.

15         MR. STAHL:  Your Honor, while Mr. Gersh is

16   looking, we may have some confusion.  I'm just trying to

17   nip it in the bud.

18         We offered the TLA as part of the APA in our

19   case.  Now they're going to offer it, I'm assuming, and

20   it's just the numbering thing, that we're all going to be

21   talking about the same document and not confuse the record.

22         THE COURT:  It happens to be marked as the same

23   exhibit number.

24         MR. GERSH:  That is correct, Your Honor.

25         THE COURT:  But he's pulling up the plaintiff's

1    book, so we're going to be using Plaintiff's 2.

2              MR. STAHL:  That's fine.  Thank you, Your Honor.

3              THE COURT:  Okay?

4    Q.   Would you take a look at Plaintiff's Exhibit 1.  Do

5    you see that before you?

6    A.   I do.

7    Q.   Okay.  If you look into that document, there are some

8    numbers down at the bottom right-hand corner, and there's

9    numbers -- the last two numbers are 56, BFW -- BSW 56.  Do

10   you see that?

11   A.   Yes.

12   Q.   That's a trademark assignment?

13   A.   That's what it says.

14   Q.   Let me ask you to look through Exhibit 1 and ask you,

15   do you recognize this document and all the exhibits?

16   A.   Yes.

17   Q.   Okay.  Take a look at, I'm sorry, BSW 30.  It's

18   entitled Trademark License Agreement?

19   A.   Yes, I see that.

20   Q.   Was that an exhibit to the Asset Purchase Agreement?

21   A.   Yes.

22   Q.   Okay.  And you signed that document?

23   A.   Yes, I did.

24   Q.   On behalf of Interplay?

25   A.   Yes.

 1    Q.    You signed the Asset Purchase Agreement also on behalf

 2    of Interplay?

 3    A.    Yes, I did.

 4    Q.    Did you have an understanding of what the relationship

 5    was between the Trademark License Agreement and the Asset

 6    Purchase Agreement when you signed them?

 7              MR. STAHL:  Objection, Your Honor.  The documents

 8    speak for themselves.  What the witness's understanding was

 9    is really not relevant.

10              THE COURT:  I'm taking it subject to the

11    objection.  Go ahead.

12              MR. GERSH:  I'm sorry.  I didn't hear you.

13              THE COURT:  I'm taking the evidence subject to

14    the exception.  You can go ahead.

15              MR. GERSH:  Thank you.

16    Q.    You can answer the question.

17    A.    What was the question again?

18    Q.    The question was did you have an understanding of the

19    relationship between the Trademark License Agreement and

20    the Asset Purchase Agreement?

21    A.    Yes.

22    Q.    What was that?

23    A.    There's no -- they go together.  There was one

24    transaction.  We executed both at the same time.  So the

25    trademark license was a condition to the APA.

1  Q.   Now, could you take a look at paragraph 2.1 of the

2  Trademark License Agreement.  It's called Grant of License.

3  Do you see that?

4  A.   Yes, I do.

5  Q.   Did you ever have any discussions with anybody at

6  Bethesda, or ZeniMax, which is the parent of Bethesda --

7  well, strike that.

8         Do you know ZeniMax to be the parent of Bethesda?

9  A.   Yes, I do.

10  Q.   Okay.  Did you have any discussions with anybody,

11  either ZeniMax or Bethesda, regarding what was meant by the

12  terms Fallout-branded MMOG in paragraph 2.1?

13  A.   Yes, I did.

14  Q.   What discussions did you have?

15  A.   During the negotiations for this transaction, the

16  negotiation and discussion with Mr. Vlatko -- I'm not sure

17  about his last name -- Andonov, that we would retain the

18  rights to make the Fallout MMOG as part of this

19  transaction.

20  Q.   Did you have any other further discussions with him

21  about what it meant to make a Fallout MMOG?

22  A.   Yeah --

23         MR. STAHL:  Objection, Your Honor.

24         THE COURT:  If this is the same objection, it

25  will be continuing.

1      MR. STAHL:  Very well.  Thank you, Your Honor.

2   A.   What he meant -- what it says, making a Fallout MMOG,

3   an MMOG that looks and smells and feels like a Fallout

4   game.

5   Q.   Did that have some importance to you in terms of your

6   desire to enter into the TLA?

7   A.   Of course.

8   Q.   Why?

9   A.   It's huge for us.  Fallout MMOG and the MMOG market

10  was the future, and retaining those rights was very

11  important to Interplay.

12  Q.   And retaining the rights to make what kind of game?

13  A.   Again, a Fallout game that would be played online by

14  thousands of players in the Fallout universe, the same

15  universe Interplay created when it created Fallout 1 and 2.

16  Q.   And what did you understand to be elements that you

17  could include in that game?

18  A.   Everything that relates to what Interplay had created

19  when it created Fallout 1, 2, Tactics, the pre-existing

20  Fallout.

21  Q.   Could you elaborate on that a little bit?  Explain

22  that?

23  A.   Well, Fallout is a story.  It's a post-Apocalyptic

24  world.  Certain events in the world that the story calls

25  for happen in the future, in other words, the 2077 nuclear

1   war, and that's the premise for all four games.  And the

2   world evolves because of nuclear radiation in the world.

3   New creatures basically inhabit the world, and the Fallout

4   universe include those creatures.

5          The humans have survived.  Some humans have

6   survived somehow, so the way they survive is also part of

7   Fallout universe.  There is reasons why these creatures

8   have evolved between animals and humans, and, again,

9   those -- those are part of Fallout universe.

10          So all of that would have been the story behind

11   the Fallout game.  The same creatures, the places where

12   humans have survived, called vaults, that were built by the

13   Government to shelter people in case of a nuclear war.

14          We use the same name as the company that

15   created -- Vortek is the company, the game, that created

16   those vaults and the way to protect the humans, so we would

17   use that in the Fallout MMOG.

18          So that's the creatures, the races.  We also

19   could create more content, obviously, but the background

20   story would be consistent with other Fallout games.

21   Q.   Is there some theme or I think you said background

22   story that kind of runs consistent from the Fallout games,

23   from the inception through some virus, that's a -- that's a

24   theme?

25   A.   Yeah, there's the --

1    Q.    Could you explain that?

2    A.    Yeah.  There is, in the Fallout games, experiments by

3    the humans where -- prior to the Apocalypse, that created

4    in labs some viruses or that were meant to create super

5    soldiers.  And when the Apocalypse struck, these viruses

6    went into nature and turned into -- created big monsters

7    that we call super mutants in the game.

8              So all that would be also part of the reason why,

9    in the Fallout MMOG, you'd find these creatures in -- in

10   the world.

11   Q.   At the time that you signed the Trademark License and

12   the Asset Purchase Agreement, did you have any reason to

13   believe that you wouldn't be able to use this -- what

14   you've just described in the Fallout MMOG?

15   A.   No.

16             MR. STAHL:  Your Honor --

17   Q.   Did anybody ever --

18             MR. STAHL:  -- I'm assuming my objection is

19   continuing.

20             THE COURT:  Yes.  Absolutely.

21   Q.   Did you ever have any discussions with anyone at

22   Bethesda or on behalf of ZeniMax that you would only be

23   able to put the word Fallout on some type of game but that

24   had nothing -- even if it had nothing to do with Fallout?

25   A.   No, never had these discussions.  And even -- I

1    proposed to clarify in case we were to lose the license, I

2    wanted to make sure that we could continue to use any newly

3    created creatures, characters in the game going forward,

4    with the condition that we would take out any of the

5    Fallout content, and this is what -- what I proposed.  And

6    nobody ever told me at the time that I was not allowed or

7    able to use those Fallout characters or story or scenes or

8    whatever it was in the original Fallout games in the MMO.

9    Q.   Are you familiar with brand identification?

10   A.   Absolutely.

11   Q.   How are you familiar with that?

12   A.   Well, consumers, when they want to buy a game today,

13   for example, most successful games are sequels or licenses

14   to either movie or sequels to preexisting games, so the

15   brand is very important in the consumer reaction when they

16   purchase video games.

17   Q.   In your opinion, in the video game industry, is

18   Fallout an important brand to the video market?

19   A.   Yes.

20   Q.   At the time that you entered into the APA and the TLA,

21   was Fallout the same -- was Fallout an important brand

22   then, too?

23   A.   Yes.  It had been game of the year.  It had been --

24   won a lot of awards when we introduced Fallout 1 and 2.

25   Q.   And subsequent to the time you introduced Fallout 1

1    and 2, Fallout has continue, through Bethesda, to win

2    accolades and awards, right?

3    A.    Yes.

4    Q.    And, in your experience, is that something that would

5    enhance your -- your MMOG when it hit the market?

6    A.    Absolutely, yeah.  Bethesda has --

7    Q.    Why is that?

8    A.    -- continued to use the Fallout brand, was very

9    successful with it, and this is the reason why our MMO

10   rights would be very valuable and our MMO would be very

11   successful, too.

12   Q.    When was the first time you ever learned that Bethesda

13   was taking the position that you could not use any

14   characters or scenes or anything that had to do with

15   Fallout in your Fallout MMOG?

16   A.    During this litigation.  It came out in the middle of

17   the litigation.

18   Q.    Prior to the litigation, did anybody ever tell you

19   from Bethesda, or did you have any discussions with anyone

20   from Bethesda, that all you could do was make a game and

21   slap the word Fallout on it?

22   A.    No, never.  In fact, I asked Bethesda for a meeting

23   before this litigation to discuss the MMO that we were

24   working on, and I had no luck getting any answer from

25   Bethesda as to setting up a meeting to review what we were

1   working on.

2   Q.   The meeting was to discuss what, content for the game?

3   A.   Correct.

4   Q.   And what happened when you asked for the meeting to

5   discuss content for the game?

6   A.   I had no answer.

7   Q.   Did you ever get an answer to sit down with somebody

8   at Bethesda to discuss content for the game?

9   A.   No.

10  Q.   So what did -- did Interplay then continue to go out

11  and try to build the game on what it believed it could do?

12  A.   Absolutely.

13  Q.   Now, you were talking about provision, or I think in

14  the agreement, that -- where you could keep certain rights

15  to certain elements of the game?  Do you remember that?

16  A.   Yes.

17  Q.   All right.  Could you take a look at paragraph 3.4 of

18  the Trademark License Agreement.

19          What was your understanding -- well, strike that.

20          Did you ask for something like this to be

21  inserted in the TLA?

22  A.   Yes, I did.

23  Q.   Why was that?

24  A.   Well, in my experience in the game industry, when you

25  have licenses to use somebody else's marks and copyrights,

1    the license have a term and they expire.  So you always

2    want to clarify that whatever you created that's not using

3    the copyright or the trademark, you can continue to use.

4    So that's why I asked for that.  It's my experience in

5    contract dealings with licensing.

6    Q.    And what was your understanding of what rights

7    Interplay got by virtue of this paragraph 3.4?

8    A.    Well, we -- we make a Fallout MMOG, including all of

9    the Fallout elements, story, characters that were created

10   by Interplay in the original Fallout games.

11   Q.    Okay.  And was it your understanding that you could

12   keep certain rights?

13   A.    Yes.  Anything that was not included in the Fallout 1

14   or 2, if we created new characters, new creatures, races,

15   weapons, whatever were not included in the original

16   Fallout, this clause clarifies that we're allowed to

17   continue to use those elements.

18   Q.    Does it also explain what happens -- in your

19   understanding, if you had Fallout characters, copyrights in

20   there, what would happen with those?

21   A.    We would have to take them out of the game.

22   Q.    And is that if the game was not approved?

23   A.    That would be if the game -- I mean the license would

24   be terminated for whatever the reason is.  For example, if

25   we were not to have the minimum number of players accessing

1   the game, there is a provision that says that so we

2   could -- the license could get terminated under that.

3           We would continue to use any characters, classes,

4   anything that was not part of Fallout 1 or 2 in the game,

5   whether the same game or a modified game of that version.

6   Q.   Okay.  So take a look at paragraph 5.0.  Did you ever

7   have an understanding at the time you signed the

8   contract -- strike that.

9           Do you have an understanding of paragraph 5.1.2,

10  what that means?

11  A.   Well, my understanding would be that it has to be a

12  good quality game.

13  Q.   Well, does this paragraph say that the game has to be

14  as good as itself?

15  A.   Yeah.  Reading it now, that's what it says, yes.

16  Q.   Do you understand what that means?

17  A.   No.

18  Q.   Did you understand what it meant at the time you

19  signed the agreement?

20  A.   You know, we would have to receive some quality

21  standards by Bethesda.  They would have to give us -- this

22  is the quality standards that we expect you to meet for you

23  to be able to release the game.

24  Q.   All right.  Take a look at paragraph 2.3, please.

25           2.3, just in summary, deals with these two

1    conditions we've been discussing, the full-scale

2    development and secured financing for Fallout MMOG in an

3    amount of no less than $30 million.  Do you see that?

4    A.    I do.

5    Q.    All right.  Let's discuss the full-scale development.

6    Did you have an understanding of what full-scale

7    development was and what you had to accomplish by April 4,

8    2009 at the time you signed this?

9    A.    I did.

10   Q.    What was your understanding?

11   A.    Well, in licensing, you're tying up your rights, your

12   license rights, to someone, and in this case, I was

13   licensing rights from Bethesda.  So the concern was that

14   Bethesda wanted to make sure we would be making a game,

15   that we wouldn't be tying up those rights for a long period

16   of time.

17          So we'd agreed that two years into its contract,

18   Interplay should show that it was actually making a game,

19   and we had needed the game to be in development and some

20   means to make this game.  So we put those conditions so

21   that Bethesda knew two years into the contract that

22   Interplay would actually be making a game.

23   Q.    Can you describe for us anything else that you believe

24   was necessary to accomplish full-scale development by

25   April 4, 2009?

1    A.    Well, full-scale development is a vague term.  It's

2    basically there to say you're actually making the game.

3    I've -- I've been in the business of making video games for

4    a long time, and you basically need to be making the game

5    at that time.

6    Q.    And as of April 4, 2009, was Interplay involved in

7    making the Fallout MMOG?

8    A.    Yes.

9    Q.    Can you describe how that was being done?  Well,

10   strike that.

11          First of all, can you describe for me in general

12   terms some of the things that Interplay had done between

13   the time of entering into the TLA in April of 2007 through

14   April 4, 2009 in order to achieve full-scale development by

15   that date?

16   A.    After we entered into the TLA, we hired one of the

17   original designer and creator of Fallout and started to

18   work on the game design, what the Fallout MMOG could be.

19   So we created a game design that was hundreds, even

20   thousands of pages of design before we moved with a

21   developer, either internally or externally, to actually

22   build the game based on that design.

23          We'd found a developer who had the technology and

24   the tools to incorporate all of our design.  We created all

25   the classes or the characters, all the game mechanics, the

 1   world where it's supposed to be, the locations, all the

 2   concept art, and we've entered into this agreement with the

 3   developer, who was an MMO developer, who could actually

 4   build and as of April had started to build based on our

 5   design of the game.

 6           And the game was up and running because they had

 7   the technology, so we bootstrapped a lot of the development

 8   by using preexisting MMO technology, client server.  And

 9   all we had to do was populate the world and continue

10   building the game through the end of this -- the deadline.

11   Q.   Okay.  So --

12           MR. STAHL:  Your Honor, if I may.  I won't repeat

13   the old objection, which I assume is still pending.

14           THE COURT:  Um hum.

15           MR. STAHL:  This is obviously going to Masthead,

16   this testimony, and in light of the Court's prior rulings,

17   we don't have a clue, leaving aside best evidence and other

18   objections, about what it was these people did, if

19   anything, and when.  And even though the name's not been

20   mentioned, that's clearly, I think, who he's been referring

21   to.  We object to that.

22           THE COURT:  Is this beyond the testimony he gave

23   during discovery?

24           MR. STAHL:  Absolutely.

25           MR. GERSH:  Absolutely not.

 1          THE COURT:  All right.

 2          MR. GERSH:  Okay.  The testimony he gave during

 3   discovery -- and this testimony has to do with what this

 4   witness was personally involved in and his -- and what he

 5   had hired an independent company to do for him.

 6          What you've ruled is we can't say what

 7   Masthead -- we can't talk about -- not talk about, but we

 8   can't introduce evidence related to Masthead --

 9          THE COURT:  All right.  Well, there's an

10   objection on the basis of his knowledge.  If this is based

11   on what someone told him or what he assumed, I -- so the

12   objection is he's got to speak from personal knowledge.

13   He's just --

14          MR. GERSH:  And that's exact --

15          THE COURT:  All right.

16          MR. GERSH:  -- that's exactly what he's speaking

17   to.

18          THE COURT:  Well, I can't accept your --

19          MR. GERSH:  I understand.

20          THE COURT:  -- statement of that.  I need to go

21   back now.  Given where we've been in this case, you need to

22   establish the basis of his knowledge and not simply that

23   it's what someone told him was happening.

24          MR. GERSH:  And I understand that, Your Honor.

25   All he's talking about is the general background of what's

1    involved with the game and making it right now.  We'll get

2    into the specifics up 'til April 4.

3              THE COURT:  It's not generally what he was -- you

4    asked him.  You asked him to begin by telling what had

5    happened up until April 4th of 2009.  He said we found a

6    developer, created classes, game mechanics, concept art.

7    We had an agreement with an MMO developer, who started to

8    build.  They had the technology, used a client server.  All

9    we had to do was populate that --

10             MR. GERSH:  The world.

11             THE COURT:  -- world.

12             So he is not speaking generally about what he had

13   expected to happen.  So now take a step back and establish,

14   if you can, that he has not personal knowledge from what

15   someone told him.

16             MR. GERSH:  I will do that.

17             MR. STAHL:  Your Honor, may I be heard on this?

18             THE COURT:  Um hum.

19             MR. STAHL:  If you'll recall, Your Honor, the

20   genesis of the motion for sanctions to limit this

21   testimony, in the Answers to Interrogatories that Mr. Caen

22   signed under oath, he said he didn't know the names of any

23   of these people, didn't know what they were doing, couldn't

24   tell who was working on what or what their skills were.

25             In the documents that have been produced, there

1   is no game.  There is no -- there's not one line of source

2   code in this entire proceeding.

3         THE COURT:  Okay.  I understand the parties'

4   positions.

5         MR. STAHL:  In terms of best evidence, Your

6   Honor, leaving aside the bigger objection --

7         THE COURT:  Okay.  Well, this isn't proving the

8   contents of a document at this point, at least -- but to

9   the extent to which they are going to try to prove the

10   contents of a document, you're right.  If they don't have

11   the original, they have to explain whether they have

12   something as good as an original or a satisfactory

13   substitute and there's a good reason for it.  But I think

14   you're several steps ahead.

15         But I -- I don't -- haven't forgotten where --

16   how we got to where we are today.

17         So, Mr. Gersh, why don't you take that step back

18   and try to establish the sufficient foundation for the

19   witness's testimony.

20         MR. GERSH:  I will, Your Honor.

21         Let me do it this way, if I may.  Let me call the

22   Court's attention to Exhibit 7.

23         THE COURT:  Plaintiff's Exhibit 7?

24         MR. GERSH:  Defendant's Exhibit 7.

25         MR. STAHL:  We have an objection to that

1    document.

2              THE COURT:  Okay.

3              MR. GERSH:  Okay.  And just for the Court's

4    edification, you have two things before you as part of

5    Exhibit 7.  You have a CD, which is the entire Exhibit 7,

6    containing over 2400 plus pages of what's called a Wiki.

7              You also have before you -- is it in that book?

8    Okay.  It's also in that book -- about, I'm going to say

9    roughly 50 pages, portions of the Wiki that we want to go

10   over and explain with you, and representing to the Court

11   that these pages were taken directly out of the CD.  But

12   rather than put before you 2400 plus pages, we are offering

13   the CD as the totality of the Wiki as of April 4, 2009, and

14   we wanted to discuss certain portions of it individually,

15   which are the pages that are in there alone.

16             MR. STAHL:  Your Honor, I have an objection.

17             The Wiki that he's -- that's being referred to

18   here was produced to us in hard copy, and it is Bates

19   Number zero -- IPE 005439.  That's the first page of it.

20   It goes on for hundreds or thousands of pages.

21             The date on this document is February 1, 2011.

22   The Wiki, as I understand it, that is now being referred to

23   is purportedly going to be offered, as counsel for

24   Interplay just said, to prove the state of design of this

25   Fallout MMOG as of April of 2009.

1          THE COURT:  All right.  I see what you're

2    referring to.  At the top of the page is 2/1/2011 main

3    page.  But underneath the legend from F-O-O Wiki, it says

4    revision as of zero zero, colon, zero four, comma, 12

5    February, 2009.

6          MR. STAHL:  Yes, Your Honor.  I recognize that.

7    If I could continue.

8          THE COURT:  Um hum.

9          MR. STAHL:  The testimony of Mr. Caen in his

10   deposition on the Wiki was that it was electronic at

11   Interplay.  And I'm reading now from page 94 and 95 of his

12   deposition on October the 8th, 2010, and I quote:

13          "Look at paragraph 2, if you could.  It says

14   second version of Wiki submitted to MMOGC.  Do you see

15   that?

16          "Answer:  Yes.

17          "Do you know what the second version of the Wiki

18   referred to in this document is?

19          "No, I don't."

20          This is Mr. Caen's testimony.

21          "Are there multiple versions of the Fallout MMOG

22   Wiki?

23          "Answer:  Wiki.  Yeah.  There are, yes.

24          "And is there any document that explains what

25   different versions there are?

1                "Answer:  I don't think so.

2                "Question:  So how would one be able to tell what

3         version of the Wiki one is looking at?

4                "Answer:  The Wiki is an evolving document.  It

5         changes every time somebody touches it.  Every time

6         somebody touched it, there's -- a new version of it is

7         evolved."

8                That's the testimony of Mr. Caen.

9                We don't have any basis, Your Honor, for knowing

10        when this document was put together, what was in it, what

11        was out of it.  Mr. Caen is purportedly going to testify to

12        it.  I'm sure he has no idea if this one we're looking

13        at -- when it was actually put together.

14                It certainly -- it's the rankest of hearsay, and

15        it certainly doesn't qualify as a business record based on

16        his testimony of not being able to say when it was put

17        together and what version it is and there are multiple

18        versions.

19                THE COURT:  Um hum.

20                MR. STAHL:  So it should not be admitted, Your

21        Honor.

22                THE COURT:  Okay.

23                Mr. Gersh.

24                MR. GERSH:  Your Honor, the document says exactly

25        when it was created, and Mr. --

 1              THE COURT:  Okay.  No.  Not on a -- not on a

 2     printout of a --

 3              MR. GERSH:  Well, I haven't even been able to ask

 4     the witness any questions about the date of the information

 5     that's contained in the document.

 6              THE COURT:  All right.  Oh, I'm not looking at

 7     the -- whatever's in this envelope.  I only have the

 8     ability right now to look at what's on the printed pages.

 9              So there's an objection.  You need to lay a

10     foundation for the admission of this document.

11              MR. GERSH:  Okay.

12              THE COURT:  Okay?

13     Q.   Mr. Caen, looking at the printed pages before you --

14     oh, I'm sorry.  Exhibit 7, Defendant's Exhibit 7, do you

15     have that book before you?

16     A.   Yes, I do.

17     Q.   And is the first page at the bottom IPE 5439?

18     A.   Yes.

19     Q.   Can you explain what this page is?

20     A.   This is the table of content of the Wiki.

21     Q.   Do you know when this document was created in the

22     Wiki?

23     A.   It says on top the last revision was February 2009, so

24     this is when it was last touched.

25     Q.   Is -- are these --

 1          MR. STAHL:  Your Honor, it's the same exception.

 2   He's saying what the document says?

 3          THE COURT:  Yeah.  All right.  I need to

 4   understand what he knows about this, where it came from,

 5   because I certainly don't.  It doesn't speak for itself.

 6          MR. GERSH:  I understand that.

 7   Q.   Do you know where this document came from?

 8   A.   It came from Interplay.  We are creating this.

 9   Q.   And was it created by Interplay employees?

10   A.   Yeah.  Everybody contributes at Interplay to the Wiki.

11   Q.   Okay.  Now, did you have somebody from Interplay

12   gather documents related to this Wiki for everything that

13   occurred that you could find prior to April 4 of 2009?

14   A.   Yes, I did.

15   Q.   Did you then somehow review those documents to make

16   sure that they were documents prior to April 4 of 2009?

17   A.   Yes, I did.

18          MR. STAHL:  Objection, Your Honor.

19          THE COURT:  Okay.  I'm not sure this is going to

20   be sufficient, but I'll let him testify as to what he did.

21          Do you have somebody else who's coming in to talk

22   to me about this?

23          MR. GERSH:  About the Wiki?

24          THE COURT:  Yeah.

25          MR. GERSH:  No.

 1            THE COURT:  All right.  Well, then you need to

 2    take baby steps.  Assume I do not know what a Wiki is.

 3            MR. GERSH:  I'm trying.

 4            THE COURT:  Well, no.  You've jumped ahead.

 5            MR. GERSH:  I apologize.  Let me try better.

 6    Q.   Can you explain to the Court exactly what this Wiki

 7    is.

 8    A.   When we first looked at how we can approach the

 9    development of the Fallout MMOG back in 2007, we knew that

10    it would be a collaborative work by a lot of people, and a

11    lot of people had to contribute, so we decided to create

12    the Wiki as a reference for everybody internally and

13    externally who would be working on the project so we could

14    educate new employees quickly.  They could refer to the

15    Wiki as they were hired as to what they would have to do in

16    the game, instead of re-explaining or retraining them every

17    time, for the whole development of the game to be

18    consistent, so they would understand what characters would

19    be, what game system would be, what weapons would be.

20            And then we'd hire an artist and we'd tell him,

21    okay, you got to draw weapons.  You could go into Wiki

22    under weapons that were created by the game designers and

23    know what you would have to do, what it was supposed to

24    look like, how big they were supposed to be.

25            So we started the work, the technical work, to

1    have the Wiki up and running.  And then as people were

2    working on the game, they would be revising each page of

3    the Wiki, creating graphics or texts or explanation of

4    reference art and including that into the Wiki.

5    Q.    So can you describe the purpose of this Wiki?

6    A.    Purpose would be at any given time, any new employee

7    or any new subcontractor that would be working on the

8    Fallout MMOG could easily go and log into the Wiki, and

9    depending on what the task would be, able to look at, okay,

10   I've been hired to draw a monster, and go to what kind of

11   monster we tell him he has to draw that particular day, and

12   have all the reference art, the pop culture reference that

13   we needed, how big that monster would be.

14            Previously created art would also go into the

15   Wiki so that they would know -- so the whole game would --

16   the whole world would be consistent as to how it plays, how

17   it looks.  Instead of having a fixed-design document --

18   MMO's are different in development.  They require more

19   people and a different approach as to what needs to be

20   done.

21   Q.    Did you review the Wiki as it was being prepared?

22   A.    Yes.

23   Q.    About how often?  Once a week?  Once a month?  Every

24   other day?

25   A.    I would say in the beginning, about once a month.  And

1   then maybe every other month to make sure work was

2   progressing as per planned.

3   Q.   Were you reviewing it for anything else or just

4   whether -- how the work was progressing and what was going

5   on?

6   A.   Also, for my interest, you know, what these guys were

7   creating, the game designers and what they were coming up

8   with.

9   Q.   And as part of your function in the company, were you

10  directing other people -- or you hired other people to

11  actually physically, you know, add content to the Wiki?

12  A.   Yes.

13  Q.   And did you ever have discussions with those people as

14  to content that went -- would go into the Wiki?

15  A.   What do you mean by that?

16  Q.   Well, let me back up.  Before you get to putting stuff

17  in the Wiki, is -- what goes into the MMOG?  Is there some

18  kind of concept of what the game's going to be?

19  A.   Yeah.  People work on their own computers, on art.

20  They have like -- the artists, for example, use tablets,

21  and they can do concept art on a tablet.  And when what

22  they've created is good enough and we decide that's going

23  to be a reference for other people to use in the

24  development of the Fallout online, it would go into Wiki at

25  that point, from their computer onto a Wiki so that

1    everybody can see it.

2    Q.   Were only Interplay employees allowed access to the

3    Wiki?

4    A.   No.  Also subcontractors.

5    Q.   Well, what subcontractors were allowed access to the

6    Wiki?

7    A.   Masthead Studios.

8    Q.   Excluding Masthead for the moment, okay, after the

9    time there's this agreement that we'll talk about in a

10   moment, up until you got involved with Masthead, was it

11   only Interplay employees that were allowed access to the

12   Wiki?

13   A.   I believe so.

14   Q.   Okay.  And was the Wiki kept secure with passwords to

15   be able to get into it and work on it?

16   A.   Yes.

17   Q.   So it wasn't something out there for anybody to

18   randomly make changes now and then?

19   A.   No.  Each person gets a password because you want

20   each -- each -- and they have some credentials as to what

21   they're allowed to do to the Wiki.  Can they modify?  Only

22   read?  All of it?  Portions of it?  Depending on who they

23   are in the development team.

24   Q.   And is the Wiki somehow marked with a time or date

25   when people work on it to show when revisions were being

1   done or when things were created?

2   A.   Yes.  Wiki tracks every time a change is made so you

3   know who made the change, and it tracks at the top of each

4   page the date of the last revision.  And you can click back

5   when you're on the document and go, well, it was changed by

6   that person.  Go back in time, if you will.

7   Q.   Or you could go forward in time to see if there was

8   anything from them --

9   A.   Correct.

10   Q.   -- that was done?

11   A.   Correct.

12   Q.   And in gathering the documents that are part of

13   Exhibit 7 before this Court, what were the parameters in

14   terms of what these documents were to be in scope and time?

15   A.   We -- we printed out the Wiki as of April of 2009.

16   Q.   And was the Wiki used to -- the Wiki, this main

17   document, was it used to -- for monitoring the development

18   of the game by Interplay, or what was it used for?

19   A.   It's used as the Bible reference, if you will, for all

20   the development team so that they can log in, and if they

21   have any question, you want -- they have access to it.  We

22   anticipated to have more subcontractors doing 3D models and

23   animations, so they need to have access.

24          And also, the team, as they grow, you don't want

25   to have retrain -- retraining of each new employee every

1    time you hire somebody.  You want them to educate

2    themselves first and just narrow down the question that

3    they might have after they've gone through the entire

4    design document.

5    Q.    And did you use this Wiki to monitor the development

6    of the game and the progress of the people that worked at

7    Interplay on developing the game?

8    A.    Not really, no.  It's a different purpose.  The Wiki

9    is really a design document that tells you what the game's

10   going to be.

11   Q.    But did you, when you looked at it, were you able to

12   determine and monitor what was going on?

13   A.    In the design side of the game, yeah.  I was able to

14   see if we had finished creating the world with all the

15   locations, all the buildings, all the classes, the races.

16   When we introduce a new race that weren't in the original

17   Fallout games, I could go through it and then, you know,

18   discuss with the designer the relevance of adding -- there

19   are creepy kids in the -- in the new game, so we discussed

20   that.

21          And that's -- as far as the design, I could

22   monitor and follow what was created and what would go in

23   the game later.

24   Q.    From your review of the Wiki then, would you be able

25   to meet with your employees to discuss things that needed

1  to be done within the game?  Within the Wiki.  Things that

2  needed to be changed?  Things that needed to be added?

3  A.    Yeah, correct.  To the extent that something I

4  wouldn't like, subject -- you know, something that I could

5  think is offensive to me and I wanted to discuss why they

6  would want that in this game, yes, I could look at it and

7  call the game designer or designers and discuss that with

8  them.

9          MR. STAHL:  Your Honor, objection.  He's now

10  testifying what it was used for.  There's been no

11  testimony, not a word, what he did as of April 4th, 2009.

12  This document was printed in 2011.  If you look at the

13  pages in the Wiki --

14          THE COURT:  Um hum.

15          MR. STAHL:  -- all of them don't say, even at the

16  top, when it was last changed.  In fact, many of them

17  don't.  Let me give you an example.  We could just leaf

18  through it quickly.

19          If you looked at Document Bates Stamp Number

20  005687 --

21          THE COURT:  Wait a minute.

22          MR. STAHL:  -- nothing at the top of that page

23  and when it was last changed.

24          THE COURT:  Okay.  They haven't given me the --

25  what I have in this book are excerpts.

 1          MR. STAHL:  Well, it should -- we're looking at

 2    the entirety, Your Honor, of Exhibit 7, Defendant's Exhibit

 3    7, which is the Wiki, and they've taken excerpts from it.

 4          THE COURT:  Well, I don't have -- I don't have

 5    those pages.

 6          MR. STAHL:  I'm delighted to hand them up to the

 7    Court, if you'd like.

 8          The point I'm making, Your Honor, is that there's

 9    no testimony from this witness, particularly in light of

10    his previous sworn testimony in his deposition, that he has

11    any clue as to what this Wiki actually looked like on or

12    before April 4, 2009 because everyone, he said, at

13    Interplay, and perhaps others, had access to it, and they

14    changed it regularly.  They added to it.  Maybe they

15    subtracted from it.

16          This is -- as I said before, it's absolute

17    hearsay.  It doesn't meet any of the standards for a

18    business record, let alone anything that would --

19          THE COURT:  Well, I'm not sure that it can't, but

20    let me ask Mr. Gersh.

21          You've given me some excerpts -- I think there

22    are --

23          MR. GERSH:  They're in no partic --

24          THE COURT:  -- I don't know, seven or eight of

25    them that are paper clipped together in separate sections.

1      MR. GERSH:  I think I've got nine, but yes.

2      THE COURT:  Okay.  Each of them, at the beginning

3   page, does have a revision as of a date that predates

4   April 4th of 2009.  Is this the only part of the Wiki you

5   want me to look at?

6      MR. GERSH:  No, Your Honor.  I'll go through all

7   2500 pages.  What I wanted to do was give you a

8   representative sample, and I believe that if Mr. Stahl will

9   let me look at what he's referring to, I think those are

10  like the second pages of some particular documents.

11     THE COURT:  That's what I was asking.  Okay.

12     Then, at the very least, your witness needs to

13  explain how these pages existed or what they represent.

14  Are there sections or -- you know, that that -- that

15  time-prepared or last-revised legend doesn't appear?  He

16  said it appeared on every page, which is what has become

17  misleading.

18     MR. GERSH:  I -- I --

19     THE COURT:  I don't know if that means a page on

20  a computer that doesn't translate to an eight and a half by

21  eleven page or just what it is.

22     MR. GERSH:  Let me -- if I --

23     MR. STAHL:  Your Honor, if I may just be heard

24  one moment?

25     THE COURT:  And here -- I mean this is electronic

1      discovery, I gather, and I don't know how it was treated by

2      the parties during --

3                    MR. STAHL:  We had printed copies.

4                    THE COURT:  Huh?

5                    MR. STAHL:  We had a printed copy.

6                    MR. GERSH:  They had --

7                    MR. STAHL:  TIFs, they're called.

8                    Your Honor, let me just try to give you an

9      example of what's in the document.

10                   THE COURT:  Okay.  Well, we'll get everybody out.

11     Um hum.

12                   MR. STAHL:  If you -- if you look at -- and I

13     don't know where it is on the excerpts, and I apologize,

14     that Mr. Gersh has given to you, that counsel for Interplay

15     has.

16                   If you look at document Bates stamped IPE 007454,

17     it has a heading at the top of it just like the other ones

18     that had -- some of them had Bates.  This one's called Text

19     Input Window.  It's got a date on it.

20                   But then, as you move on to like the next page,

21     Factual Views of the Damned, which is on 07456, there's no

22     date at all on that.  If -- and I don't think that's a

23     subheading.  I just think that's another piece that's in

24     this Wiki.

25                   If you move on to page 007459, it's called The

1    Living Oak.  It's got some dates on it, but as you proceed

2    on with -- what you don't know is whether, for example,

3    Your Honor, that page was actually in a Wiki on that date.

4    It may have been added.  It may have been deleted and put

5    back in at a later date.

6         The mere fact that we're looking at a document

7    that we know is dated February the 11th -- that's the date

8    it was printed, that's the date, I'm assuming, the disc was

9    made that was sent to us or the TIFs were made were sent to

10   us -- doesn't prove at all what actually was in this Wiki

11   as of April the 4th, 2009, leaving aside the captions at

12   the top of it.  And this witness has said under oath he

13   doesn't know.

14        MR. GERSH:  Your Honor, I can scroll -- we can

15   scroll through the 2500 pages.  I'm happy to do that.  I

16   was hoping we wouldn't have to.  But we can go through them

17   and show where the dates are and what they represent and

18   have this witness explain every one of them.  We'll do

19   that.

20        MR. STAHL:  That's not my objection, Your Honor.

21        THE COURT:  Well, we've got several problems

22   here.  When was this document produced during discovery?

23        MR. GERSH:  Oh, it was produced --

24        THE COURT:  And was it produced electronically or

25   just in the hard copy?

1          MR. GERSH:  I believe hard copy.  And

2     subsequently a disc also.

3          We produced TIF files.  I'm sorry.  We did

4     produce electronically as a TIF file, and we gave them --

5     we didn't -- we didn't send you the pages.

6          MR. LoBUE:  No, you didn't send us the Wiki.

7          THE COURT:  What?

8          MR. GERSH:  We actually -- two things, Your

9     Honor.  We actually gave them access to the Wiki

10    electronically.  Okay?  That they were given a password and

11    a code for, to actually go in and look at it --

12         THE COURT:  Um hum.

13         MR. GERSH:  -- of which I have the email

14    concerning that.  And we actually gave them TIF files

15    concerning everything that is on these pages.

16         MR. STAHL:  Your Honor, we didn't get the pass

17    code to the Wiki.

18         MR. GERSH:  Baloney.

19         MR. STAHL:  Until after the close of discovery.

20    We had the photographs, if you will, the images of these

21    pages, but that's all we had.

22         MR. GERSH:  Your Honor, there's a -- well, maybe

23    I do.

24         We gave Mr. Stahl access to the Wiki in -- I

25    think it was August 2011, a pass code and a password and

1    whatnot, for them to look at it because they --

2              THE COURT:  They don't disagree they got it, but

3    it was not during discovery.

4              MR. GERSH:  They had asked me for it.  We got it.

5    We produced it.

6              As a matter of fact, Your Honor, back when

7    Mr. Marbury was involved in the case, he asked for it.

8    Okay?  We told him he could have it.  Never heard again.

9              When they asked for it, we got it.  We gave it to

10   them.  Okay?  So they got it both -- had access to actually

11   work within the Wiki.  Never once complained about it.

12   Actually got the TIF files that are here before you as

13   well.

14             And as far as what they are, I'm happy to go

15   through the pages and have Mr. Caen explain, you know, what

16   they are by date and what they represent.  I was hoping to

17   avoid that and simply go with a representative example of

18   some of the documents to try to move this along, but if we

19   have to go through all of them, I -- we can do that.

20             THE COURT:  All of this is a design document, is

21   that right?

22             MR. GERSH:  All of this is part of design,

23   concept.  It discusses, you know, the game.  All the stuff

24   that goes in to help full-scale development of this game,

25   what we believe is part of full-scale development.  It's

1   more than just design.

2          If you look at the very, very first page, where

3   it talks about the core design, it mentions everything

4   that's part of it.

5          THE COURT:  Um hum.

6          MR. GERSH:  That's the first -- the table of

7   contents, so to speak of the -- Fallout-on-line, of what

8   this Wiki represents.  And then it goes through this and

9   explains, you know, exactly what these different things are

10  and what goes into this -- or what goes into it and what

11  went into the development of this game as of April 4, 2009.

12         So there's thousands of pages of information, of

13  designs, of characters, of effects, how these effects are

14  going to work, what's going to happen.  This isn't

15  something that's created overnight, and I think Mr. Caen

16  has indicated that he gathered this information, had the

17  company gather this information for everything prior to

18  April 4, 2009.

19         Now, while Mr. Caen, you know, said that they're

20  on every page, I think, you know, if you look at them, what

21  the reality is, is they're on the beginning of certain

22  pages for certain things.  Like you go three things in,

23  there's a warrior, and it talks about the revision and it's

24  got all the pages behind it.

25         Well, if this page was revised September 15, '08,

 1    we're not talking about information behind it that was

 2    created after the fact.  This entire section on the warrior

 3    was done as of September 15, '08.  I can go through that

 4    with Mr. Caen.

 5         Syker, same thing.  March of '09.  Clones,

 6    January 20th of '09.  And there's -- it's multiple -- this

 7    is an evolving, living, breathing document, and all we did

 8    was gather the information that was alive up to that date,

 9    and that's what Mr. Caen's testified to.  This doesn't

10    include information after that date.

11         Could -- you know, in the 2500 pages, is there a

12    page or two or three or five or ten that don't have one of

13    these dates on it?  There may be.  You know, I tried to

14    look through them to make sure that the sections had dates

15    on them.  I believe that they did, and I believe that what

16    Mr. Stahl is referring to are like second and third and

17    fourth pages related to a particular thing.

18         Like if you looked at combat for argument's sake,

19    under combat, it talks about the date it was created.  And

20    if you go further in, there are subheadings of different

21    things.  It describes physical contact, damage to avoid,

22    targeting, Argo system -- well, that's actually -- which is

23    part of combat, but that's a separate one in and of itself

24    which has a date on it.

25         That's -- that's what it all is.  That's all

1   reflective of everything pre-April 4, 2009.

2           MR. STAHL:  Your Honor, what we got originally?

3   We never got the password to get into the Wiki until after

4   discovery closed, but it wouldn't have done us much good

5   because we would have been looking at it as of August 2011.

6           THE COURT:  Well, except what he's saying is that

7   if you get into the Wiki, you can ask it to go backward in

8   time and to display what material was there at a prior

9   iteration.  That's what my understanding is this witness

10  has just said he directed to be done.

11          Now, Mr. Gersh, am I wrong about that?

12          MR. GERSH:  No, you are correct, and if we had

13  internet access in the courtroom, I could put you in that

14  Wiki right now and do the exact same thing, and you would

15  see the same documents.  We froze that Wiki, this access to

16  the password, and you would see the stuff that's on that

17  Wiki.

18          And I understood we couldn't get internet access

19  here, so we weren't trying to do that, but we froze that

20  Wiki for that point in time, and it's still there.  It's

21  the same thing.  All we've done is print off the pages and

22  give the Court the actual pages.

23          But I could put you in that Wiki right now.  You

24  could wander around through it.  You could search for a

25  date prior to April of '09 -- you could search for a date

1   post of '09.  I don't believe it's there.  I searched, just

2   myself, last night to represent to the Court what happened

3   before '07.  There's nothing there.

4          I mean, this is what it is.  This is what they

5   put together for the relevant point in time.

6          MR. STAHL:  Your Honor, there isn't a shred of

7   evidence on this document, which is hearsay on its face, as

8   to when it was prepared, what was in it, what was out of

9   it, and I read you this witness's testimony from his

10  deposition.  He said there were multiple iterations.  Now

11  we're talking about the very same thing --

12         THE COURT:  All right.

13         MR. STAHL:  -- he didn't know which one they

14  were.

15         THE COURT:  No, I understand.

16         MR. GERSH:  There -- there are multiple

17  iterations because it's a living, breathing document, okay,

18  and it does change.  And there may be things that are

19  post-April 4.  We didn't produce any of that for the Court

20  to consider because we have this date that everybody's

21  looking at.

22         So we didn't say to you, yeah, well, there's a

23  whole bunch of other stuff, Judge.  We can show you where

24  the game is today, and we can show you where the Wiki is

25  today, but boy, that's going to raise, you know, a major

1    argument because they're going to say that's not relevant

2    to what happened as of April 4.

3          So, therefore, we limited this to the time period

4    in question, April 4, '09, and that's what it was.  And

5    that's why when you look at the documents, which you,

6    yourself, saw it from the top of the document, this is a

7    revision as of a certain date.  That's the revision.  Might

8    there be revisions after?  Sure.

9          THE COURT:  And when did you print out what you

10    contend is the version as it existed as of April of 2009

11    and you produced that in hard copy to the plaintiff?

12          MR. GERSH:  It appears February 1, '11.  From the

13    top left-hand corner, that's the printing date.

14          MR. STAHL:  And, Your Honor, this problem is

15    exacerbated by the problem we have had --

16          THE COURT:  And was that the document you had

17    when you were taking the deposition of Mr. Caen?

18          MR. STAHL:  Yes, Your Honor.  That's the

19    document.

20          THE COURT:  And that's what you showed?

21          MR. STAHL:  We didn't have the Wiki at all.  We

22    did not have it at all, but let me raise one other issue,

23    Your Honor.

24          THE COURT:  Um hum.

25          MR. STAHL:  You recall the deposition -- the

 1      Interrogatory problems we've had about the pre- and

 2      post-April 4, '09 information?

 3              THE COURT:  Um hum.

 4              MR. STAHL:  Here's another classic example of it.

 5      We're being told, although there's not a shred of evidence

 6      to support it, that this is frozen as of April 4, '09, even

 7      though it's dated February '11.

 8              THE COURT:  I understand.  Yeah.

 9              MR. STAHL:  If it was -- if there were changes

10      after '011, as he said there were, with -- Masthead had

11      access to it and that stopped --

12              THE COURT:  Um hum.

13              MR. STAHL:  -- we don't have any of that.  So we

14      don't have any -- they didn't give us anything.  Now

15      they're saying post-April 4, '09, which they were obligated

16      to give us.

17              THE COURT:  Right.  Well, that's a whole

18      different -- that may be a different problem, depending on

19      how we resolve the lawsuit here in terms of what you're

20      entitled to see and understand, but --

21              MR. STAHL:  But this goes to authenticity.

22              THE COURT:  -- I'm trying to deal with one piece

23      at a time.  I -- you requested, under Rule 34, documents

24      that evidence certain things, I gather?

25              MR. STAHL:  Absolutely.

1          THE COURT:  And, Mr. Gersh, you agree that this

2     is responsive to a document request?

3          MR. GERSH:  This is responsive to a document

4     request.

5          THE COURT:  Okay.  But in producing it, you

6     printed it out and gave it to them in February of 2011.

7          Did the parties discuss how they -- how you were

8     going to produce electronically stored information?

9          MR. GERSH:  For here, for the trial?

10         THE COURT:  No.  During discovery, under Rule 34.

11         MR. GERSH:  No.  No.

12         THE COURT:  You had no agreement as to how --

13    because that's what this is.  It's electronically stored

14    information.

15         MR. GERSH:  We had -- we had no agreement.  We

16    had no discussion, Your Honor, and we've had no discussion

17    about any concerns about --

18         THE COURT:  Under Rule 34, a party must produce

19    documents as they are kept in the usual course of business

20    or must organize and label them to correspond to the

21    categories in the request.  If the request does not a

22    specify a form for producing electronically stored

23    information, a party must produce it in a form or forms in

24    which it is ordinarily maintained or in a reasonably usable

25    form or forms.

 1          MR. GERSH:  So we can't -- we can't produce the

 2   internet in the form in which it's maintained.  It's on the

 3   internet.  So what we did was --

 4          THE COURT:  When you produced this printout, did

 5   you explain any of this to the plaintiff?

 6          MR. GERSH:  Oh, absolutely.  We've had numerous

 7   discussions about what this document is and never once had

 8   an objection that it wasn't enough information or produced

 9   improperly.  You know, when we were able to get access to

10   it, we gave them access to it.

11          As I told you previously, Mr. Marbury was offered

12   access from the very, very, very first day we were here on

13   the preliminary injunction to this.  When they asked for

14   it, we got a password.  We set it up in a secure

15   environment so they could get into it and deal with it.

16   Never once heard another word about it.

17          When we produced this in hard copy, never once

18   heard a word.  Hey, this is a problem.  We don't want it

19   this way.  We want it -- we want something else from you.

20          And, in addition, I'll point out to the Court

21   that we even offered counsel the opportunity to look at the

22   game in development in a secure environment.  Never took us

23   up on that.

24          So I can't -- I can't take this internet

25   document, okay, and produce that Wiki and say --

1          THE COURT:  Is this an internet document?

2          MR. GERSH:  Yeah.  This is a document that

3    basically is an internet document.

4          THE COURT:  Internet.

5          MR. GERSH:  Internet.  It's out -- it's on the

6    internet that everybody can have access to.  Not intranet.

7          MR. STAHL:  That's not true, Your Honor.  This is

8    a document through the server of your company.

9          MR. GERSH:  I'm sorry?

10         MR. STAHL:  We access it through the internet.

11         MR. GERSH:  They access the document through the

12   inter -- oh, I'm sorry.  It is -- it is --

13         THE COURT:  But you're -- but when you do it, you

14   are basically logging on to a dedicated server that's at

15   Interplay.

16         MR. GERSH:  That's correct.  That's correct.

17         I misspoke.  It is on a server, okay, that's

18   accessed through the internet for people to work on it from

19   whenever.  Yes, it's not in the cloud.  I misspoke.  Okay.

20         MR. STAHL:  We could have seen it, Your Honor.

21   If you look at the 30(b)6 deposition where, again, Mr. Caen

22   was the witness, we asked for the game.  We, of course --

23   as of April 4 of '09, we never got it.  Not a line of

24   software.  Not a piece of code.  We asked for these types

25   of documents, design documents.

1        I'll read you again from his deposition as to

2   what this --

3        THE COURT:  When was this taken?

4        MR. STAHL:  October the 8th, 2010, Your Honor.

5        THE COURT:  Okay.  Go ahead.

6        MR. STAHL:  Your Honor, when we asked him in his

7   deposition, that same one, about this Wiki, for example, it

8   was similar to the testimony I read before, lots of

9   versions, he didn't know, et cetera, there's a question --

10  this is on page 104.  "Okay.  So the Wiki's the blueprint,

11  and then there's some other storage device somewhere else

12  that holds the actual game?

13       "Answer:  Correct.

14       "Are there any elements of the game that can be

15  played on the Wiki?

16       "No.

17       "And when did that become in existence?  That

18  was -- when was the database created?

19       "I don't know.  It's a database."

20       That's what this witness said under oath.  This

21  Wiki, a database, I don't know when it was created.

22       And we have a copy of the document, he doesn't

23  know when it was created, and it's the very document we're

24  now referring to, I think.  And I've just read you what he

25  said under oath.

 1          MR. GERSH:  Your Honor --

 2          THE COURT:  Um hum.

 3          MR. GERSH:  -- sitting there in a vacuum, not

 4   looking at a document, he may not know when it was created,

 5   I mean it doesn't necessarily make sense to know when --

 6   and in addition, there's multiple parts to this.  It's

 7   not -- it's not any one document created.  This is not like

 8   when did you draft this agreement that you signed, or when

 9   did you read this agreement that you signed?  This is a

10   living, breathing document that moves.

11          So to say I don't know when it was created, in a

12   vacuum --

13          THE COURT:  Um hum.

14          MR. GERSH:  -- is a perfectly reasonable response

15   to the question when you'd have to look at the document to

16   say, okay, the -- the combat portion of the document was --

17   portion of it was done on January 15, '09.  How do I know

18   that?  I look at the Wiki, and the Wiki tells me when this

19   was created.

20          The -- the classes, when it was created, I --

21   when were the classes created?  I don't know.  Do you need

22   something to look at?  Yeah.  If I look at the Wiki, I can

23   tell you when it was created.

24          So for the witness to have answered, "I don't

25   know," to that general of a question, I don't find

1   inappropriate at all.  He wouldn't know.  There's no way

2   that anybody could know with the amount of information.

3        We provided you 2500 pages of documents

4   concerning this Wiki.  How is he supposed to know, without

5   looking at the documents, when something specifically was

6   done?  It's -- it's absurd to think that he could.

7        THE COURT:  Is this the only document that you

8   provided in discovery evidencing the development?

9        MR. GERSH:  No.

10        THE COURT:  What other documents other than -- I

11   don't want -- Memorandum of Understanding, but -- I'm sure

12   you'll get to, but what other documents did you produce?

13        MR. GERSH:  I believe we're looking at Exhibits

14   40 -- Exhibit 48 would be screen shots, art and design.

15   Exhibit 49, pre-April 4 Fallout MMOG art and design.  Same

16   for Exhibit 50, I believe.  I got to look at the document.

17        There's a video of the Fallout-on-line that was

18   given early on in the case to show what Mr. Caen actually

19   saw that was developed when he was in Bulgaria.  That was

20   given way early on in the case.  It was provided here for

21   Mr. Marbury as part of the original --

22        THE COURT:  Is that your document 45 on this

23   list?

24        MR. GERSH:  It's our Document 45.  45, yes.

25        There's also -- if you're talking pre-April '09,

 1   pre-April '09, there is -- that's some of it.  Then there's

 2   also -- there's post-April '09 documents that -- Mr. Stahl

 3   just said we didn't give him information concerning all of

 4   that.  Not true.

 5        Going from Exhibits 63 through 67 -- I'm sorry.

 6   61 through 67 are all documents we gave concerning

 7   environmental concepts, textures, modeling, 3D art, screen

 8   shots, characters, weapons, et cetera, which we have

 9   provided.

10        I think I had mentioned 45.  46 is design art

11   documents.  45 was the -- was the video, the 90-second

12   video showing exactly what had been done.  As a matter of

13   fact, this game was -- was in development, actually

14   something somebody could play, and Mr. Caen can testify

15   exactly to what he personally did, you know, what he -- he

16   personally played this and was involved with it.

17             THE COURT:  Um hum.

18             MR. GERSH:  Plus the Wiki.

19             MR. STAHL:  Your Honor, as to each and every one

20   of those documents, most of them are Masthead documents.

21   They're complete hearsay.  There's no one here from

22   Masthead that's going to testify to it independent of Your

23   Honor's ruling.

24             THE COURT:  Um hum.

25             MR. STAHL:  We're going to object to every one of

1    them on the -- largely on the --

2            THE COURT:  I was just trying to find out where

3    we might have some discovery problems, but there are no

4    other Interplay-created documents?

5            MR. GERSH:  Oh, no, no, no, no.  Not at all.

6    These documents that I've mentioned, other than the -- the

7    video was taken by Interplay.  Okay?  The -- all of these

8    other documents --

9            THE COURT:  The video was taken by Interplay?

10           MR. GERSH:  Yeah.  Herve Caen personally took --

11    shot the video of the game that's been produced.

12           THE COURT:  All right.  Well, we haven't gotten

13    to it, but I'm trying to figure --

14           MR. GERSH:  Okay.  But the -- but --

15           MR. STAHL:  Let me correct that, if I might.  The

16    testimony is going to be he pushed a button on a computer,

17    he says, in Masthead's studio in Bulgaria, and this is

18    where this 90-second clip came from.

19           THE COURT:  Okay.  All right.  I'm --

20           MR. STAHL:  He didn't take it at all.

21           THE COURT:  -- getting ahead of my place there.

22           MR. GERSH:  The -- the --

23           THE COURT:  All right.  I have a -- what I have

24    here is a discovery problem, first, and an evidentiary

25    problem, second.

1          Interplay was late in responding properly to the

2     discovery disputes, and by February of 2011 is when this

3     document, which obviously would be responsive to pretty

4     basic discovery requests, was finally produced.  It was

5     after the 30(b)6 deposition had been taken, although there

6     was some questioning about it, I gather, at some point, and

7     that's what's creating more of a problem here.

8          I don't think Bethesda Softworks ever was, during

9     the active discovery period, under a full understanding of

10    what this Wiki was and how to maneuver through it, and

11    that's what's causing a bit of a problem now.  Had it been

12    explained that they could verify that the printout that

13    they were provided in February of 2011 was created by

14    someone manually looking at each section of the Wiki and

15    requesting it to display how that section existed prior to

16    April 4th of 2009, they could have checked it themselves?

17    Is that what you're telling me?

18          MR. GERSH:  Had they asked any questions

19    concerning it?  Was that your inquiry, Your Honor?

20          THE COURT:  Well, you gave them only a printout

21    but didn't explain how that was obtained.

22          MR. GERSH:  Nobody ever asked me to explain.

23    They didn't ask for --

24          THE COURT:  Well, except that you're producing

25    electronically stored information.  You're the one who's

 1    got an obligation to produce it in a form that can be used.

 2              MR. GERSH:  Your Honor --

 3              THE COURT:  And you had -- so -- but I'm saying

 4    because of the timing of it, it was after all the

 5    depositions, basically.

 6              MR. GERSH:  Your Honor, they seem to be taking --

 7    of the opinion that they're precluded, once they got this

 8    document, for asking to take a deposition of the person

 9    most knowledgeable.  They did nothing.  They got --

10              THE COURT:  And is that Mr. Caen, or is there

11    someone else at Interplay who would be the one to ask?

12              MR. GERSH:  To ask concerning -- the creation --

13              THE COURT:  This is electronically --

14              MR. GERSH:  Mr. Caen.  Mr. Caen.  Okay?  And

15    they -- they never once requested any information

16    concerning this, nor did we ever have an understanding that

17    the way in which it was produced was improper or not

18    adequate for their needs.  As I've indicated, while the

19    access code was provided in August, never had a question

20    concerning it, could have had any questions they wanted to.

21              Look, part of the problem is there was a vast

22    amount of documents here to put together --

23              THE COURT:  Yeah, but this one --

24              MR. GERSH:  -- and we --

25              THE COURT:  You have to acknowledge that this is

 1    a pretty critical document.

 2              MR. GERSH:  I do acknowledge that it's a critical

 3    document.  I do --

 4              THE COURT:  And it wasn't produced until February

 5    2011 even though, as you now say, it existed in this form

 6    in April of 2009.  And it was not produced until February

 7    of 2011.

 8              MR. GERSH:  It was produced in response to the

 9    discovery in February of 2011 --

10              THE COURT:  Um hum.

11              MR. GERSH:  -- but I don't think that the fact

12    that it was produced during discovery, whether it was

13    produced in February -- remember, the lawsuit was in

14    2000 and --

15              THE COURT:  '9.

16              MR. GERSH:  -- '9, was in the latter part of

17    2009.  I believe we were here in December or -- yeah.

18              THE COURT:  Lawsuit was filed September 8th,

19    2009.

20              MR. GERSH:  Okay.  And we -- we produced -- we

21    produced this entire Wiki for them and never once had an

22    objection to the manner in which it was produced, that they

23    wanted something different, that they wanted anything else

24    to get into it.  So we produced it.

25              When they asked us for an electronic version of

1   that, we ended up having to create a secure environment and

2   got them the password and the Wiki.

3              MR. STAHL:  Your Honor --

4              MR. GERSH:  I understand -- am I done?  I

5   understand --

6              THE COURT:  All right.  I'm going to look at the

7   motion now.  It's Paper 70, I believe.  Was the motion to

8   compel.

9              MR. STAHL:  May I make one other point, Your

10   Honor, before you do that?  The fact that the first quote I

11   read from the 30(b)6 deposition of Interplay, where

12   Mr. Caen was the witness designated as the person most

13   knowledgeable about the documents, he said, with regard to

14   the Wiki, "Are there multiple versions of the Fallout MMO

15   Wiki?

16              "Answer:  Wiki.  There are, yes.

17              "And is there any document that explains what

18   different versions there are?

19              "I don't think so.

20              "So how would one be able to tell what version of

21   the Wiki one is looking at?

22              "Answer:  The Wiki is an evolving document.  It

23   changes every time somebody touches it.  Every time

24   somebody touches it, there's a new version of it which has

25   evolved."

1    We were -- we were led to believe exactly the

2  opposite of what's being argued to Your Honor today, that

3  you couldn't tell when any particular version was done.

4  And more fundamentally, as to the electronic document, do

5  you know how many times we asked for the pass code to get

6  access to the -- what we were entitled to under Rule 34?

7  We know the rule.  We got it at the end of August or the

8  beginning of September, after discovery had closed?

9    MR. GERSH:  Your Honor, that's the same --

10    MR. STAHL:  And after, Your Honor, I think, the

11  second sanctions motion.

12    MR. GERSH:  Your Honor, that's the same passage

13  that was read before, and I stand by exactly what we said

14  previously.  The witness wouldn't know the date of the

15  document without looking at the document, and they had the

16  document.

17    THE COURT:  Well, yeah, but they asked him is

18  there any way to find out when it was done, and he didn't

19  say at that time that this Wiki could tell you that you

20  could query the Wiki itself.

21    MR. GERSH:  I don't know -- to be honest with

22  you, I don't know the answer, but I'm not sure the witness

23  knew, without looking at the document, that you could query

24  it.

25    THE COURT:  Well, somebody had to know,

 1    Mr. Gersh.  You're now telling me this.

 2            MR. GERSH:  Your Honor, he is the president of

 3    the company that oversaw the document, not the creator.

 4            THE COURT:  Why did I ask you before isn't there

 5    someone else who's going to come in and tell me about this?

 6            MR. GERSH:  You did.

 7            THE COURT:  All right.  And you told me no, he's

 8    the one who knows the most about it.

 9            MR. GERSH:  Because he's the -- he is the

10    president of the company.  It is a business record that the

11    company maintains --

12            THE COURT:  Oh, well --

13            MR. GERSH:  -- that employees work on this --

14            THE COURT:  Um hum.

15            MR. GERSH:  -- and they make changes to it as it

16    goes along.  And so he was able, I believe his testimony

17    is, or at least the understanding of his testimony, is he

18    was able to determine a particular point in time, and

19    that's what we gave them in February of 2011, the Wiki, as

20    it existed as of that -- as of '09.

21            THE COURT:  All right.  I'm -- now, give me a

22    moment.  I have up here the motion to compel that was

23    granted in January of 2011 that led to the production of

24    this printed document.  Let me just take a moment here and

25    look at it again.

1          (Pause.)

2          THE COURT:  I see nothing in the motion or the

3   responses to it indicating that what we were dealing with

4   in its Document Request 34 entailed electronically stored

5   information.  I don't know that I have all the

6   communications that went back and forth between counsel

7   concerning that.

8          Mr. Stahl, when you first got this printout of

9   the Wiki, you understood it was electronically stored

10  information?

11         MR. STAHL:  We didn't understand anything about

12  it other -- we just got it.  Remember, the depositions had

13  been concluded.  The 30(b)6 was over with.  I don't believe

14  we took another deposition -- I don't think we took another

15  deposition.  We got it without any explanation of what it

16  was or where it came from or, more fundamentally, Your

17  Honor, what it purported to be.

18         As you recall, we had had this raging -- raging.

19  We had had this contested argument pre-April of '09,

20  post-April of '09.  This document's dated February 11.

21  Maybe it's post-April of '09.  We don't have any way of

22  knowing what the date is of that, but --

23         THE COURT:  Okay.  When they produced it to you,

24  it didn't designate what it was?

25         MR. STAHL:  No.  We --

 1          THE COURT:  And your Request Number 34, I think,

 2  is what it responded to.

 3          MR. GERSH:  Your Honor, this was a -- this was a

 4  response to a motion to compel because we asserted what we

 5  believed were valid objections to producing this

 6  information --

 7          THE COURT:  Right.  You didn't understand what

 8  full-scale development meant, and I said do your best.

 9          MR. GERSH:  And we -- we said that some of this

10  information was trade secret and confidential and --

11          THE COURT:  And we had -- and we -- and it was

12  marked outside counsel only.

13          MR. GERSH:  Correct.  By virtue of the motion,

14  this all happened.  And after you determined that we should

15  produce the information, confidential, outside counsels

16  only, which they would not agree to --

17          THE COURT:  Um hum.

18          MR. GERSH:  -- and while you did order production

19  of it, we timely produced the document.

20          THE COURT:  But without an explanation as to what

21  it was.

22          MR. STAHL:  None.

23          MR. GERSH:  It -- it -- it was responsive to --

24  to their request in Number 34.  I don't have the request,

25  but I believe it was information to show full-scale

1    development.

2              THE COURT:  Full scale?  Well, did --

3              MR. GERSH:  And if --

4              THE COURT:  No, no, no, no.  Was it marked as

5    being responsive to 34 as opposed to 36 or 37?

6              MR. GERSH:  Yes.

7              THE COURT:  Oh, okay.

8              MR. STAHL:  Your Honor, these documents just

9    came.  And more fundamentally than anything, this came --

10   Your Honor, you'll recall, you ordered them to honor our

11   document request under Rule 34.  They gave us what they

12   gave us, and they didn't give us, obviously, anything

13   electronic.

14             They never told us that it was manipulatable,

15   that you could move it to get it back to April '09 or that

16   it was some other date.  We didn't have any clue of

17   anything.  There was no explanation of it.

18             We kept asking for the code, meaning we knew that

19   it had to be electronically stored somewhere.  We kept

20   asking for it.  We didn't get it until the end of

21   discovery, until after discovery had closed.

22             Had we gotten it and had anyone explained to us,

23   which they never did, and they haven't even today, that you

24   could somehow manipulate this to make it freeze as of April

25   of '09, maybe that would have helped solve some of this

1    problem.  Not all of it because we still have the

2    evidentiary problem of business records to deal with, but

3    none of that happened.

4             And, in fact, we were handicapped more, Your

5    Honor, because it was marked, "Attorneys' eyes only,"

6    which, as you'll recall --

7             THE COURT:  Until the pre-trial, right.

8             MR. STAHL:  And then at the end of it, when we

9    were going to bring this again to Your Honor's attention,

10   they dropped the designation as to every single document at

11   one time.

12            So then, and only then, could we share it with

13   our clients, who have some understanding of what these

14   things are as opposed to me, and then we were even more

15   flummoxed about what it was when we -- that's when we kept

16   asking where is the password?  How do we get into the

17   electronic information?

18            So, Your Honor, this is like so many of the other

19   things.  We don't know whether it's pre or post.  We don't

20   know what it really purports to be.  We don't -- everybody

21   had access to it, apparently at Interplay.  It's an

22   evolving document.

23            The witness says it's a design document.  He

24   doesn't know how many versions there are.

25            How do you think we feel?

1          MR. GERSH:  Your Honor, the -- we've never been

2    asked for the code.  We don't own the code.  The code is

3    owned by Masthead.  We were asked --

4          THE COURT:  Wait a minute.  No, no, no.  Okay.

5    Now you're getting into --

6          MR. GERSH:  Counsel said we were asked for the

7    code.  Okay?  We've never been asked for the source code,

8    and we don't own the source code.

9          THE COURT:  Well, you're now putting the word

10   source before code.  I don't --

11         MR. GERSH:  Okay.

12         THE COURT:  So don't get ahead of what I'm

13   capable of understanding.

14         MR. GERSH:  I only know of -- I only know code as

15   one thing, is to be source code.

16         As to the electronic version of that document,

17   Your Honor, I just remind the Court that when we had a

18   discovery dispute over what should be produced and how it

19   should be produced, we could not get an agreement with

20   counsel.  Came before you.  You indicated we needed to

21   produce it, and you even granted our request that it could

22   be outside counsels' eyes only, and it was produced in a

23   hard form.  Okay?

24         Subsequent to that, they've never come back and

25   said can I get into it?  How do I get into it?  Should I

1  take a deposition?  Should I ask Mr. Caen more information

2  concerning that?  Should I ask for another 30(b)6 witness

3  concerning it?  They did nothing.  And then they come here

4  and complain they don't have the information.

5         I -- look, the documents were provided as you

6  ordered, and they were provided confidential, attorneys'

7  eyes only.  I can't designate the -- the Wiki, as such, on

8  a document, but I did designate the hard copies, which

9  seemed to make the most sense.  That's what we did, and we

10  produced what we were ordered to produce.

11         MR. STAHL:  Your Honor, if I might be heard on

12  this?

13         THE COURT:  Um hum.

14         MR. STAHL:  We wrote to Mr. Gersh on May the

15  31st, 2011, Mr. LoBue did, where he said, with regard to

16  this very issue -- I want to remind Your Honor of something

17  Your Honor already knows.  There's a continuing obligation

18  under the rules to supplement your Answers to

19  Interrogatories, document requests, et cetera, as new and

20  additional documents come available.  They never did that.

21         But listen to what we did, Your Honor, the end of

22  May, before the discovery cut off.  "Furthermore, in the

23  supplemental response of Interplay Entertainment

24  Corporation's Request for Production of Documents, Numbers

25  33 and 34, Set Number 2, Interplay stated that there are

1   additional documents contained in Interplay's

2   Fallout-on-line Wiki that have not been produced.  As to

3   these documents, Interplay stated that it would provide

4   Bethesda's counsel, upon request, log-in and password

5   information that would permit review of the documents on a

6   secure internet site.  Bethesda hereby requests that

7   Interplay provide the internet address, log-in information

8   and password necessary to permit access to these additional

9   documents.  Sincerely" -- there's another paragraph --

10  "Joseph LoBue."

11          We got that end of August or September, October

12  of this year.  And if Your Honor would like, I'll hand a

13  copy of this letter -- I'll hand you this letter.  We don't

14  have a copy, but I'll be glad to give it to you.

15          It's either September or October, Your Honor, we

16  got the password.

17          MR. GERSH:  It was actually provided in August.

18  I have the correspondence.

19          (Pause.)

20          THE COURT:  All right.  I think we probably all

21  can use a break.  We've been here for more than two hours,

22  so I'm going to take a recess.  We'll resume in ten

23  minutes.

24          (Recess.)

25

1

2

3                     COURT REPORTER'S CERTIFICATE

4                               -oOo-

5          I certify that the foregoing is a correct

6    transcript from the record of proceedings in the above

7    matter.

8

9    Date:

10                                /s/ _____

11                                Sharon O'Neill

12

13

14

15

16

17

18

19

20

21

22

23

24

25